**23-2235**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers,

*Plaintiff–Appellant,*

v.

DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review,

*Defendant–Appellee.*

On appeal from the United States District Court for the
Eastern District of Virginia — No. 1:20-cv-00731-LMB-JFA (Brinkema, L.)

# BRIEF FOR APPELLANT

Ramya Krishnan
Alexia Ramirez
Xiangnong Wang
Alex Abdo
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

Victor M. Glasberg
Nickera Simone Rodriguez
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100
vmg@robinhoodesq.com

*Counsel for Plaintiff–Appellant*

## Table of Contents

Table of Authorities ................................................................................. ii

Introduction ........................................................................................... 1

Statement of Jurisdiction ..................................................................... 4

Statement of Issues on Appeal ............................................................ 4

Statement of the Case .......................................................................... 4

Summary of Argument ....................................................................... 13

Standard of Review ............................................................................ 15

Argument ............................................................................................ 16

    I.    The Civil Service Reform Act does not impliedly divest district
        court jurisdiction over NAIJ's claims ...................................... 16

        A.    NAIJ's claims would not receive meaningful judicial review
              through the CSRA. ...................................................... 18

            1.    The CSRA does not apply to NAIJ's claims because
                    NAIJ is challenging a broad prior restraint on
                    employee speech—not a covered employment action. ....... 19

            2.    Even if NAIJ's claims fell within the CSRA, NAIJ
                    still could not obtain meaningful judicial review
                    through the statute. ........................................................... 26

        B.    NAIJ's claims are wholly collateral to the CSRA because
              they are not an attempt to reverse a covered employment
               action. ........................................................................... 31

        C.    NAIJ's claims are outside the Merit Systems Protection
              Board's expertise. ........................................................ 33

Conclusion .......................................................................................... 34

Statement Regarding Oral Argument .................................................. 35

## Table of Authorities

**Cases**

*Able v. United States*, 88 F.3d 1280 (2d Cir. 1996) ................................................. 30

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ..................................................... passim

*Bennett v. SEC*, 844 F.3d 174 (4th Cir. 2016) ........................................... 17, 29, 31

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019)...................................... 29

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012)................................................... passim

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................... 29

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) ..................... passim

*Firenze v. NLRB*, No. 12-CV-10880, 2013 WL 639151 (D. Mass. Jan. 10, 2013) .............................................................................................. 25

*Fleming v. Spencer*, 718 Fed. App'x 185 (4th Cir. 2018) ............................... 27, 28

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005)...................................................... 32

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)........................................................................ 3, 17, 28, 31

*Hesse v. Dep't of State*, 217 F.3d 1372 (Fed. Cir. 2000)....................................... 20

*Krafsur v. Davenport*, 736 F.3d 1032 (6th Cir. 2013) ........................................... 29

*Lucero v. Early*, 873 F.3d 466 (4th Cir. 2017) ..................................................... 15

*Manivannan v. Dep't of Energy*, 42 F.4th 163 (3d Cir. 2022).......................... 19, 21

*NAIJ v. McHenry*, 477 F. Supp. 3d 466 (E.D. Va. 2020) ...................................... 11

*NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339 (4th Cir. June 7, 2022) ............... 12

*NAIJ v. Neal*, No. 20-1868, 2022 WL 997223 (4th Cir. Apr. 4, 2022) ................. 12

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ............................................. 23, 29

*Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) ............................................................................................................ 32

*Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) .................................................... 23, 27

*Ramirez v. U.S. Customs and Border Prot.*, 709 F. Supp. 2d 74 (D.D.C. 2010) .................................................................................... 21, 26, 30

*Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022) .................................................................................................... 21, 30, 32

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ......................................................... 16

*Thunder Basin Coal. Co. v. Reich*, 510 U.S. 200 (1994) ................................. 13, 27

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................................................................... 2, 20, 25

*United States v. NTEU*, 513 U.S. 454 (1995) ................................................. 2, 15, 16

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ....................... passim

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) .............................................. 16

*Yates v. United States*, 574 U.S. 528 (2015) ......................................................... 22

**Statutes**

5 U.S.C. § 1214 ............................................................................................... 23, 26, 29

5 U.S.C. § 2302 ............................................................................................... 19, 20, 22

5 U.S.C. § 7501 ......................................................................................................... 20

5 U.S.C. § 7502 ......................................................................................................... 20

5 U.S.C. § 7503 ................................................................................................... 20, 21

5 U.S.C. § 7504 ......................................................................................................... 20

5 U.S.C. § 7512 ................................................................................... 20, 31

5 U.S.C. § 7513 ............................................................................. 21, 23, 31

5 U.S.C. § 7703 ................................................................................. 23, 31

8  U.S.C. § 1101 ...................................................................................... 4

8 C.F.R. § 1003.10 (2021) ...................................................................... 4

## Introduction

This case, brought by the National Association of Immigration Judges ("NAIJ"), challenges a sweeping prior restraint that the government has imposed on the speech of the nation's approximately 750 immigration judges. Under a policy issued in 2021 ("Policy"), the Executive Office for Immigration Review ("EOIR") categorically prohibits immigration judges from speaking publicly in their private capacities about immigration law and policy or about EOIR programs or policies. On these topics, judges can seek approval to speak in an official capacity—that is, to be a mouthpiece for the agency—but they cannot share their private views. At a time of spirited public debate over the nation's immigration policies, the policy imposes a gag order on public servants in a unique position to educate the public about the immigration system and the effect of recent changes to immigration law and policy. This gag order violates the First and Fifth Amendments.

The district court dismissed NAIJ's challenge, however, based on its conclusion that the Civil Service Reform Act ("CSRA" or "Act") impliedly divested it of jurisdiction over NAIJ's claims. This holding was wrong. As the Supreme Court has taught, courts may infer congressional intent to divest district court jurisdiction over a plaintiff's claims only where that intent is "fairly discernible" from the text, structure, and purpose of an alternative scheme of review. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). No such intent is discernible here. The CSRA provides for

review of routine employment actions taken against individual employees—not of broad prior restraints on speech of the kind the Policy imposes here. For that reason, neither NAIJ nor its members could have challenged the Policy through the CSRA, and so they could not have obtained any judicial review—let alone meaningful judicial review—of their serious constitutional claims through the statutory scheme. As the Supreme Court has consistently recognized when assessing congressional intent to channel claims, "Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023).

It is unsurprising, therefore, that the Supreme Court and lower courts have long permitted federal employees to challenge employee speech policies directly in district court, so long as the challenges target the policies themselves rather than a specific sanction for non-compliance. *See, e.g.*, *United States v. NTEU*, 513 U.S. 454 (1995); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 367 (D.D.C. 2020). As the Fifth Circuit recently held in an analogous decision allowing federal employees to challenge President Biden's vaccine mandate in district court, "the CSRA creates a decades-old, well-established, bright-line rule: Federal employees must bring challenges to CSRA-covered personnel actions through the CSRA, but they remain free to bring other, non-CSRA challenges under the district courts' general § 1331

jurisdiction." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 373 (5th Cir. 2023) (en banc), *cert. granted and vacated as moot*, No. 23-60, 2023 WL 8531839 (U.S. Dec. 11, 2023).

The implications of the district court's holding to the contrary, if affirmed, would be stark. If the CSRA impliedly withdrew district court jurisdiction over pre-enforcement challenges to prior restraints on speech, the free speech rights of federal employees would be nearly impossible to vindicate. The federal government could impose far-reaching restrictions on the speech of its employees, but those employees would be unable to challenge the restrictions in district court—or through the CSRA's review scheme—unless the employees first risked their employment and their livelihood by violating the restrictions. But as the Supreme Court said in rejecting a similar argument made by the government in another case, "We normally do not require plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). The reason speaks for itself: plaintiffs should not have to risk sanction to vindicate their constitutional rights.

The Court should reverse the district court's decision granting Defendant's motion to dismiss and remand for further proceedings.

**Statement of Jurisdiction**

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. The district court had jurisdiction over the underlying action under 28 U.S.C. § 1331 and the U.S. Constitution. The district court entered an order granting Defendant's motion to dismiss on September 21, 2023. Op. 44 (JA107). NAIJ filed a timely notice of appeal on November 19, 2023. JA114–JA115.

**Statement of Issues on Appeal**

1.  Did the district court err in holding that the Civil Service Reform Act impliedly divested it of jurisdiction over NAIJ's First and Fifth Amendment challenge to a policy that imposes a broad prior restraint on the private speech of hundreds of immigration judges?

**Statement of the Case**

Immigration judges are administrative judges who exercise the authority of the United States Attorney General to adjudicate immigration proceedings. SAC ¶ 13 (JA017); *see also* 8 U.S.C. § 1101(b)(4); 8 C.F.R. § 1003.10 (2021). In this role, they preside over immigration hearings as neutral and impartial arbiters. SAC ¶ 13 (JA017). Immigration judges undertake this work as employees of EOIR, an agency within the Department of Justice. *Id.* ¶ 12 (JA017).

NAIJ is a non-partisan, non-profit voluntary association of immigration judges formed to promote the independence, dignity, professionalism, and efficiency of the U.S. immigration courts. *Id.* ¶ 11 (JA016–JA017). From 1979 to 2022, NAIJ was the certified bargaining representative for all non-supervisory immigration

judges. *Id*. ¶ 11 (JA016–JA017). NAIJ was formally decertified on April 15, 2022; however, it remains a voluntary association of immigration judges and continues to have hundreds of dues-paying members. *Id.* ¶ 11 (JA016–JA017).

<u>EOIR's Speaking Engagement Process Prior to 2021</u>

In addition to serving as judicial officers, many immigration judges are also active members of their civic communities who wish to speak to the public in their roles as private citizens. Prior to 2017, immigration judges regularly spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration law trainings—all in their private capacities, and all without interfering with the work of EOIR. SAC ¶ 17 (JA019). Their efforts helped to educate and inform the public about the immigration courts and made the immigration system more transparent. *Id.* ¶ 14 (JA017).

While approval was required for these activities, immigration judges routinely received that approval. *Id.* ¶ 18 (JA019). Under the then-existing process, judges would submit requests to speak in their private capacities to their supervising Assistant Chief Immigration Judge (the "supervisor"). *Id.* ¶ 18 (JA019). If the judge's supervisor approved their request—typically given as a matter of course—the supervisor would forward the request to EOIR's Ethics Program, which would then offer ethics guidance to the judge. *Id.* ¶ 18 (JA019). Judges were generally permitted to use their official titles to identify themselves in connection with their

speaking or writing, so long as they included a disclaimer stating that the views presented were their own and not those of EOIR. *Id.* ¶ 18 (JA019). This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges (the "Ethics Guide"). *Id.* ¶ 18 (JA019).

Beginning in 2017, however, EOIR issued a series of policies sharply limiting the ability of judges to engage in private speech. *Id.* ¶ 19 (JA020). The first such policy established a new and significantly more onerous preapproval process for speaking engagements. *Id.* ¶ 21 (JA020); Attach. 1 to SAC (JA041–JA045) (the "2017 Policy"). Under this policy, supervisors were granted discretion to decide whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. SAC ¶ 22 (JA020). Judges who wished to speak about "immigration-related topics" or whose requests were reclassified as "official capacity," were required to seek a second level of approval from the centralized speaking engagement team (the "SET"). *Id.* ¶ 22 (JA020). The policy did not specify any criteria for EOIR officials to consider in determining whether to approve speaking requests. *Id.* ¶ 23 (JA021). Nor did it require officials to make decisions within any particular time frame. *Id.* ¶ 23 (JA021).

In 2020, EOIR replaced the 2017 Policy with a still more restrictive one that categorically prohibited judges from speaking or writing in their private capacities

about immigration or EOIR. *Id.* ¶ 26 (JA021–JA022); Attach. 2 to SAC (JA048–JA053) (the "2020 Policy"). The 2020 Policy effected this prohibition by labeling all speech on or about "immigration law or policy issues" or "agency programs and policies" as "official" speech. SAC ¶ 26 (JA021–JA022). For all other topics, the policy continued to require judges to seek preapproval, but subjected requests for preapproval to four layers of review: by the judge's supervisor, by the SET, by the Ethics Program, and by their supervisor for a second time. *Id.* ¶ 26 (JA021–JA022). Like the 2017 Policy, the 2020 Policy did not cabin the discretion of EOIR officials to grant or deny speaking requests, and it failed to impose any firm deadline for decision. *Id.* ¶ 27 (JA022).

<u>EOIR's 2021 Policy</u>

On October 12, 2021, EOIR Director David L. Neal issued the currently operative speaking policy, which retains the central flaws of its predecessor. *Id.* ¶ 28 (JA022); Attach. 3 to SAC (JA056–JA062) (the "Policy").

Most significantly, the Policy continues to categorically prohibit immigration judges from speaking about immigration or EOIR in their private capacities. *See* Op. 5 (JA068). The Policy does so by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." SAC ¶ 29 (JA022); *see also* Policy at 2 (JA057); Op. 5–6 (JA068–JA069). As the district court noted, Attachment A to the

Policy "confirm[s]" that EOIR considers immigration to be "a subject matter that directly relates" to an immigration judge's duties because many of the attachment's examples of "personal capacity" speech "explicitly exclude[]" speech about immigration—for instance, "moot court judge – not immigration related," "commencement speaker when topic is unrelated to immigration or official duties," and "speaking at community, religious, youth, or small social groups . . . and meetings, not directly related to immigration law or advocacy." Op. 6 (JA069) (quoting Policy at 7 (JA062)).

The Policy has the unsurprising effect of silencing immigration judges on topics that are of substantial public interest. Many of NAIJ's members wish to contribute to public and scholarly discourse concerning developments in immigration law and policy, but the Policy prevents them from doing so. *See* SAC ¶¶ 47–55 (JA028–JA034); Policy at 2–4, 7 (JA057–JA059, JA062). For example, the Policy stops immigration judges from speaking at law schools about their experiences as immigration judges; it forbids them from expressing any personal views on immigration court procedure during panel presentations at national and international legal conferences; and it prevents them from publishing scholarly perspectives on substantive questions of immigration law in law reviews and legal magazines. Civic organizations and instructors that once hosted immigration judges at their events and classes can no longer do so. SAC ¶¶ 58–62 (JA034–JA036). Many

event organizers have concluded that the Policy makes it futile to invite sitting immigration judges to participate in speaking engagements, and some have stopped extending these invitations altogether. *Id.* ¶¶ 58–62 (JA034–JA036). The result is that the public is denied access to important insights and knowledge about how the immigration system operates in practice. *Id.* ¶ 39 (JA025–026).

Some judges have nevertheless tried to continue to speak publicly by seeking approval to do so in an official capacity, in the hope that the agency will agree with their private views and, therefore, allow them to present those views as the official views of the agency. SAC ¶¶ 49, 52, 54 (JA029–JA033). But speaking in an official capacity renders a judge a spokesperson for the agency. *Compare* Policy at 2 (JA057) (explaining that employees who speak in an "official capacity" do so "on behalf of the agency") *with* Policy at 3 (JA058) (noting that employees who speak in a "personal capacity" do not speak on behalf of the agency and accordingly "may not state or imply that EOIR endorses or sanctions the speaking engagement"). And as a mouthpiece for the agency, judges are restricted to sharing only the agency's official positions—they cannot share their private views. Indeed, judges who seek approval to speak in an official capacity are frequently asked to modify the content of their proposed speech as a condition of receiving approval. SAC ¶¶ 49–52 (JA029–JA032). In some cases, they are told that they cannot address certain issues at all. *Id.* ¶ 54 (JA032–JA033).

Immigration judges who attempt to speak about immigration law or policy in an official capacity encounter serious procedural hurdles, as well. SAC ¶ 34 (JA024). Judges who seek approval must undergo multiple layers of review. Requests are reviewed first by the judge's supervisor. *Id.* ¶ 34 (JA024). If the supervisor determines that the request relates to the judge's official duties, the supervisor must forward the request to the SET for review, regardless of the judge's proposed capacity. *Id.* ¶ 34 (JA024). The Ethics Program will also "receive and review" all requests that relate to a judge's official duties. Policy at 3 (JA058). Although the Ethics Program "does not approve or deny requests to speak, it offers guidance to avoid speakers' ethical dilemmas." *Id.* at 3 (JA058). After the supervisor completes a "final review" of the judge's request, "including consideration of any guidance received from the SET," they will approve or deny the request and inform the judge of their decision and of any guidance from the Ethics Program. SAC ¶ 34 (JA024). The Policy's preapproval scheme does not cabin the discretion of agency officials to grant or deny requests. *Id.* ¶¶ 36–37 (JA024–JA025). Nor does it impose any firm deadline for decision. *Id.* ¶ 38 (JA025). Indeed, members who seek preapproval often encounter severe delays—or receive no formal response at all—making it difficult

to participate in proposed engagements regardless of whether their requests are ultimately approved. *Id.* ¶¶ 50–52, 54 (JA030–JA033).[1]

## Procedural History

When NAIJ brought this lawsuit in 2020, it raised First and Fifth Amendment claims against the 2017 and 2020 policies and moved for a preliminary injunction. *See* Dkt. Nos. 1, 9 (JA003–JA004). On August 6, 2020, the district court denied NAIJ's motion, holding that the Federal Service Labor-Management Relations Statute impliedly divested it of jurisdiction over NAIJ's claims. *NAIJ v. McHenry*, 477 F. Supp. 3d 466, 471–72 (E.D. Va. 2020). The court reached this conclusion because NAIJ was, at that time, a certified bargaining representative that could raise bargaining disputes through the administrative process established by the labor statute. *Id*.

NAIJ appealed the district court's decision to this Court on August 7, 2020. Dkt. No. 32 (JA006). The Court initially stayed the appeal to give EOIR's new leadership an opportunity to revise the 2020 Policy, resulting in the current Policy.

---

[1] Although the Policy purportedly "eliminates" the preapproval requirement for "personal capacity" speech "unrelated to an immigration judge's official duties," it continues to subject some such speech to prior review. SAC ¶¶ 30–32 (JA022–JA023). In particular, if a judge's proposed speaking engagement is during working hours, the Policy requires the judge to submit a leave request; the judge's supervisor is then entitled to "inquire how [the judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself. Policy at 2 (JA057).

*See* SAC ¶ 28 (JA022). On April 4, 2022, this Court issued an unpublished per curiam opinion affirming the district court's judgment. *NAIJ v. Neal*, No. 20-1868, 2022 WL 997223, at \*2 (4th Cir. Apr. 4, 2022). Prior to the mandate issuing, however, NAIJ was formally decertified, leading NAIJ to petition for rehearing. *See* Petition for Rehearing at 1, *NAIJ v. Neal*, No. 20-1868 (4th Cir. Apr. 27, 2022). The Court granted this petition, vacated its decision and the district court's order, and remanded for further proceedings. *NAIJ v. Neal*, No. 20-1868, 2022 WL 2045339, at \*1 (4th Cir. June 7, 2022).

On August 18, 2022, NAIJ filed an amended complaint describing the Policy and NAIJ's changed status, and on October 7, 2022, Defendant filed a motion to dismiss. Dkt. Nos. 47, 49 (JA008). The district court dismissed NAIJ's claims for lack of standing but granted NAIJ leave to amend its pleadings. Dkt. No. 62 (JA009). On January 9, 2023, NAIJ filed its second amended complaint, and on February 1, 2023, Defendant again filed a motion to dismiss. Dkt. Nos. 65, 68 (JA009–JA010). The district court granted Defendant's motion on September 21, 2023, determining that while NAIJ has standing to pursue its claims, the CSRA impliedly divested the court of jurisdiction over those claims. Op. 1–2 (JA064–JA065).

On November 19, 2023, NAIJ timely filed its notice of appeal. JA111–JA112.

## Summary of Argument

The district court erred in concluding that the CSRA impliedly divested it of jurisdiction over NAIJ's claims. The Supreme Court has made clear that courts may infer congressional intent to withdraw district court jurisdiction only where it is evident from the statute's text, structure, and purpose that Congress intended the statute to be an exclusive avenue for review *and* where it is evident that Congress intended the kinds of claims in question to be routed through the scheme. Here, while there is no dispute that the CSRA provides the exclusive avenue for review of certain employment-related claims, Congress did not intend for the kinds of claims raised in this case by NAIJ to fall within the statute's ambit. NAIJ brings a simple pre-enforcement challenge to a far-reaching prior restraint on the speech of federal employees. Nothing in the CSRA's text, structure, or purpose suggests that Congress intended for this kind of claim to be routed through the statute's review scheme.

Indeed, under the three factors that the Court identified in *Thunder Basin Coal. Co. v. Reich*, 510 U.S. 200 (1994), as relevant to determining congressional intent, it is clear that the district court has jurisdiction over NAIJ's claims. First, and most significantly, NAIJ cannot obtain meaningful judicial review of its claims through the CSRA because it is not challenging a CSRA-covered action. The CSRA provides for review of "typical, everyday" individual employment decisions. *Feds for Med. Freedom*, 63 F.4th at 375. But the Policy is not a routine employment

13

decision taken against a specific employee—it is a broad prior restraint on constitutionally protected speech. For that reason, NAIJ cannot challenge the Policy through the CSRA, and so it cannot obtain any judicial review—let alone meaningful judicial review—of its constitutional claims through the statutory scheme. Even if NAIJ could challenge the Policy through the CSRA, NAIJ still could not obtain meaningful judicial review, because judicial review would depend on the unreviewable discretionary decisions of the Office of Special Counsel ("OSC"), which could (and likely would) reject any challenge to the Policy, thereby ending any prospect for further review. In any event, any judicial review theoretically obtainable through the CSRA would come too late to remedy the "here-and-now" injury caused by EOIR's unconstitutional prior restraint. *Axon Enter., Inc.*, 598 U.S. at 191 (cleaned up).

The remaining *Thunder Basin* factors also weigh strongly against cutting off jurisdiction. NAIJ's constitutional claims are wholly collateral to the CSRA because they are not the "vehicle" by which NAIJ seeks "to reverse" removal or some other employment action covered by the scheme. *Elgin*, 567 U.S. at 22. And NAIJ's claims are beyond the specific expertise of the Merit System Protection Board ("MSPB"), the agency charged with resolving disputes under the CSRA.

Accepting the district court's holding to the contrary would also imply that the Supreme Court's seminal decision on the free speech rights of public employees

was wrongly decided. Just one year after *Thunder Basin*, the Supreme Court decided *United States v. NTEU*, 513 U.S. 454 (1995), in which the Court exercised jurisdiction over a First Amendment claim virtually identical to NAIJ's—brought by federal employees challenging a broad prior restraint on employee speech—without even mentioning the possibility of administrative channeling. Instead, the Court resolved the employees' claims on the merits, holding that a ban on federal employees accepting honoraria was an unconstitutional prior restraint. In fact, the D.C. Circuit cited the Court's decision in *NTEU* just one year later again when it expressly rejected the argument that the CSRA precludes district court review of "a simple pre-enforcement attack on a regulation restricting employee speech." *Weaver*, 87 F.3d at 1434.

For these reasons and those below, this Court should reverse the district court's grant of Defendant's motion to dismiss and remand for further proceedings.

## Standard of Review

This Court reviews the grant of a motion to dismiss *de novo*, "accept[ing] as true all well-pleaded facts in a complaint and constru[ing] them in the light most favorable to the plaintiff." *Lucero v. Early*, 873 F.3d 466, 469 (4th Cir. 2017) (quoting *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017)).

# Argument

## I. The Civil Service Reform Act does not impliedly divest district court jurisdiction over NAIJ's claims.

The central conclusion of the district court—that the CSRA impliedly divests it of jurisdiction over NAIJ's claims—is incorrect. Time and again, federal courts considering First Amendment challenges to employee speech regulations have either rejected or declined to address the jurisdictional argument that the district court endorsed here. *See, e.g.*, *NTEU*, 513 U.S. 454; *Weaver*, 87 F.3d at 1433–35; *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995); *Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006). Even the Supreme Court, in its seminal decision in *NTEU*, invalidated employee speech restrictions in a challenge brought originally in federal district court by federal employees that were subject to the same statutory scheme at issue here. *NTEU*, 513 U.S. 454. In doing so, the Court did not so much as mention the question of jurisdiction. This is not surprising: Under the framework announced in *Thunder Basin*, it is clear that the CSRA does not withdraw district court jurisdiction over a "simple pre-enforcement attack on a regulation restricting employee speech." *Weaver*, 87 F.3d at 1434.

In *Thunder Basin*, the Supreme Court established a two-step test for determining whether a remedial scheme enacted by Congress impliedly divests district court jurisdiction over a plaintiff's claims. Under the first step, courts must ask "whether Congress's intent to preclude district court jurisdiction is 'fairly

discernible in the statutory scheme.'" *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016) (quoting *Thunder Basin*, 510 U.S. at 207). The Supreme Court has already held that such intent is manifest in the CSRA, *see Elgin*, 567 U.S. at 12, and so only the second step of the *Thunder Basin* inquiry is at issue here. Under this second step, courts must assess "whether [the plaintiff's] claims are of the type Congress intended to be reviewed within this statutory structure." *Bennett*, 844 F.3d at 181 (quoting *Thunder Basin*, 510 U.S at 212).

In this, as in any statutory analysis, courts must be guided by "text, structure, and purpose." *Elgin*, 567 U.S. at 10. But three considerations help focus the inquiry. "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim"? *Axon Enter., Inc.*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13). "Next, is the claim 'wholly collateral to [the] statute's review provisions'"? *Id.* "And last, is the claim 'outside the agency's expertise'"? *Id*. When the answer to each of these questions is "yes," courts "presume that Congress does not intend to limit jurisdiction." *Free Enter. Fund*, 561 U.S. at 489. But even where the considerations point in different directions, "[t]he ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Axon Enter., Inc.*, 598 U.S. at 186.

Here, all three considerations point decisively to one conclusion: that Congress did not intend the CSRA to withdraw jurisdiction over a simple pre-enforcement challenge to a prior restraint on the speech of federal employees.

### A.     NAIJ's claims would not receive meaningful judicial review through the CSRA.

NAIJ's prior restraint claims would not receive meaningful judicial review through the CSRA for two reasons. First, the CSRA simply does not apply to NAIJ's claims. The CSRA provides for review of an employee's claim only if the employee is challenging a covered employment action. If an employee is *not* challenging a covered action, they cannot pursue their claims administratively or obtain judicial review through the statutory scheme. The prior restraint the Policy imposes on immigration judges is not a covered employment action—accordingly, challenging it could not and would not result in judicial review under the CSRA. Second, even if the Policy were a covered employment action, any judicial review NAIJ could obtain through the CSRA would not be meaningful. Proceeding administratively would not guarantee judicial review—it would guarantee only needless delay of the review of NAIJ's claims, causing irreparable harm to the First Amendment rights of immigration judges and the public in the interim.

1.    **The CSRA does not apply to NAIJ's claims because NAIJ is challenging a broad prior restraint on employee speech—not a covered employment action.**

As the Supreme Court explained in *Elgin*, the CSRA can provide meaningful judicial review of a federal employee's claim only if the employee is challenging a "covered employment action." *Elgin*, 567 U.S. at 14. If the plaintiff is *not* challenging a covered employment action, neither the MSPB nor the Federal Circuit would have jurisdiction over the claim, meaning there could be *no* judicial review—let alone meaningful judicial review—of such a challenge. *See, e.g.*, *Manivannan v. Dep't of Energy*, 42 F.4th 163, 173 n.5 (3d Cir. 2022) (citing *Schmittling v. Dep't of Army*, 219 F.3d 1332, 1336 (Fed. Cir. 2000)); *see also Elgin*, 567 U.S. at 18–19. Even the district court recognized this. Op. 26 (JA089).

Text, structure, and precedent all show that the Policy is not a CSRA-covered employment action.

To begin, the text of the CSRA is clear that it applies to individual employment decisions—not broad prior restraints on employee speech like the one NAIJ challenges. In general, the Act covers two categories of employment actions. First, Chapter 23 governs "prohibited personnel practices," which are "the least severe employment actions the Government can take." *Feds for Med. Freedom*, 63 F.4th at 370–71 (citing 5 U.S.C. § 2302(b)). To commit a prohibited personnel practice, a federal employer must take a "personnel action," 5 U.S.C. § 2302(b),

19

defined as one of twelve employment actions taken "with respect to *an employee*." *Id.* § 2302(a)(2)(A) (emphasis added). Second, Chapter 75 governs "the most-severe employment actions"—called "adverse actions." *Feds for Med. Freedom*, 63 F.4th at 371 (citing 5 U.S.C. §§ 7502, 7512(1)–(5)). These actions include removals, suspensions, reductions in grade or pay, and certain furloughs. 5 U.S.C. §§ 7501–04, 7512(1)–(5). All of these actions—under both Chapters 23 and 75—are individual employment decisions. But NAIJ is not challenging an individual employment decision; it is challenging an agency-wide policy that imposes a prior restraint on the speech of hundreds of immigration judges.

The district court nonetheless held that the Policy could be challenged under the Act because "personnel action[]" is defined to include a "significant change in . . . working conditions" and the Policy affects judges' working conditions broadly construed. Op. 28 (JA091). But as multiple lower courts have held, the term "working conditions" as used in the CSRA most naturally refers to "the daily, concrete parameters of a job," such as "hours, discrete assignments, and the provision of necessary equipment and resources." *Turner*, 502 F. Supp. 3d at 367; *see also Hesse v. Dep't of State*, 217 F.3d 1372, 1378 (Fed. Cir. 2000) ("'working conditions' most naturally connotes the physical conditions under which an employee labors"). In the context of the Act, a *change* in working conditions therefore refers to "typical, everyday employment decisions," *Feds for Med.*

20

*Freedom*, 63 F.4th at 375, not policies that institute sweeping changes in the workplace—and certainly not policies like EOIR's that regulate employee speech *outside of work*. *See, e.g.*, *Ramirez v. U.S. Customs and Border Prot.*, 709 F. Supp. 2d 74, 80 (D.D.C. 2010) (CBP's decision not to authorize an employee's outside political activities was not a significant change in working conditions); *Feds for Med. Freedom*, 63 F.4th at 376 ("permanent medical decisions made outside the workplace" are not a change in working conditions); *Manivannan*, 42 F.4th at 174 (employer's alleged conversion of former employee's personal property is not a change in working conditions).[2]

The canon of *ejusdem generis* supports this interpretation. *See Feds for Med. Freedom*, 63 F.4th at 375–76. *Ejusdem generis* provides that "where general words follow specific words in a statutory enumeration, the general words are construed to

---

[2] In the district court, the government also argued that the Policy could be challenged as a prohibited personnel practice or adverse action based on the hypothetical future discipline NAIJ's members might face for violating it. The district court correctly rejected that argument. Op. 27 n.19 (JA090). Although a covered employee may challenge a "proposed" removal or other adverse action under Chapter 75, 5 U.S.C. §§ 7503(b), 7513(b), no such action has been proposed here. *Cf. Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *6–7 (4th Cir. Apr. 19, 2022) (finding that employees' termination had been "proposed" because "enforcement ha[d] begun"). Indeed, NAIJ has alleged that its members intend to comply with the Policy, meaning that no disciplinary sanction could be imposed. Meanwhile, Chapter 23's provisions do not contemplate challenges to purely prospective personnel actions. *See Ramirez*, 709 F. Supp. 2d at 77 (noting OSC's advice that "threatened" personnel actions are insufficient to warrant further inquiry).

embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up). Here, the phrase "any other significant change in . . . working conditions" appears in a residual clause at the end of a twelve-item list that defines "personnel action." 5 U.S.C. § 2302(a)(2)(A)(xii). All of the actions listed before this clause are "discrete employment decisions," like the decision to appoint or "promote or reassign a single employee." *Feds for Med. Freedom*, 63 F.4th at 375. The singular reference to "policy" comes in romanette (xi), which refers to the "implementation or enforcement of any nondisclosure policy, form, or agreement." 5 U.S.C. § 2302(a)(2)(A)(xi). Although the district court considered this romanette to be evidence that Congress intended to cover policies regulating employee speech, Op. 30 (JA093), it actually confirms the opposite. Like the other enumerated actions, the "implementation or enforcement" of a nondisclosure policy "with respect to an employee" is an individual personnel decision. *Id.* § 2302(a)(2)(A). If Congress had intended "personnel action" to cover employee speech policies and not simply the specific decisions made pursuant to such policies, it would surely have said so. This Court should not presume that "Congress ha[s] hidden a rather large elephant in a rather obscure mousehole." *Feds for Med. Freedom*, 63 F.4th at 384 (cleaned up); *see also id.* at 374 (noting that had Congress wanted the CSRA to apply to *any* claim arising from the federal employment relationship, it could have "made the CSRA

less complicated by obviating all of the personnel-action limitations in Chapter 23 and Chapter 75—a road Congress plainly did not take").

The structure of the CSRA also confirms this reading. The CSRA's statutory framework "provide[s] for varying degrees of review based on the gravity of the deprivation in question." *Pinar v. Dole*, 747 F.2d 899, 911 (4th Cir. 1984). Because "personnel action[s]" under Chapter 23 are relatively minor as compared with "adverse actions" under Chapter 75, they do not entitle affected employees to judicial review. *See Weaver*, 87 F.3d at 1434; *cf.* 5 U.S.C. §§ 7513(d), 7703. An employee challenging a personnel action as a prohibited personnel practice must first complain to the OSC. 5 U.S.C. § 1214(a)(1)(A). The OSC, in turn, can, in its sole discretion, terminate the matter or refer it to the MSPB. 5 U.S.C. § 1214(a)(2) (termination), (b)(2) (referral). Final decisions of the Board are appealable to the Federal Circuit, but if the OSC declines to pursue a complaint, the CSRA provides for no further administrative or judicial review, *id.* §§ 1214(c), 7703(b). NAIJ challenges a broadly applicable prior restraint—one that limits and chills the speech of hundreds of government employees. Such a policy can hardly be characterized as "so minor in nature." *Pinar*, 747 F.2d at 912; *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (describing a prior restraint on speech as "the most serious and the least tolerable infringement on First Amendment rights"). And this Court should not impute to Congress an intent to channel review of such actions through a

statutory scheme that provides no assurance of judicial review for NAIJ's constitutional claims. *See infra* Part I.A.2.

Precedent also confirms this interpretation of the CSRA. Courts have consistently read "personnel action[s]" to refer to individual employment actions against specific employees, and have specifically held that challenges to employee speech policies do not qualify. The D.C. Circuit's decision in *Weaver* is illustrative. There, a federal employee challenged the constitutionality of a speech policy requiring her to submit certain materials for prepublication review and, after she received an oral admonishment for non-compliance, she amended her complaint to also challenge the admonishment. *Weaver*, 87 F.3d at 1432. The D.C. Circuit dismissed the challenge to the admonishment, explaining that it was remediable through the CSRA as a "prohibited personnel practice." *Id.* at 1433. But the court exercised jurisdiction over the constitutional claim as a "simple pre-enforcement attack on a regulation restricting employee speech" that "st[ood] independently of the admonishment." *Id.* at 1434. In doing so, the court cited the Supreme Court's decision in *NTEU* and the D.C. Circuit's en banc decision in *Sanjour*, *id.*, which similarly involved employees challenging speech regulations before any personnel action had been taken against them for non-compliance.[3]

---

[3] The district court's suggestion that *Weaver* is "of waning significance" since *Elgin* is misguided. Op. 33 (JA096). As the Fifth Circuit noted recently, "*Elgin* did

More recently, the Fifth Circuit's en banc decision in *Feds for Medical Freedom* drew an analogous distinction. In that case, the plaintiffs brought a pre-enforcement challenge to President Biden's vaccine mandate for federal employees. The court held that the CSRA did not preclude district court jurisdiction over the action because the vaccine mandate itself was not the sort of "typical, everyday employment decision[]" that could be challenged as a personnel action under Chapter 23, 63 F.4th at 375–76; "the plaintiffs alleged an injury distinct from any personnel action," namely, the order to get vaccinated or face disciplinary consequences, *id.* at 385; and "[the] plaintiffs did not seek . . . relief from any personnel action," *id.* at 386. In doing so, the court rejected the government's objection that allowing pre-enforcement challenges to some federal policies to proceed in district court would somehow open the floodgates to this kind of litigation. As the court explained: Even for claims challenging actions not covered

---

not break new ground regarding implicit preclusion." *Feds for Med. Freedom*, 63 F.4th at 379 (cleaned up). Still less can it be argued that *Elgin* "held *sub silentio* that the [Supreme] Court lacked jurisdiction in all its past cases entertaining pre-enforcement challenges to federal employment policies," including *NTEU*. *Id.* Indeed, multiple courts have endorsed *Weaver*'s logic since *Elgin*. *See, e.g.*, *Turner*, 502 F. Supp. 3d at 369 (allowing First Amendment challenge to employee policies and procedures because challenge was "distinct from and antecedent to [plaintiff] experiencing a covered personnel action"); *Firenze v. NLRB*, No. 12-CV-10880, 2013 WL 639151, at *8 (D. Mass. Jan. 10, 2013) (allowing First Amendment challenge to employee speech rule because "the promulgation . . . of such a rule" was not a "personnel action" and "there [was] no allegation that a prohibited 'personnel action' ha[d] taken place *vis-à-vis* the First Amendment claim").

by the CSRA, "the eye of the federal employee's needle is narrow," *id.* at 386, because plaintiffs must satisfy the well-established requirements of standing and ripeness, *id.* at 386–87.

> **2.** **Even if NAIJ's claims fell within the CSRA, NAIJ still could not obtain meaningful judicial review through the statute.**

Even if NAIJ's members could challenge the Policy as a significant change in working conditions under Chapter 23, they would still be deprived of meaningful judicial review.

First, as the Fifth Circuit held, "Chapter 23 provides no guarantee of judicial review—much less a meaningful one." *Feds for Med. Freedom*, 63 F.4th at 379. Judicial review is available only for final actions of the MSPB. 5 U.S.C. § 1214(c). But a challenge to a prohibited personnel practice can be adjudicated by the MSPB only if the Special Counsel decides, in their sole and unreviewable discretion, to petition the MSPB for corrective action. 5 U.S.C. § 1214(b)(2)(C). In other words, a complaint rejected by the OSC will never reach a federal court because the Special Counsel's decisions are not judicially reviewable. Here, the most likely outcome is that the Special Counsel would reject a complaint challenging the Policy because no personnel action has been taken against a specific employee. *See Ramirez*, 709 F. Supp. 2d at 79 (noting that the OSC dismissed the plaintiff's complaint because no "personnel action" had been taken).

The district court tried to elide this problem by suggesting that NAIJ return to federal court if it failed to obtain judicial review through the CSRA. But this sleight of hand would transform the CSRA's jurisdictional bar into a requirement to exhaust, Op. 37–38 (JA100–JA101), effectively eliminating the first and most important consideration of the *Thunder Basin* inquiry—whether "a finding of preclusion *could* foreclose all meaningful judicial review," *Thunder Basin*, 510 U.S. at 212–13 (emphasis added). "Meaningful judicial review" here means judicial review within the bounds of the statutory scheme. *See id.* at 215 (holding that claims were channeled where they would be "meaningfully addressed in the Court of Appeals"); *Elgin*, 567 U.S. at 21 (similar). Accordingly, the fact that a plaintiff might be able to file in district court following a futile attempt to obtain judicial review through a statutory scheme simply is not relevant. *Cf.* Op. 37–38 (JA100–JA101).[4]

---

[4] The Fourth Circuit's unpublished decision in *Fleming v. Spencer*, 718 Fed. App'x 185 (4th Cir. 2018) is not to the contrary. *Cf.* Op. 37–38 (JA100–JA101). First, the Court's suggestion that the plaintiff might have been able to file his claim in district court had he first brought it to the OSC and "been denied the opportunity to pursue it in the Federal Circuit" is dicta—the plaintiff did not bring his claim to the OSC. Second, and as the district court appeared to recognize, this remark is in tension with the Court's earlier decision in *Pinar* holding that a plaintiff who had exhausted his Chapter 23 remedies was nonetheless precluded from seeking district court review. Op. 36 (JA099). Third, the Court's apparent assessment in *Fleming* and *Pinar* that Chapter 23's remedial provisions were sufficient turned on the relatively "minor" nature of the personnel actions there at issue. *See Pinar*, 747 F.2d at 911–12 (holding that provisions afforded a "constitutionally adequate" process only because "the personnel actions [we]re so minor" and expressly reserving the question whether the provisions divest district court jurisdiction where actions are

This principle—that plaintiffs may seek immediate judicial review where a statutory scheme does not guarantee eventual judicial review in a court of appeals—is at the core of the Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). In that case, an accounting firm brought an Article II challenge to the Public Company Accounting Oversight Board, an entity that operated under SEC oversight. The government argued that the challenge was channeled by the Securities Exchange Act, but the Court demurred, holding that the firm could not "meaningfully pursue" their claims through the scheme. *Id.* at 490 (cleaned up). Although the firm "was enmeshed in a Board investigation, . . . some Board actions never got to the SEC," *Axon Enter., Inc.*, 598 U.S. at 190—and, as the Court explained, the statute "provides only for judicial review of *Commission* action," *id.* (quoting *Free Enter. Fund*, 561 U.S. at 490). The upshot was that, "absent district court jurisdiction, [the firm] might never have had judicial recourse." *Id.*

A similar risk exists here. If NAIJ were to file a complaint with the OSC, the Special Counsel might conclude that the complaint lacks merit or decline to refer the case to the MSPB. In either case, NAIJ's members would be "out of luck" because "[a] court may not review the Special Counsel's decisions unless the Counsel has

---

more "severe"); *Fleming*, 718 Fed. App'x at 188 (similarly noting "minor" nature of actions). As noted above, a Policy that imposes a broad prior restraint on employees' private speech can hardly be described as "so minor."

declined to investigate a complaint at all." *Krafsur v. Davenport*, 736 F.3d 1032, 1034 (6th Cir. 2013) (cleaned up). The "narrowness" of this pathway to review—"and the fact any review at all turns on the unreviewable discretion of Government officials"—makes clear that the CSRA fails to afford NAIJ a meaningful avenue for judicial review. *Feds for Med. Freedom*, 63 F.4th at 380.

Any relief NAIJ could obtain under Chapter 23 would not be meaningful for an additional reason: It would "come too late," *Axon Enter., Inc.*, 598 U.S. at 191, imposing "irremediable harm beyond the burdens associated with the dispute resolution process," *Bennett*, 844 F.3d at 186 n.13 (cleaned up). The Policy is an unconstitutional prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. Accordingly, courts have recognized that the imposition of a prior restraint, even for short periods of time, causes irreparable harm. *See, e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 831–32 (9th Cir. 2019); *see also Elrod v. Burns*, 427 U.S. 347 (1976). Here, the risk of delay is especially acute because the Special Counsel has up to 240 days to respond to any allegation of a prohibited personnel practice. *See* 5 U.S.C. § 1214(b)(2)(A). Moreover, at the end of such period, the Special Counsel may simply decline to petition the MSPB, in which case NAIJ's members would be foreclosed from Federal Circuit review altogether. NAIJ's members should not be required to pursue OSC review in such circumstances. *Cf. Able v. United States*, 88

F.3d 1280, 1288 (2d Cir. 1996) (holding that plaintiffs challenging the Don't Ask, Don't Tell law were not required to exhaust administrative remedies in separation proceedings because they "alleg[ed] violations of their First Amendment right to free speech" and "even minimal impairments on this right create irreparable injury"); *Ramirez*, 709 F. Supp. 2d at 83–84 (similar with respect to CBP employee challenging denial of authorization to serve on a city council).

The district court reasoned that this Court's unpublished decision in *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022), compels a different conclusion. But that case supports NAIJ's point. The plaintiffs in *Rydie*, like the plaintiffs in *Feds for Medical Freedom*, challenged President Biden's vaccine mandate. But unlike the plaintiffs in *Feds for Medical Freedom*, they faced a more immediate prospect of removal for non-compliance. *Id.* at *7. (noting that removal had already been "proposed" for the purposes of 5 U.S.C. § 7513 because "enforcement ha[d] begun"). The Court therefore concluded that plaintiffs' challenge was, in reality, a challenge to their impending termination, *id.*—an injury that would be fully remediable by an order reinstating the employees with backpay and awarding attorney's fees. *See Elgin*, 567 U.S. at 22 ("[R]einstatement, backpay, and attorney's fees are precisely the kinds of relief that the CSRA empowers the MSPB and the Federal Circuit to provide."). Not so here. NAIJ asserts a "here-and-

now injury" that cannot be "undone" by any post-deprivation relief the Federal Circuit could provide. *Axon Enter., Inc.*, 598 U.S. at 191 (cleaned up).[5]

### B. NAIJ's claims are wholly collateral to the CSRA because they are not an attempt to reverse a covered employment action.

The second *Thunder Basin* consideration—whether a plaintiff's claims are "wholly collateral" to the CSRA—also weighs strongly in favor of finding district court jurisdiction. NAIJ's claims are wholly collateral to the CSRA because they do not seek "to reverse" any covered employment action. *Bennett*, 844 F.3d at 186–87 (cleaned up); *see also supra* Part I.A.1. This distinguishes the mine run of cases in which courts have held that a plaintiff must seek review through the CSRA. In *Elgin*, for example, the Supreme Court held that the plaintiffs' claims were not wholly collateral to the CSRA because they were the "vehicle" by which the plaintiffs sought "to reverse" a CSRA-covered action—namely, removal. *Elgin*, 567 U.S. at

---

[5] The district court also relied on the fact that "no individual immigration judge has chosen to proceed through the administrative scheme after almost three years of litigation." Op. 42 (JA105). But the failure of any individual judge to go through this scheme is hardly surprising. The Policy is not a CSRA-covered action. Accordingly, NAIJ's claims would not receive judicial review even if a judge attempted to proceed through the scheme. Indeed, a judge would not be entitled to judicial review even if the Policy were a CSRA-covered action. The only way to guarantee judicial review would be for a judge to flout the Policy to such an extent that it prompted a serious "adverse action." *See* 5 U.S.C. § 7512; *see also id.* §§ 7513 (d), 7703. Forcing a judge to provoke such a sanction is the definition of "bet[ting] the farm"—something the Supreme Court has said can never be a meaningful avenue of relief. *Free Enter. Fund*, 561 U.S. at 490.

22; *see also Rydie*, 2022 WL 1153249, at *7 (challenge to executive order was the vehicle by which plaintiffs sought to challenge their removal); *Fornaro v. James*, 416 F.3d 63, 68 (D.C. Cir. 2005) (challenge to retirement benefits policy would necessarily decide the merits of plaintiffs' individual benefit claims); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) (challenge to guidelines on promotion by employee passed over for promotion). By contrast, NAIJ brings a "general challenge" to an employee speech policy that affects hundreds of immigration judges—not "[a] challenge to [a] particular personnel action" taken against a specific employee. *Weaver*, 87 F.3d at 1434 n.2.

In fact, the CSRA simply does not provide the type of relief sought by NAIJ. *See Elgin*, 567 U.S. at 22 (holding that the employees' claims were *not* wholly collateral to the CSRA scheme because plaintiffs were "requesting relief that the CSRA routinely affords"). As the Fifth Circuit recognized in *Feds for Medical Freedom*, and as this brief has explained, the CSRA channels "*individual* grievances regarding *individual* personnel actions." *Feds for Med. Freedom*, 63 F.4th at 381 (emphasis added); *see supra* Part I.A.1. Thus, the statutory scheme typically affords prevailing claimants remedies such as "reinstatement, backpay, and attorney's fees," *Elgin*, 567 U.S. at 22—not declaratory and injunctive relief against agency- or executive-branch-wide policies that affect hundreds or thousands or potentially even millions of employees. *Feds for Med. Freedom*, 63 F.4th at 381. Counsel is not aware

of any case, nor did the government cite one in the district court, "where OSC agreed in its unreviewable discretion to petition the MSPB for relief that remotely resembles what [NAIJ] request[s] here." *Id.*

### C. NAIJ's claims are outside the Merit Systems Protection Board's expertise.

NAIJ's claims are also outside the MSPB's expertise because they are purely constitutional claims involving the right of immigration judges to speak in their private capacities and the right of the public to hear what they have to say. The MSPB resolves highly specific disputes concerning individual personnel actions— like terminations, suspensions, and reductions in hours—not pre-enforcement constitutional challenges to prior restraints. To be sure, in the context of individual personnel actions, the MSPB could consider whether an agency has engaged in a prohibited personnel practice by "tak[ing] a personnel action that unconstitutionally burdens an employee's speech." *Weaver*, 87 F.3d at 1432. But as explained above, "personnel action" does not encompass the kind of sweeping employee speech policy at issue here. *See supra* I.A.1. Indeed, the Board has *never* had occasion to address the constitutionality of a far-reaching prior restraint like the Policy. Nor is it equipped to meaningfully assess the impact of such a restriction on the speech interests of hundreds of present and future public employees and the listening public, as courts are required to do in applying the framework from *NTEU* to a prior restraint challenge like NAIJ's.

The district court found that the MSPB nevertheless had expertise relevant to NAIJ's claims because it *may* have experience with any analogous restrictions imposed on administrative law judges throughout the federal sector. Op. 44 n.26 (JA107). But the (purely speculative) existence of such restrictions is irrelevant to the constitutionality of the Policy.[6] The district court also did not identify any issues on which the Board could apply its expertise to "obviate the need to address" NAIJ's constitutional claims. *Elgin*, 567 U.S. at 22. This is unsurprising. Even assuming NAIJ could challenge the Policy itself as a prohibited personnel practice—a non-starter for the reasons already explained—its challenge would boil down to the very constitutional question it seeks to litigate here: Does the Policy violate the First Amendment? This question is quintessentially a matter within the expertise of the federal courts, not administrative agencies.

*    *    *

For these reasons, all three *Thunder Basin* considerations support finding district court jurisdiction over NAIJ's claims.

## Conclusion

This Court should reverse the district court's grant of Defendant's motion to dismiss and remand for further proceedings.

---

[6] Notably, Social Security Administrative Law Judges and Administrative Patent Judges are *not* subject to similar restrictions on their speech. SAC ¶ 56 (JA034).

## Statement Regarding Oral Argument

Due to the novel and significant legal issues in this case, Plaintiff–Appellant respectfully requests oral argument pursuant to Local Rule 34(a).


January 22, 2024                    Respectfully submitted,

                                     /s/ Ramya Krishnan
                                    Ramya Krishnan
                                    Alexia Ramirez
                                    Xiangnong Wang
                                    Alex Abdo
                                    Knight First Amendment Institute at
                                        Columbia University
                                    475 Riverside Drive, Suite 302
                                    New York, NY 10115
                                    Phone: (646) 745-8500
                                    Fax: (646) 661-3351
                                    ramya.krishnan@knightcolumbia.org

                                    Victor M. Glasberg
                                    Nickera S. Rodriguez
                                    Victor M. Glasberg & Associates
                                    121 S. Columbus Street
                                    Alexandria, VA 22314
                                    Phone: (703) 684-1100
                                    Fax: (703) 684-1104
                                    vmg@robinhoodesq.com