No. 23-2235

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

―――――――――――

NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the
International Federation of Professional and Technical Engineers,

*Plaintiff–Appellant,*

v.

DAVID L. NEAL, in his official capacity as Director of the Executive Office for
Immigration Review,

*Defendant–Appellee.*

―――――――――――

On appeal from the United States District Court for the
Eastern District of Virginia — No. 1:20-cv-00731-LMB-JFA (Brinkema, L.)

―――――――――――

## JOINT APPENDIX

―――――――――――

Jennifer L. Utrecht
Michael S. Raab
U.S. Department of Justice
Appellate Staff, Civil Division
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530
(202) 353-9039
jennifer.l.utrecht@usdoj.gov

*Counsel for Defendant–Appellee*

Ramya Krishnan
Alexia Ramirez
Xiangnong Wang
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
ramya.krishnan@knightcolumbia.org

*Counsel for Plaintiff–Appellant*

*(Additional Counsel on Following Page)*

Victor M. Glasberg
Nickera Simone Rodriguez
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100
vmg@robinhoodesq.com

*Counsel for Plaintiff-Appellant*

# Table of Contents

Docket Entries ................................................................................JA001

Second Amended Complaint (ECF No. 65), filed January 9,
2023................................................................................JA012

Attachment 1 to Second Amended Complaint (ECF No. 65-1),
filed January 9, 2023 ...............................................JA039

Attachment 2 to Second Amended Complaint (ECF No. 65-2),
filed January 9, 2023 ...............................................JA046

Attachment 3 to Second Amended Complaint (ECF No. 65-3),
filed January 9, 2023 ...............................................JA054

Memorandum Opinion (ECF No. 77), filed September 21,
2023................................................................................JA063

Order (ECF No. 78), filed September 21, 2023................................JA108

Notice of Appeal (ECF No. 80), filed November 19, 2023..............JA110

# Docket Entries

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00731-LMB-JFA

| | |
|---|---|
| National Association of Immigration Judges v. David L. Neal | Date Filed: 07/01/2020 |
| Assigned to: District Judge Leonie M. Brinkema | Date Terminated: 09/21/2023 |
| Referred to: Magistrate Judge John F. Anderson | Jury Demand: None |
| Case in other court:  4th CCA, case manager Michael Radday,, 20-01868 | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |
| 4th Circuit, 23-02235 | |
| Cause: 28:2201 Constitutionality of State Statute(s) | |

**Plaintiff**

| | | |
|---|---|---|
| **National Association of Immigration Judges**<br>*affiliated with the International Federation of Professional and Technical Engineers* | represented by | **Alexander Abraham Abdo**<br>Knight First Amendment Institute Columbia University (NY-NA)<br>475 Riverside Drive<br>Suite 302<br>New York, NY 10115<br>**NA**<br>646-745-8500<br>Fax: 646-661-3361<br>Email: alex.abdo@knightcolumbia.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Alexia Rae Ramirez**<br>Knight First Amendment Institute Columbia University (NY-NA)<br>475 Riverside Drive<br>Suite 302<br>New York, NY 10115<br>**NA**<br>646-745-8500<br>Fax: 646-661-3361<br>Email: alexia.ramirez@knightcolumbia.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Nickera Simone Rodriguez**<br>Victor M. Glasberg & Associates<br>121 S. Columbus Street<br>Alexandria, VA 22314<br>703-684-1100<br>Fax: 703-684-1104<br>Email: nsr@robinhoodesq.com<br>*ATTORNEY TO BE NOTICED* |

**Ramya Krishnan**
Knight First Amendment Institute Columbia
University (NY-NA)
475 Riverside Drive
Suite 302
New York, NY 10115
**NA**
646-745-8500
Fax: 646-661-3361
Email: ramya.krishnan@knightcolumbia.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victor Michael Glasberg**
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100
Fax: 703-684-1104
Email: vmg@robinhoodesq.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**David L. Neal**
*in his official capacity as Director of the
Executive Office for Immigration Review*

represented by

**Catherine M. Yang**
DOJ-USAO
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
202-514-4336
Email: catherine.m.yang@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Matthew J. Mezger**
DOJ-USAO
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: matthew.mezger@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/01/2020 | 1 | Complaint ( Filing fee $ 400, receipt number 0422-7278084.), filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 2 | EXHIBIT *Attachment 1 to Complaint* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers.. |

| | | |
|---|---|---|
| | | (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 3 | EXHIBIT *Attachment 2 to Complaint* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers.. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 4 | EXHIBIT *Attachment 3 to Complaint (Parts 1 & 2)* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers.. (Attachments: # 1 Attachment 3 (Pages 5-7))(Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 5 | Motion to appear Pro Hac Vice by Alexander Abraham Abdo and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7278334. by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) Modified on 10/28/2022 (nneb, ). (Entered: 07/01/2020) |
| 07/01/2020 | 6 | Motion to appear Pro Hac Vice by Stephanie Clara Krent and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7278351. by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 7 | Motion to appear Pro Hac Vice by Ramya Krishnan and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7278377. by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) Modified on 10/28/2022 (nneb, ). (Entered: 07/01/2020) |
| 07/01/2020 | 8 | Proposed Summons by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 9 | MOTION for Preliminary Injunction by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 10 | Memorandum in Support re 9 MOTION for Preliminary Injunction filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 11 | Declaration re 9 MOTION for Preliminary Injunction , 10 Memorandum in Support *Declaration of Laura Lynch* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 12 | Declaration re 9 MOTION for Preliminary Injunction , 10 Memorandum in Support *Declaration of A. Ashley Tabaddor* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K, # 12 Exhibit Exhibit L, # 13 Exhibit Exhibit M)(Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 13 | NOTICE by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers re 9 MOTION for Preliminary Injunction , 11 Declaration, 12 Declaration,, 10 Memorandum in Support *Notice of Intent to Set Hearing Date* (Glasberg, Victor) (Entered: 07/01/2020) |

| 07/01/2020 | 14 | NOTICE by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers re 9 MOTION for Preliminary Injunction *Proposed Order* (Glasberg, Victor) (Entered: 07/01/2020) |
|---|---|---|
| 07/01/2020 | 15 | CERTIFICATE OF SERVICE by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers re 9 MOTION for Preliminary Injunction , 13 NOTICE, 12 Declaration,, 14 NOTICE, 10 Memorandum in Support (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | | Initial Case Assignment to District Judge T. S. Ellis, III and Magistrate Judge John F. Anderson. (dvanm, ) (Entered: 07/01/2020) |
| 07/01/2020 | | Notice of Correction re 8 Proposed Summons. The filing user has been notified to file summons for the US Attorney and Attorney General. (dvanm, ) (Entered: 07/01/2020) |
| 07/01/2020 | 16 | Proposed Summons *William Barr* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 17 | Proposed Summons *Civil Process Clerk, U.S. Attorney's Office* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | 18 | Summons Issued as to James R. McHenry, III, in his official capacity as Director of the exeecutive Office for Immigration Review, U.S. Attorney and U.S. Attorney General NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the attachments for each defendant to be served with the complaint. (Attachments: # 1 Notice)(dvanm, ) (Entered: 07/01/2020) |
| 07/01/2020 | 19 | Notice of Hearing Date set for July 31, 2020 re 9 MOTION for Preliminary Injunction , 10 Memorandum in Support (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/01/2020 | | Case Reassigned to District Judge Liam O'Grady. District Judge T. S. Ellis, III no longer assigned to the case. (rban, ) (Entered: 07/01/2020) |
| 07/01/2020 | 20 | CERTIFICATE of Service *Supplemental* re 9 MOTION for Preliminary Injunction , 11 Declaration, 19 Notice of Hearing Date, 13 NOTICE, 12 Declaration,, 14 NOTICE, 10 Memorandum in Support, 15 Certificate of Service, by Victor Michael Glasberg on behalf of National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers (Glasberg, Victor) (Entered: 07/01/2020) |
| 07/06/2020 | | Set Deadlines as to 9 MOTION for Preliminary Injunction . Motion Hearing set for 7/31/2020 at 10:00 AM via **Teleconference** before District Judge Liam O'Grady. (clar, ) (Entered: 07/06/2020) |
| 07/08/2020 | 21 | SUMMONS Returned Executed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers James R. McHenry, III, in his official capacity as Director of the exeecutive Office for Immigration Review served on 7/2/2020, answer due 8/31/2020 (Glasberg, Victor) Modified to correct answer due date on 7/9/2020 (dvanm, ). (Entered: 07/08/2020) |
| 07/08/2020 | 22 | SUMMONS Returned Executed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers (Glasberg, Victor) (Entered: 07/08/2020) |
| 07/08/2020 | 23 | SUMMONS Returned Executed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers James R. McHenry, III, in his official capacity as Director of the exeecutive Office for Immigration |

| | | |
|---|---|---|
| | | Review served on 7/6/2020, answer due 8/31/2020 (Glasberg, Victor) Modified to correct answer due date on 7/9/2020 (dvanm, ). (Entered: 07/08/2020) |
| 07/09/2020 | 24 | NOTICE of Appearance by Catherine M. Yang on behalf of James R. McHenry, III, in his official capacity as Director of the exeecutive Office for Immigration Review (Yang, Catherine) (Entered: 07/09/2020) |
| 07/09/2020 | 25 | Consent MOTION for Extension of Time to File Response/Reply as to 9 MOTION for Preliminary Injunction by James R. McHenry, III, in his official capacity as Director of the exeecutive Office for Immigration Review. (Attachments: # 1 Proposed Order)(Yang, Catherine) (Entered: 07/09/2020) |
| 07/09/2020 | 26 | ORDERED that Defendant's motion is GRANTED; and Defendant shall file his response to Plaintiff's motion for preliminary injunction by July 20, 2020. Signed by District Judge Liam O'Grady on 07/09/2020. (dvanm, ) (Entered: 07/09/2020) |
| 07/20/2020 | 27 | Memorandum in Opposition re 9 MOTION for Preliminary Injunction filed by James R. McHenry, III. (Attachments: # 1 DEX 1, # 2 DEX 2, # 3 DEX 3, # 4 DEX 4, # 5 DEX 5) (Yang, Catherine) (Entered: 07/20/2020) |
| 07/27/2020 | 28 | Reply in Support re 9 Motion For A Preliminary Injunction filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) Modified on 7/29/2020 (aott, ). (Entered: 07/27/2020) |
| 07/27/2020 | 29 | Declaration *Supplemental Declaration of A. Ashley Tabaddor* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Attachments: # 1 Exhibit Exhibit N, # 2 Exhibit Exhibit O) (Glasberg, Victor) (Entered: 07/27/2020) |
| 07/31/2020 | 30 | Minute Entry for proceedings held before District Judge Liam O'Grady:Motion Hearing held on 7/31/2020 re 9 MOTION for Preliminary Injunction filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Plaintiff appeared through Victor Glasberg and Ramya Krishnan. Defendant appeared through Catherine Yang and Kevin Hancock. Counsel present arguments. Court takes matter under advisement. (Court Reporter S. Wallace.)(awac, ) (Entered: 07/31/2020) |
| 08/06/2020 | 31 | ORDER denying 9 Motion for Preliminary Injunction. Signed by District Judge Liam O'Grady on 8/6/2020. (awac, ) (Entered: 08/07/2020) |
| 08/07/2020 | 32 | NOTICE OF APPEAL by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Filing fee $ 505, receipt number 0422-7341608. (Glasberg, Victor) (Entered: 08/07/2020) |
| 08/10/2020 | 33 | Transmission of Notice of Appeal to US Court of Appeals re 32 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm, ) (Entered: 08/10/2020) |
| 08/10/2020 | | Assembled INITIAL Electronic Record Transmitted to 4CCA re 32 Notice of Appeal (dvanm, ) (Entered: 08/10/2020) |
| 08/12/2020 | 34 | USCA Case Number 20-1868 4th CCA, case manager Michael Radday, for 32 Notice of Appeal filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (dvanm, ) (Entered: 08/12/2020) |
| 08/13/2020 | 35 | MOTION to Stay *Consent Motion to Stay Proceedings Pending Appeal* by National Association of Immigration Judges, affiliated with the International Federation of |

| | | Professional and Technical Engineers. (Attachments: # 1 Certificate of Service, # 2 Proposed Order)(Glasberg, Victor) (Entered: 08/13/2020) |
|---|---|---|
| 08/14/2020 | 36 | Waiver of re 35 MOTION to Stay *Consent Motion to Stay Proceedings Pending Appeal Waiver of Hearing* by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers (Glasberg, Victor) (Entered: 08/14/2020) |
| 08/14/2020 | 37 | ORDER granting 35 Motion to Stay. It is further ORDERED that the parties shall file a joint status report within fourteen days of the issuance of a mandate from the U.S. Court of Appeals for the Fourth Circuit. Signed by District Judge Liam O'Grady on 08/14/2020. (dvanm, ) (Entered: 08/14/2020) |
| 08/15/2020 | 38 | TRANSCRIPT of proceedings for dates of 7-31-20, before Judge Liam O'Grady, re 34 USCA Case Number Court Reporter Scott Wallace, Telephone number 202-277-3739. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained from the court reporter or through PACER. Redaction Request due 9/14/2020. Redacted Transcript Deadline set for 10/15/2020. Release of Transcript Restriction set for 11/13/2020.(wallace, scott) (Entered: 08/15/2020)** |
| 04/26/2021 | 39 | ORDER of USCA as to 32 Notice of Appeal filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. This case was previously scheduled for oral argument. Upon consideration of appellees consent motion to stay appeal, the court grants the motion, removes the case from the argument calendar and places this case in abeyance to allow the new Executive Office for Immigration Review and Department of Justice leadership officials sufficient time to become familiar with the issues on appeal and determine how they wish to proceed. The parties are directed to file a status report 60 days from the date of this order. (dvanm, ) (Entered: 04/27/2021) |
| 04/04/2022 | 40 | Opinion of USCA, decided on 04/04/2022 in re 32 Notice of Appeal attached copy of judgment will not take effect until issuance of the mandate; Affirmed and Remanded with Instructions. (jlan) (Entered: 04/07/2022) |
| 04/04/2022 | 41 | USCA JUDGMENT as to 32 Notice of Appeal filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. In accordance with the decision of this court, the district court's order dated August 6, 2020, is affirmed. This case is remanded to the district court with instructions consistent with the court's decision. The judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. (jlan) (Entered: 04/07/2022) |
| 04/28/2022 | 42 | Temporary Stay of Mandate in re 32 Notice of Appeal. Under Fed. R. App. P. 41(b), the filing of a timely petition for rehearing or rehearing en banc stays the mandate until the court has ruled on the petition. In accordance with Rule 41(b), the mandate is stayed pending further order of this court. (kgall) (Entered: 04/28/2022) |
| 06/07/2022 | 43 | ORDER of USCA as to 32 Notice of Appeal that we grant the motion for rehearing, vacate the district court's order of August 6, 2020 and remand for further proceedings as appropriate. (jlan) (Entered: 06/07/2022) |

| | | |
|---|---|---|
| 06/07/2022 | 44 | USCA JUDGMENT as to 32 Notice of Appeal. In accordance with the decision of this court, the district court order entered August 6, 2020, is vacated. This case is remanded to the district court for further proceedings consistent with the court's decision. This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41. (jlan) (Entered: 06/07/2022) |
| 08/01/2022 | 45 | USCA Mandate in re 32 Notice of Appeal. The judgment of this court, entered June 7, 2022, takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41(a) of the Federal Rule of Appellate Procedure. (kgall) (Entered: 08/01/2022) |
| 08/15/2022 | 46 | Joint MOTION for Entry of Proposed Briefing Schedule (Joint Status Report) by James R. McHenry, III. (Attachments: # 1 Proposed Order)(Mezger, Matthew) (Entered: 08/15/2022) |
| 08/17/2022 | | Case Reassigned to District Judge Leonie M. Brinkema. District Judge Liam O'Grady no longer assigned to the case. (jlan) (Entered: 08/17/2022) |
| 08/18/2022 | 47 | AMENDED COMPLAINT *for Declaratory and Injunctive Relief* against James R. McHenry, III, filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers.(Glasberg, Victor) (Entered: 08/18/2022) |
| 08/18/2022 | 48 | ORDER granting 46 Joint Motion for Entry of Proposed Briefing Schedule (See Order for Details). Signed by District Judge Leonie M. Brinkema on 8/18/2022. (show) (Entered: 08/19/2022) |
| 10/07/2022 | 49 | MOTION to Dismiss *Amended Complaint* by James R. McHenry, III. (Mezger, Matthew) (Entered: 10/07/2022) |
| 10/07/2022 | 50 | Memorandum in Support re 49 MOTION to Dismiss *Amended Complaint* filed by James R. McHenry, III. (Attachments: # 1 Exhibit Ex. A)(Mezger, Matthew) (Entered: 10/07/2022) |
| 10/07/2022 | 51 | Notice of Hearing Date re 50 Memorandum in Support, 49 MOTION to Dismiss *Amended Complaint* (Mezger, Matthew) (Entered: 10/07/2022) |
| 10/07/2022 | | Set Deadlines as to 49 MOTION to Dismiss *Amended Complaint*. Motion Hearing set for 12/2/2022 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (clar, ) (Entered: 10/11/2022) |
| 10/27/2022 | 52 | Motion to appear Pro Hac Vice by Alyssa Sarah Morones and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number AVAEDC-8632136. by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 10/27/2022) |
| 10/27/2022 | 53 | ORDER denying 52 Motion for Pro hac vice. Signed by District Judge Leonie M. Brinkema on 10/27/2022. (nneb) (Entered: 10/27/2022) |
| 10/28/2022 | 54 | ORDER granting 5 Motion for Pro hac vice Appointed Alexander Abraham Abdo for National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Signed by District Judge Leonie M. Brinkema on 10/28/2022. (nneb) (Entered: 10/28/2022) |
| 10/28/2022 | 55 | ORDER granting 7 Motion for Pro hac vice Appointed Ramya Krishnan for National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Signed by District Judge Leonie M. Brinkema on 10/28/2022. (nneb) (Entered: 10/28/2022) |

| | | |
|---|---|---|
| 10/31/2022 | 56 | Memorandum in Opposition re 49 MOTION to Dismiss *Amended Complaint* filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 10/31/2022) |
| 11/10/2022 | 57 | Consent MOTION for Extension of Time to File Response/Reply as to 49 MOTION to Dismiss *Amended Complaint* by James R. McHenry, III. (Attachments: # 1 Proposed Order)(Mezger, Matthew) (Entered: 11/10/2022) |
| 11/10/2022 | 58 | ORDER granting 57 Motion for Extension of Time to File Response/Reply. ORDERED that Defendant will file his reply brief in support of his motion to dismiss on or before November 16, 2022. Signed by District Judge Leonie M. Brinkema on 11/10/2022. (show) (Entered: 11/10/2022) |
| 11/16/2022 | 59 | REPLY to Response to Motion re 49 MOTION to Dismiss *Amended Complaint* filed by James R. McHenry, III. (Mezger, Matthew) (Entered: 11/16/2022) |
| 11/29/2022 | 60 | ORDER: Due to docket congestion, it is necessary to change the time of the hearing on defendant's Motion to Dismiss [Dkt. No. 49]. Accordingly, it is hereby ORDERED that the hearing currently scheduled for Friday, December 2, 2022 at 10:00 a.m. be and is RESCHEDULED to Friday, December 2, 2022 at 9:00 a.m. Motion Hearing as to 49 MOTION to Dismiss *Amended Complaint* RESET for 12/2/2022 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema.. Signed by District Judge Leonie M. Brinkema on 11/29/22. (yguy) (Entered: 11/29/2022) |
| 12/02/2022 | 61 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing held on 12/2/2022. Appearances of counsel. Deft's 49 MOTION to Dismiss *Amended Complaintis is argued and GRANTED without prejudice. (order to follow) (Court Reporter S. Austin.)(yguy) (Entered: 12/02/2022)* |
| 12/02/2022 | 62 | ORDER: For the reasons stated in open court, defendant's Motion to Dismiss [Dkt. No. 49] is GRANTED, and it is hereby ORDERED that the Amended Complaint [Dkt. No. 47] be and is DISMISSED WITHOUT PREJUDICE. Plaintiff has leave to amend the complaint within forty-five (45) days of this Order. Signed by District Judge Leonie M. Brinkema on 12/2/22. (yguy) (Entered: 12/02/2022) |
| 01/06/2023 | 63 | Motion to appear Pro Hac Vice by Alexia Rae Ramirez and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number AVAEDC-8740773. by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 01/06/2023) |
| 01/06/2023 | 64 | ORDER granting 63 Motion for Pro hac vice Appointed Alexia Rae Ramirez for National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Signed by District Judge Leonie M. Brinkema on 1/6/2023. (swil) (Entered: 01/06/2023) |
| 01/09/2023 | 65 | AMENDED COMPLAINT *Second Amended Complaint for Declaratory and Injunctive Relief* , filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Attachments: # 1 Attachment #1, # 2 Attachment #2, # 3 Attachment #3)(Glasberg, Victor) Modified docket text on 1/10/2023 (show). (Entered: 01/09/2023) |
| 01/10/2023 | 66 | Consent MOTION for Extension of Time to File Response/Reply as to 65 Amended Complaint, by James R. McHenry, III. (Attachments: # 1 Proposed Order)(Mezger, Matthew) (Entered: 01/10/2023) |
| 01/10/2023 | 67 | ORDER granting 66 Motion for Extension of Time to File Response/Reply. ORDERED that Defendant will file his responsive pleading to the Second Amended Complaint on or |

JA009

| | | |
|---|---|---|
| | | before February 1, 2023. Signed by District Judge Leonie M. Brinkema on 01/10/2023. (wgar) (Entered: 01/10/2023) |
| 02/01/2023 | 68 | MOTION to Dismiss *Second Amended Complaint* by James R. McHenry, III. (Mezger, Matthew) (Entered: 02/01/2023) |
| 02/01/2023 | 69 | Memorandum in Support re 68 MOTION to Dismiss *Second Amended Complaint* filed by James R. McHenry, III. (Mezger, Matthew) (Entered: 02/01/2023) |
| 02/01/2023 | 70 | Notice of Hearing Date re 68 MOTION to Dismiss *Second Amended Complaint*, 69 Memorandum in Support (Mezger, Matthew) (Entered: 02/01/2023) |
| 02/03/2023 | | Set Deadline as to 68 MOTION to Dismiss Second Amended Complaint. Motion Hearing set for 3/10/2023 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (wgar, ) (Entered: 02/03/2023) |
| 02/10/2023 | 71 | NOTICE of Appearance by Nickera Simone Rodriguez on behalf of National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers (Rodriguez, Nickera) (Entered: 02/10/2023) |
| 02/15/2023 | 72 | Opposition to 68 MOTION to Dismiss *Second Amended Complaint*, 69 Memorandum in Support filed by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. (Glasberg, Victor) (Entered: 02/15/2023) |
| 02/21/2023 | 73 | REPLY to Response to Motion re 68 MOTION to Dismiss *Second Amended Complaint* filed by James R. McHenry, III. (Mezger, Matthew) (Entered: 02/21/2023) |
| 02/24/2023 | | Notice of Correction: The filing user has been notified that recent filing has a case number, caption, and/or style that does not correspond to the case in which you filed in re 73 Reply to Response to Motion. (show) (Entered: 02/24/2023) |
| 03/10/2023 | 74 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing held on 3/10/2023. Appearances of counsel. Deft 68 MOTION to Dismiss *Second Amended Complaint is argued and TAKEN UNDER ADVISEMENT. (Court Reporter S. Austin.)(yguy) (Entered: 03/10/2023)* |
| 04/17/2023 | 75 | NOTICE by National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers *of Filing of New Authority* (Attachments: # 1 Exhibit Opinion in Axon v. FTC, # 2 Exhibit Opinion in Menders v. Loudoun Co. Sch. Bd.)(Glasberg, Victor) (Entered: 04/17/2023) |
| 04/18/2023 | 76 | Response to 75 NOTICE, filed by David L. Neal. (Mezger, Matthew) (Entered: 04/18/2023) |
| 09/21/2023 | 77 | MEMORANDUM OPINION in re [Dkt. No. 68] MOTION to Dismiss *Second Amended Complaint*. Signed by District Judge Leonie M. Brinkema on 9/21/2023. (Dest) (Entered: 09/21/2023) |
| 09/21/2023 | 78 | ORDERED that for the reasons stated in the accompanying Memorandum Opinion, defendant's Motion to Dismiss [Dkt. No. 68] is GRANTED, and it is hereby ORDERED that judgment be and is entered in favor of defendant (see Order for further details). Signed by District Judge Leonie M. Brinkema on 9/21/2023. (Dest) (Entered: 09/21/2023) |
| 09/21/2023 | 79 | CLERK'S JUDGMENT is hereby entered in accordance with Rule 58 of the Federal Rules of Civil Procedure in favor defendant David L. Neal, in his official capacity as Director of the Executive Office of Immigration Review, and against plaintiff National Association of Immigration Judges, affiliated with the International Federation of Professional and Technical Engineers. Entered by Clerk on 9/21/2023. (Dest) (Entered: 09/21/2023) |

| 11/19/2023 | 80 | NOTICE OF APPEAL by National Association of Immigration Judges. Filing fee $ 505, receipt number AVAEDC-9227258. (Glasberg, Victor) (Entered: 11/19/2023) |
| 11/27/2023 | 81 | Transmission of Notice of Appeal to US Court of Appeals re 80 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (Dest) (Entered: 11/27/2023) |
| 11/29/2023 | 82 | USCA Case Number 23-2235 4th Circuit, Case Manager Rachel Phillips for 80 Notice of Appeal filed by National Association of Immigration Judges. (Dest) (Entered: 11/30/2023) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 01/09/2024 14:07:57 | | |
| PACER Login: | reedcanaan | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:20-cv-00731-LMB-JFA |
| Billable Pages: | 9 | Cost: | 0.90 |

Second Amended Complaint (ECF No. 65), filed January 9, 2023

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers,<br><br>        Plaintiff,<br><br>   v.<br><br>DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review,<br><br>        Defendant. | Civil Action No. 20-cv-731 |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This lawsuit challenges a policy of the Executive Office for Immigration Review ("EOIR") that imposes an unconstitutional prior restraint on the speech of federal immigration judges. The policy bans judges from sharing their private views on immigration law or policy issues, or about the agency that employs them. Judges who violate the policy face a range of disciplinary sanctions, including reprimand, suspension, and even removal from the federal service.

2.      For years, EOIR permitted immigration judges to speak in their private capacities on issues relating to immigration, so long as they provided a disclaimer that they were not speaking on behalf of the agency. Judges often spoke at schools, universities, and bar associations about the immigration courts and their function within them. Their efforts educated the public about the immigration courts and made the immigration system more transparent.

1

3.      Starting in 2017, the agency made a series of revisions to its speaking engagement policy to limit the ability of immigration judges to speak publicly in their private capacities. The agency initially instituted a more burdensome preapproval process for judges who wished to engage in private-capacity speech. In 2020, however, EOIR categorically prohibited judges from speaking publicly in their private capacities about immigration or the agency. And, in 2021, the agency retained this prohibition when it once again revised its policy—this time during NAIJ's appeal in this case to the Fourth Circuit.

4.      EOIR's attempts to silence immigration judges come at a time of intense scrutiny of the nation's immigration system. Both President Trump and President Biden made immigration a central issue of their presidential campaigns, and their administrations have made sweeping changes to the immigration court system. During the Trump administration, for example, the Justice Department instituted case completion quotas for immigration judges, restricted the ability of immigration judges to close cases administratively or grant continuances, and reassigned judges from their home dockets to prioritize the disposition of cases involving migrants who apply for asylum from Mexico. The Biden administration has sought to reverse many of these changes, while also launching significant new efforts to reform the immigration system. For example, in May 2022, the Biden administration began using an overhauled screening system for migrants seeking asylum at the southern border in an effort to speed up processing and alleviate backlogs in the immigration court system. There is significant public interest in understanding these reforms as well as their effects on the independence of immigration judges and the process afforded to migrants who appear before them. Immigration judges are uniquely positioned to satisfy this interest, but the agency's speaking engagement policy prevents them from doing so.

5.     The policy imposes a prior restraint in violation of the First Amendment. As the Supreme Court has repeatedly held, people do not surrender their free speech rights when they accept government employment. They retain their rights, as citizens, to speak on matters of public importance, and the government can silence them only if it can show that its interest in doing so outweighs the employees' interests in speaking and the public's interest in hearing what they have to say.

6.     The government cannot satisfy this test here. The interests of immigration judges in engaging in the speech restrained by the policy is substantial, as is the public's interest in hearing it. There is an ongoing national debate about the wisdom and fairness of recent changes to immigration laws and policies and about the effect of those changes on the immigration court system. Immigration judges have unique insights to contribute to this discussion. While EOIR has a legitimate interest in promoting the efficiency of the services it performs through its employees, the policy's categorical ban on private-capacity speech about immigration and the agency is not tailored to that interest. Nor is the policy's preapproval process, which continues to require immigration judges to submit to an onerous system of review before speaking publicly in their private capacities on topics unrelated to immigration and the agency.

7.     NAIJ is a non-partisan, non-profit, voluntary association of immigration judges. It brings this challenge on behalf of its members, who are injured by the policy. Many of NAIJ's members wish to speak publicly in their private capacities about immigration law and policy, but the policy prevents them from doing so. Members who used to seek preapproval to speak about immigration-related topics in their private capacities no longer do so because they believe their requests will be denied as a matter of course. Of the members that continue to seek preapproval, many feel constrained by the policy to seek approval to speak in their official capacities, or to

3

allow the agency to determine the appropriate capacity, simply to be able to continue speaking. The result is that the agency exercises tight control over what they can say. Many of these members remain in limbo months after submitting requests. Some never receive a decision at all. NAIJ respectfully requests that the Court declare that the policy is unlawful and enjoin the government from enforcing it. Unless the policy is enjoined, it will continue to prevent immigration judges from speaking publicly in their private capacities about matters of immense public concern.

### Jurisdiction and Venue

8.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and the U.S. Constitution.

9.      This Court has authority to issue declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and this Court's inherent equitable jurisdiction. The Court also has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this district, and Defendant is an officer of the United States sued in his official capacity.

### Parties

11.      Plaintiff NAIJ is a voluntary association of United States immigration judges, formed to promote the independence, dignity, professionalism, and efficiency of the U.S. immigration courts. NAIJ was founded as a voluntary association of immigration judges in 1971 and, in 1979, it was designated as the collective bargaining representative for all non-supervisory immigration judges. In 2019, the Department of Justice filed a petition with the Federal Labor Relations Authority ("FLRA") to decertify NAIJ, leading to an FLRA decision determining that immigration judges are "management officials" who must be excluded from NAIJ's bargaining

4

unit. NAIJ's Certification of Representative was formally revoked on April 15, 2022; however, it remains a voluntary association of immigration judges and continues to have hundreds of dues-paying members, including seven officers. NAIJ also continues to be affiliated with the International Federation of Professional and Technical Engineers.

12.     Defendant David L. Neal is the Director of EOIR. EOIR is an agency of the federal government within the Department of Justice and is located in Falls Church, Virginia. Defendant Neal has authority over all EOIR policies and practices, including the policy challenged here. Plaintiff sues him in his official capacity only.

<u>Facts</u>

## I.     Immigration Judges and the Immigration Court System

13.     Immigration judges are judicial officers who exercise the authority of the U.S. Attorney General. Their primary responsibility is to serve as neutral and impartial arbiters in the immigration court system. They are also active members of the legal and civic communities, and have for many years contributed to public understanding of immigration law and policy through speaking engagements, including at the invitation of bar associations, schools, universities, and other institutions.

14.     As a former president of NAIJ testified before the Senate Judiciary Committee in 2018, immigration judges play an important role in educating the public about the immigration court system. When immigration judges speak to their communities, they "help the community better understand [the] Immigration Courts and their function in the community, helping to demystify the system and bring transparency." This, in turn, helps "build the understanding and trust needed for the [court] system to function smoothly."

15.     Interest in the immigration court system has grown in recent years, as the Trump and Biden administrations have shaped and reshaped immigration enforcement policies and

priorities. Under the Trump administration, for example, the Justice Department subjected immigration judges to case completion quotas and other performance benchmarks; limited their ability to close cases administratively and grant continuances; gave EOIR's Director the authority to overrule their decisions; issued hiring policies that gave political appointees greater influence in the selection of new judges; and required certain judges to conduct hearings via videoconference at temporary tent facilities along the U.S.–Mexico border as part of the administration's "Remain in Mexico" program. Under the Biden administration, the Justice Department has sought to roll back many of these measures, while also introducing new reform efforts. For example, in May 2022, the administration began implementing an overhauled system for screening migrants seeking asylum at the southern border. According to Attorney General Merrick B. Garland, the new system is intended to "ensure that asylum claims are processed fairly [and] expeditiously," while also "reduc[ing] the burden on our immigration courts."

16.    These changes have received considerable congressional and news attention. For example, the *Associated Press* visited almost a dozen immigration courts in the fall of 2019 and reported "nonstop chaos." Journalists observed that "[f]requent changes in the law and rules for how judges manage their docket make it impossible to know what the future holds when immigrants finally have their day in court." In January 2020, the House Subcommittee on Immigration and Citizenship held a public hearing on the state of judicial independence and due process in the immigration courts, receiving extensive testimony of a system in crisis. More than two years later, a story published in the *Guardian* reported that the dysfunction continues, with immigration courts "struggling to function at the most basic level," and judges "overwhelmed by a growing backlog of more than 1.6 million cases." Congress continues to consider reforms to this day, with several House members having introduced H.R. 6577, a bill that would move the

immigration court system from the Department of Justice in an effort to make the courts more independent.

## II.    EOIR's Speaking Engagement Policy

17.    Prior to 2017, immigration judges routinely spoke at local and national conferences, guest lectured at universities and law schools, participated in practical legal trainings, and published law review articles and other legal commentary—all in their private capacities. For example, they spoke on panels addressing the immigration consequences of criminal activity, the use and effect of international law on asylum claims, best practices for representing young people in immigration cases, and professional ethics in immigration law. They participated in pro bono trainings and mock trials where they taught attorneys the essentials of immigration court representation and how to avoid common mistakes. They also published articles in law reviews and legal magazines on topics ranging from the impact of criminal convictions under immigration law, to undocumented workers' entitlement to state workers' compensation, to projects and strategies to increase the representation of poor migrants before the immigration courts. EOIR never claimed that this speech caused harm to the agency's mission or operations.

18.    While approval was required for this speech prior to 2017, immigration judges routinely received that approval. Judges would submit a request to their supervising Assistant Chief Immigration Judge ("supervisor"). If the supervisor approved the request, they would forward it to EOIR's Ethics office, which would then offer ethics guidance. Judges were generally permitted to use their official titles to identify themselves in connection with their speaking or writing, so long as they also included a disclaimer stating that the views presented were their own and not those of EOIR. EOIR described this kind of speech as "personal capacity with use of title and disclaimer" or "PTD." This process was memorialized in the 2011 Ethics and Professionalism Guide for Immigration Judges, and it remained in place until EOIR issued a new policy in 2017.

7

19.     Starting in 2017, EOIR made a series of revisions to its speaking engagement policy that strictly limited the ability of judges to engage in private-capacity speech, with or without a disclaimer. Under EOIR's current policy, immigration judges are categorically banned from speaking publicly in their private capacities about immigration or EOIR, and must continue to go through an onerous preapproval process before speaking publicly in their private capacities on other topics.

20.     EOIR has warned judges that failure to comply with its speaking engagement policy may result in disciplinary action, including reprimand, suspension, and even removal from the federal service.

### A.     The 2017 Policy

21.     On September 1, 2017, former EOIR Director James R. McHenry III issued a memorandum titled "Speaking Engagement Policy for EOIR Employees" (the "2017 Policy"), which required all immigration judges who wished to speak publicly to submit a request to their supervisor.[1]

22.     Under the 2017 Policy, supervisors were charged with deciding whether a speaking engagement would be undertaken in a judge's "personal" or "official" capacity (as defined by the policy), and whether to approve the request. Immigration judges who wished to speak on "immigration-related topics" or whose requests were reclassified as "official capacity" were then required to seek a second level of approval from the centralized speaking engagement team (the "SET").

---

[1] A true and correct copy of the 2017 Policy is attached hereto as Attachment 1.

23.     The 2017 Policy did not specify any criteria for EOIR officials to consider in determining whether to approve "personal capacity" speaking requests. Nor did the policy require them to make decisions within any particular time frame.

24.     After the 2017 Policy was issued, NAIJ initiated collective bargaining over the policy's implementation. The parties' negotiations yielded a two-page Memorandum of Understanding (the "2018 MOU"), which set out certain procedures relating to the application of the 2017 Policy to immigration judges. Because NAIJ has been formally decertified, these procedures are no longer in effect.

### B.     The 2020 Policy

25.     On January 17, 2020, Director McHenry issued a memorandum titled "Submission and Processing of Requests for Speaking Engagements" (the "2020 Policy").[2] Although the 2020 Policy purported to "reissu[e]" without "substantively alter[ing]" the 2017 Policy, it was significantly more restrictive than its predecessor in several important ways.

26.     First, the 2020 Policy extended to all "written pieces intended for publication," not only to public speaking. Second, the 2020 Policy categorically prohibited immigration judges from publicly speaking in their private capacities about immigration or EOIR. It did so by deeming "official" any speech relating to "immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies." Third, the 2020 Policy instituted additional layers of review, creating further opportunities for delay. Under the 2020 Policy, immigration judges were required to submit all speaking requests—regardless of speaking capacity or content—to four levels of review: by their supervisor, by the SET, by the Ethics Program ("Ethics"), and by their supervisor a second time for final decision. In cases involving speeches,

---

[2] A true and correct copy of the 2020 Policy is attached hereto as Attachment 2.

written pieces, or other prepared materials, the supervisor could condition approval on making certain changes.

27.     The 2020 Policy also shared many of the 2017 Policy's defects. It did not include narrow or objective criteria for deciding whether to approve speaking requests the agency deemed "personal capacity"; and it did not impose any firm deadline for a decision.

### C.     The 2021 Policy

28.     On October 12, 2021, EOIR Director David L. Neal issued a new speaking engagement policy (the "2021 Policy" or "Policy"),[3] which canceled the 2020 Policy. The 2021 Policy was issued after EOIR sought a stay of NAIJ's appeal in this case, to allow new agency leadership an opportunity to revise the policy. The new policy, however, retains the central flaws of its predecessor.

29.     First, and most significantly, the 2021 Policy categorically prohibits immigration judges from speaking publicly about immigration or EOIR in their private capacities by deeming "official capacity" all speech that discusses "agency policies, programs, or a subject matter that directly relates to [immigration judges'] official duties." An attachment to the 2021 Policy confirms that, in the agency's view, the entire subject matter of immigration "directly relates" to an immigration judge's duties and thus may not be discussed publicly by immigration judges in their private capacities.

30.     Second, the 2021 Policy continues to subject private-capacity speech unrelated to immigration or EOIR to a burdensome prior review scheme. Though the Policy purportedly eliminates the preapproval requirement for "personal capacity" speech "unrelated to [an immigration judge's] official duties," it includes a significant carve out to this rule. If a speaking

---

[3] A true and correct copy of the 2021 Policy is attached hereto as Attachment 3.

engagement occurs during working hours, a requesting judge must submit a leave request; the supervisor is then entitled to "inquire how [the judge] intends to use the time," and must "approve[]" not only the leave request, but also the "engagement" itself. As explained further below, the Policy does not include any criteria to guide this decision. The Policy thus leaves a supervisor free to question a judge about the content of their proposed "personal capacity" speech and deny approval for any reason, including the judge's viewpoint.

31.     The 2021 Policy also allows agency officials to control judges' "personal capacity" speech even where formal preapproval may not be required. For example, "whether or not [a judge] opted to seek supervisory approval" for a proposed speaking engagement in the first instance, "if the circumstances surrounding the [engagement] change"—as the details of planned engagements often do—the Policy states that the judge "should convey such changes to the supervisor to consider the advisability of the [judge]'s continued participation." The Policy also states that a supervisor may "provide direction" on the content of a judge's proposed speech whenever it is possible that a planned engagement "may result in the perception by the public that the engagement relates to the [judge]'s official duties or employment with EOIR."

32.     Although EOIR's counsel in this case has maintained that preapproval is never required for "personal capacity" speech unrelated to immigration or the agency, the agency itself has demonstrated confusion on this point. For example, in October 2022, the Office of General Counsel ("OGC") advised one NAIJ member that although she did not require preapproval to publish a work of fiction that was unrelated to immigration, she was required to inform the office if asked to give an interview or talk about the book "so that both Ethics and [the Communications and Legislative Affairs Division] could clear [the speaking engagement]."

33.     Third, the prior review scheme maintained by the 2021 Policy lacks adequate safeguards.

34.     The 2021 Policy provides that requests for preapproval to speak in a private capacity must undergo multiple layers of review. A judge's request to speak in their "personal capacity" will be reviewed by their supervisor in the first instance. If the supervisor determines that a "personal capacity" request relates to the judge's official duties, the supervisor must submit the request to the SET for guidance—"regardless of the [judge's] proposed capacity." The supervisor may also seek the SET's guidance in determining whether an employee who wishes to speak in a "personal capacity" should, instead, be directed to speak in an "official capacity." If the supervisor approves the engagement, the supervisor next obtains guidance from Ethics about any ethical obligations that may impact the judge's decision to participate. The supervisor then conducts a "final review" of a judge's request, "including consideration of any guidance received from the SET." After the supervisor completes this review, they must inform the judge of their decision. The supervisor may also advise the judge of any guidance offered by the SET and will provide any guidance offered by Ethics.

35.     Judges who wish to speak about immigration-related topics in their private capacities but are forced by the Policy to seek preapproval to do so in their official capacities face an identical process. Under the 2021 Policy, these judges must continue to submit their requests to their supervisor. The request is then reviewed by the SET and Ethics before the supervisor makes a final determination as to whether to approve or deny the request.

36.     The 2021 Policy's prior review scheme does not include narrow or objective criteria for resolving requests by judges who wish to speak in their private capacities. The Policy does not impose any limit on the discretion of supervisors to grant or deny "personal capacity" requests or

JA024

requests that are improperly deemed "official capacity" merely because a judge wishes to speak about immigration-related topics. Nor does the Policy impose any limit on the discretion of the SET, which is broadly charged with "ensuring compliance with both the law and agency policy while also promoting consistency in all of EOIR's communications." The sum total of the Policy's guidance to EOIR officials is to "grant appropriate requests."

37.     In practice, the agency uses this process to ensure that judges who speak publicly about immigration stick to the agency's talking points. When an immigration judge's supervisor seeks "guidance" about the appropriate capacity for a speaking engagement request, the OGC "determines" the appropriate capacity. If it determines that a request is "official capacity"—as it is required to do when the request is to speak about immigration—it forwards the request to the Office of Policy's Communications and Legislative Affairs Division, which EOIR's website states is tasked with "present[ing] a unified voice for EOIR and . . . ensur[ing] consistency with the Attorney General's messages." Requests to publish writing go through additional layers of review by senior officials from the OGC, the Office of Policy, and the Office of Director to ensure that approval is granted only if a proposed publication conforms to the agency's official views.[4]

38.     The Policy also does not impose any firm deadline for decision. As a result, final decisions are often delayed for months or, sometimes, never issued at all.

## III.    Harms to Immigration Judges and the Public

39.     Recent changes to immigration law and policy, the state of the immigration court system, and the role of immigration judges are of immense public interest. After the 2017 Policy went into effect, however, immigration judges were routinely denied permission to speak publicly

---

[4] While the 2021 Policy describes the SET's input as "guidance," in reality, supervisors treat this input as determinative both as to the appropriate capacity for a speaking engagement request and as to whether the request should be approved or denied.

in their private capacities about immigration, and many were chilled from even seeking permission to do so. Then, in 2020, EOIR categorically banned judges from speaking publicly in their private capacities about immigration or the agency. This ban remains in place under the 2021 Policy, depriving the public of judges' expertise and insights on matters of urgent public interest. The experiences of specific NAIJ members injured by the Policy are described at paragraphs 47 to 54.

### A. Immigration Judges Have Been Prevented from Speaking about Matters of Public Concern in their Private Capacities

40.     As explained above, immigration judges often spoke at local and national conferences, guest lectured at universities and law schools, and participated in immigration law trainings before 2017—all in their private capacities. While they were required to seek supervisory approval, they generally got it. After the 2017 Policy went into effect, however, immigration judges who wished to speak about immigration were required to seek two levels of approval rather than one, and those who sought approval often did not get it or failed to receive a timely decision.

41.     Requests relating to speaking engagements that immigration judges had undertaken for years in their private capacities were suddenly denied. For example, in March 2018, an immigration judge submitted a request to speak at the immigration law clinic at his alma mater, something he had done annually, with EOIR's approval, since the clinic's inception. In an email forwarding the request to the SET, the judge's supervisor described him as "an outstanding candidate to conduct the speaking engagement." The SET denied the immigration judge's request, eventually explaining that "[b]ecause your topic concerned immigration court matters, and you were invited to speak because of your position as an immigration judge, personal capacity is not allowable." According to the SET, speaking engagements related to immigration were official capacity and had to be handled by EOIR "management officials" to ensure consistency in the agency's messaging: "[I]mmigration is always a topic of great interest and debate, and many

14

employees are understandably unprepared to present the Department's official view when presented with thorny questions and topics." By contrast, "[m]anagement officials, as part of their official duties, are routinely briefed on ongoing litigation and the Department's position on sensitive topics."

42.    EOIR repeatedly confirmed that position in rejecting requests by immigration judges to speak in their private capacities about immigration. For example, in April 2018, the SET denied an immigration judge's request to speak to a Harvard Law School class "due to the nature of the topic (asylum claims involving children)."

43.    The same month, a different immigration judge submitted a request to participate in her "personal capacity" on a Practising Law Institute panel on immigration and recent developments in asylum law. Months later, and only three days before the panel was scheduled to take place, the SET rejected her request because "the nature of the event calls for official capacity and supervisory immigration judges should represent EOIR at events such as this one." EOIR rejected the request even though the judge had been approved to participate in her "personal capacity" on the same panel the previous year.

44.    In September 2019, another immigration judge sought approval to speak in her "personal capacity" to an immigration class at her former law school via Skype. Her supervisor approved the request. One day before she was scheduled to attend the class, however, the SET denied the request, explaining that the topic was "too closely related to [the judge's] official duties to permit participation in her personal capacity." The SET also explained that appearing in an official capacity was not appropriate because it was not clear "[the judge's] participation would advance [EOIR]'s interests."

45.     In other cases, EOIR delayed its decision or failed to provide one, effectively denying the request to speak. For example, in February 2019, an immigration judge asked for permission to speak in his "personal capacity" to a seventh-grade class about immigration and asylum law. Although he received supervisory approval, he did not receive a response from the SET for a full month. Finally, two days before the event, the judge's supervisor told him informally that the SET was planning to deny the request. The judge canceled the visit, but the SET never sent a formal denial or explained its decision. The judge followed up in April 2019, and again in May 2019, explaining that he was "still hopeful to do the talk, even if it means changing my presentation to address whatever concerns exist." The judge never received a response.

46.     Thus, even before the 2020 Policy and the 2021 Policy were enacted, many immigration judges came to believe that it was futile to submit requests to speak publicly about immigration in their private capacities. Under the 2020 Policy, immigration judges were simply prohibited from speaking publicly in their private capacities about issues related to immigration law or policy or EOIR's policies and programs.

47.     The prohibition against speaking publicly in a private capacity about immigration law or policy continues under the 2021 Policy. Accordingly, many judges who wish to share their private views on substantive questions of immigration law or policy no longer do so. For example, NAIJ President Judge Mimi Tsankov used to speak and write extensively in her private capacity about issues and developments in immigration law, but she understands the 2021 Policy to forbid her from doing so. For instance, in the years prior to 2017, Judge Tsankov was a frequent panelist at regional, national, and international law conferences, presenting on a wide variety of immigration law topics including mental competency and juvenile docket hearings, to court practice and procedure, and "crimmigration" matters. She also published articles in law journals

16

and magazines on topics ranging from the delegation of immigration authority to law enforcement under Section 287(g) of the Immigration and Nationality Act to immigration benefits for victims of domestic violence in the United States and the European Union. She was permitted to engage in this speech in her "personal capacity" with the use of a title and disclaimer.

48. Although Judge Tsankov continues to speak publicly about issues relating to immigration judges' working conditions in her union capacity as President of NAIJ, the 2021 Policy has deterred her from seeking approval to discuss substantive questions of immigration law in her private capacity. For example, she would like to participate in panel presentations addressing the recent evolution of asylum relief for vulnerable groups such as domestic violence victims and juveniles, and state and local immigration enforcement under the Section 287(g) program. She would also like to write follow-up articles on topics such as mental competency in immigration court proceedings, and domestic violence-related protections for unauthorized migrants in the United States and the European Union. She has not sought preapproval to do so, however, because she understands the Policy to prohibit her from speaking about these issues in her private capacity, and because speaking instead in an "official capacity" would require her to recite the agency's talking points.

49. Other judges have continued to seek preapproval to speak about immigration, but have felt compelled to seek approval to speak in an "official capacity," or else allow the agency to determine the appropriate capacity, even when they would prefer to speak in their private capacities with the use of a disclaimer. These judges wish to share their private views on immigration law and policy issues—not the official views of the agency. However, they believe that under the 2021 Policy any request to speak about these issues in a "personal capacity" will automatically be rejected. For example, on September 2, 2022, NAIJ Vice President Judge Samuel

17

Cole emailed his supervisor a request to publish an article on immigration court bond hearings in Law360, a service that publishes legal news and analysis. Although he did not wish to speak on behalf of the agency, he requested approval to speak in his "personal" *or* "official capacity" because he believed that the agency would deny him approval to speak in his personal capacity, and he would rather publish the article than not at all.

50.    Judges who seek approval to speak about immigration under the 2021 Policy often encounter severe delays, and some receive no formal response at all. For example, Judge Cole's request remains pending, more than four months after he submitted it. On October 4, 2022, Judge Cole's supervisor informed him that the OGC had determined that his request was "official capacity," and consequently that "approval and clearance from the [Communications and Legislative Affairs Division] and [Office of the Director]" was necessary. When Judge Cole wrote to the SET the same day requesting a timeline, the Chief of Communications and Legislative Affairs Division said that he could not provide one. On October 17, 2022, Judge Cole again followed up, with no response. However, he was later informed by his supervisor that because he was seeking preapproval for a written publication (rather than an oral statement), his request must "go[] through two extra reviews: first to the OGC Immigration Law Division, and then to the [Office of Policy] Front Office." On October 20, 2022, Judge Cole's supervisor sent Judge Cole a revised version of his article with edits and comments from the SET. The supervisor noted that the piece had been reviewed by the OGC and the Communications and Legislative Division, but it did not appear to have been reviewed by the Office of the Director. On November 1, 2022, Judge Cole sent his supervisor revisions in response to the comments from the SET. He has not heard anything about his request since.

51.     The revisions sent to Judge Cole demonstrate the control that the agency exercises over immigration-related speech that the agency deems "official capacity." Judge Cole's article seeks to give practitioners practical advice on how to approach immigration court bond hearings based on his experience as an immigration judge. The Assistant Director of EOIR's Office of Policy made several edits to the tone and substance of the piece. She also stated that certain observations made in the piece were not appropriate because they were not the official view of the agency. For example, in response to one observation, she asked: "In an official capacity, is this a 'sanctioned' EOIR practice tip?" In response to another couched as the "author's opinion," she wrote: "Again, is this an EOIR tip? If so, should not be expressed as author's opinion. If not, evaluation must be done as to whether appropriate in official capacity." Even after making many of the advised changes, Judge Cole's request remains in limbo.

52.     A different judge encountered similar delays after submitting a request to publish an article on immigration policy in Law360.[5] On September 6, 2022, the judge emailed the draft article titled "Five Perspectives on Immigration Law and Policy" to her supervisor, requesting that the supervisor forward her request to the SET, and explaining that she hoped to send the article to the publisher by the end of the week. Although the judge wished to publish the article in her private capacity with the use of a disclaimer, she did not specify the capacity for which she sought approval to maximize the chance approval would be granted. The request was forwarded to the SET the next day. On October 5, 2022, after the judge followed up on the status of the request, the judge's supervisor asked the SET for an update. The SET responded that because the request "involves a publication review, it is going to need an extra step and will be reviewed by the [Office of General

---

[5] This judge, who is a member of NAIJ, does not wish to be identified at this stage because her request remains pending.

Counsel] and [Office of the Director] (in addition to the normal SET process)." On October 11, 2022, the judge's supervisor again followed up, after the judge indicated that their publisher was ready to publish, and was told that review could take a "few more weeks." The judge's supervisor followed up again on October 21, November 4, November 17, and December 8. The SET did not provide an anticipated date of completion in response to any of these inquiries, although it confirmed that the article was "getting an additional layer of review among senior officials because of the article's subject matter and the fact that the author is an [immigration judge]." The judge's request remains pending. It is unclear whether Law360 will remain interested in publishing the article if the judge ever receives approval.

53.     Although the 2021 Policy provides that immigration judges interested in teaching immigration law courses require only supervisory approval, in practice requests to teach are routed to the SET, and judges who have sought approval often receive no decision. For example, on November 3, 2022, Judge Tsankov requested approval to teach in her "personal capacity" an International Law and Justice practicum at Fordham Law School in the Spring 2023 semester. Despite having received approval to teach the same class in past years, her request remains pending. Similarly, NAIJ member Judge Frank James Loprest requested approval to teach a Spring 2023 immigration law course at St John's University School of Law on October 20, 2022. To date, the agency has neither approved nor denied the request. Both judges are concerned about placing the law schools that have invited them to teach in a difficult position should the agency deny their requests at the last moment.

54.     In some cases, the agency's response is so delayed that the judge is no longer able to participate in the proposed speaking engagement. For example, on October 3, 2022, NAIJ member Judge Michael Straus sought approval to speak at the November 17, 2022 meeting of the

Connecticut chapter of the American Immigration Lawyers Association ("AILA") about immigration court practice. Judge Straus wished to speak at this event on his own behalf—not on behalf of the agency. He requested approval to speak in his "official capacity," however, because he believed that this is what the Policy required him to do. On November 1, Judge Straus's supervisor asked the judge to submit talking points for the event that he could forward to the SET for their consideration. He explained that the judge would not be permitted to speak about EOIR and court "initiatives, updates, and policies because those are topics that only the [Assistant Chief Immigration Judge] and [Court Administrator] can generally speak about to outside groups." However, if the judge wished to "speak about particular practices and preferences in [his] specific courtroom, then [the SET] may consider that." Judge Straus submitted talking points the next day, which indicated that he would confine his remarks to his docket and that he would include a disclaimer that his remarks did not "reflect[] the views of other immigration judges or EOIR." He did not hear back until November 17, the day of the meeting. Although he was approved to speak in his "official capacity," his supervisor reiterated that he could not speak about agency or court programs and policies. And when he told the event organizers that he could attend the meeting, they informed him that they had changed their plans for the meeting because they assumed the agency's silence meant that he would not be able to attend.

55.     As these examples demonstrate, the 2021 Policy injures NAIJ's members in a wide variety of ways. Members who wish to speak about immigration law or policy issues in their private capacities are chilled from doing so because they believe the Policy prohibits this speech. Although some members have continued to seek approval to speak about these issues in their "official" capacities, speaking in this capacity limits what they can say. As non-supervisory judges, they are constrained in the topics they can speak about in their official capacities. And even when

approved to speak on an issue, the agency retains tight control over what they say. Moreover, members who seek approval to speak in a "personal" *or* "official" capacity do not receive timely decisions, if they receive any decisions at all. This also chills members from seeking approval to speak.

56.    Notably, the Social Security Administration's more than 1,500 Administrative Law Judges ("ALJs") are not subject to any similar restrictions. Under Social Security Administration policy, ALJs are permitted to speak publicly in their private capacities about issues relating to social security law and policy and the Social Security Administration itself, so long as they comply with ethics requirements. Although they are encouraged to seek preapproval from their supervisors, they are not required to do so. The Social Security Administration relies upon ALJs to use their judgment to avoid speaking engagements that may create a conflict or apparent conflict of interest.

**B.    The Public Has Been Denied the Opportunity to Hear from Immigration Judges Who Would Have Otherwise Spoken in their Private Capacities**

57.    Given the new restrictions on speech by immigration judges, those who once invited them to speak have been deterred from doing so. The effect is to deny the public access to insights about how recent changes to immigration law and policy are working in practice, and to create the perception that EOIR employees uniformly support the administration's policies.

58.    In October 2019, four clinical legal professors wrote an article in *Slate* describing the impact of the 2017 Policy on their ability to get immigration judges to speak to their students. The professors—Laila L. Hlass of Tulane Law School, Elora Mukherjee of Columbia Law School, Carrie L. Rosenbaum of the Golden Gate University School of Law, and Maureen Sweeney of the University of Maryland Francis King Carey School of Law—noted that in past years judges had

routinely visited their classes to speak about immigration law and policy, but that recently things had changed:

> [A]lmost all have declined [invitations]. They've told us they can't speak with our classes even on their days off, even in their personal capacities, without prior clearance and approval from high-level supervisors—approval that is increasingly difficult to obtain.

59.     Advocacy and professional organizations that once hosted immigration judges at events have also been affected. For example, organizations like the Federal Bar Association, AILA, the Practicing Law Institute, and Human Rights First have reported no longer being able to rely on the expertise of immigration judges at their events or trainings. Some of these organizations have simply given up on inviting active immigration judges, and have instead turned to retired ones.

60.     AILA and its thirty-nine local chapters routinely hold a range of events, including conferences and continuing legal education classes. Many of these events are open to the public. In past years, immigration judges frequently spoke at these events. Following the issuance of the 2017 Policy, however, immigration judges generally declined requests to attend. Many chapters simply stopped extending invitations.

61.     The experience of AILA's South Florida chapter is illustrative. Prior to 2017, immigration judges met with members of the community at chapter events at least four or five times a year—judges sat on panels at the chapter's annual conference, participated in the chapter's monthly CLE training events for its members, and joined pro bono training programs for corporate attorneys. But in 2017, immigration judges began rejecting invitations or stopped responding to them altogether.

62.     In an effort to fill the void left by active immigration judges, AILA and some of its local chapters began relying on retired immigration judges to participate in educational

conferences and other events. In April 2020, for example, AILA organized an online panel discussion on recent developments in immigration litigation. The staff member responsible for the event had hoped to invite active immigration judges, but, believing that extending an invitation would be futile, she invited only retired judges.

### First Cause of Action

63.     The 2021 Policy violates the First Amendment because it imposes a system of prior restraint on the speech of immigration judges, because it is not appropriately tailored to any legitimate government interest, and because it fails to include adequate procedural safeguards.

### Second Cause of Action

64.     The 2021 Policy is void for vagueness under the First and Fifth Amendments because it invites arbitrary and discriminatory enforcement, and because it fails to give immigration judges fair notice of what standards will be applied in reviewing their requests for preapproval.

### Prayer for Relief

Plaintiff respectfully requests that this Court:

1.     Declare that the 2021 Policy violates the First and Fifth Amendments to the Constitution;

2.     Enjoin Defendant and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from continuing to enforce the 2021 Policy;

3.     Award Plaintiff its reasonable costs and attorneys' fees in this action; and

4.     Grant Plaintiff such other relief as this Court may deem just and proper.

Dated: January 9, 2023                    Respectfully submitted,

  /s/ *Victor M. Glasberg*                      /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)             Ramya Krishnan (*Pro Hac Vice*)
Victor M. Glasberg & Associates           Alexia Ramirez (*Pro Hac Vice*)
121 S. Columbus Street                    Alex Abdo (*Pro Hac Vice*)
Alexandria, VA 22314                      Knight First Amendment Institute
T: (703) 684-1100                          at Columbia University
F: (703) 684-1104                         475 Riverside Drive, Suite 302
VMG@robinhoodesq.com                      New York, NY 10115
                                          T: (646) 745-8500
                                          F: (646) 661-3361
                                          ramya.krishnan@knightcolumbia.org

                                          *Counsel for the Plaintiff*

25

JA037

## CERTIFICATE OF SERVICE

I, Victor M. Glasberg, hereby certify that on January 9, 2023, the forgoing Second

Amended Complaint for Declaratory and Injunctive Relief was filed using the Court's CM/ECF

system, through which counsel for all parties will be served.

/s/ *Victor M. Glasberg*
Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
VMG@robinhoodesq.com

Attachment 1 to Second
Amended Complaint
(ECF No. 65-1), filed January 9,
2023

# ATTACHMENT 1

**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the Director*

Director

*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

September 1, 2017

**MEMORANDUM TO:**     All of EOIR

**FROM:**     James R. McHenry III
Acting Director

**SUBJECT:**     Speaking Engagement Policy for EOIR Employees

**Introduction**

Interest in immigration law has grown exponentially over the past ten years.   As a result, the public has become increasingly interested in hearing about, and understanding, what the agency does and specifically how Immigration Courts operate.   Our Immigration Judges (IJs), along with senior EOIR officials and other staff, are frequently invited to speak on immigration law and policy at different events across the country.   Depending on who is invited, who has issued the invitation, the forum and the topic of the discussion or presentation, a management determination must be made as to which capacity is most appropriate for the employee's participation on that specific occasion.

This Speaking Engagement Policy (Policy) and its attachment are intended to clarify the approval process an EOIR employee must follow to speak at an event, when a request or invitation for an appearance has been received by the employee or the Agency, including the proper determination of speaking engagement capacity.   To that end, the following sets forth EOIR's policy on speaking engagements and the procedures employees must follow when requesting approval to speak at an event.

**Approval Process**

There are only two capacities in which an employee may participate in a speaking engagement: (1) official capacity; or (2) personal capacity.   The agency will no longer use the status of "personal capacity with use of title and disclaimer," otherwise known as "PTD."   An employee must first request and receive supervisory approval before participating in a speaking engagement.   Supervisors will determine the capacity in which an employee is speaking.

Memorandum to All of EOIR                                                    Page 2
Subject: Speaking Engagement Policy for EOIR Employees

After obtaining supervisory approval, all requests to speak in official capacity, and/or to speak about immigration-related topics must be reviewed by the Office of General Counsel (OGC) and the Office of Communications and Legislative Affairs (OCLA) via the headquarters speaking engagement team (SET).    EOIR personnel should submit requests to the SET by completing the Speaking Engagement Form (see Appendix) and sending the completed form to EOIRspeakers@usdoj.gov.    The form should be submitted no later than seven days before the scheduled event.    For official capacity speaking engagements, submissions include presentation slides, hand out materials and talking points. This process not only ensures compliance with agency policies, but also allows OCLA to ensure that EOIR's messaging is consistent across official engagements.

## I.   Speaking in an Official Capacity

When an EOIR employee is assigned to participate as a speaker or panel participant or otherwise present information on behalf of the agency at a conference or other event, they are doing so in their official capacity.    Any EOIR employee speaking at an event hosted by a Federal Department, Office, or Agency must speak in an official capacity.    This includes speaking at naturalization ceremonies even when not administering the naturalization oath. Certain EOIR personnel may only speak in their official capacity.    Those personnel include component heads and other senior EOIR officials, members of the Board of Immigration Appeals ("Board Members"), Deputy Chief Immigration Judges ("DCIJs") and Assistant Chief Immigration Judges ("ACIJs").    In contrast, some Immigration Judges may or may not be expected to speak in their official capacity, depending on the particulars of the speaking engagement.    For IJs, they shall only engage in a speaking engagement in their official capacity if it involves a certain activity (See Attachment A) or if another Department of Justice or EOIR employee or official is appearing at the same event in an official capacity.    Other employees may appear, and speak, at an event in their official capacity if it is part of their official duties or they have been assigned to do so by their supervisor.

If travel is required for an employee to speak in an official capacity, generally the employee may not accept reimbursement for travel and related expenses from any source other than the government.    However, 41 C.F.R. Chapter 304 authorizes the Department (or the employee on the Department's behalf) to accept payment of travel expenses from a non-Federal source," but only "when specifically authorized to do so" and "only for official travel to a meeting."[1]    Please note that EOIR has determined, as a matter of policy, that it will not accept any payment for the official travel of its employees by a non-Federal source that is considered a prohibited source for EOIR.    A prohibited source is considered a person or entity who seeks official action from the agency, does business with the agency, appears before the agency, or is

---

[1] 41 C.F.R. § 304-5.3 further provides that reimbursement for travel from outside sources must not be authorized if the approving official determines that acceptance of the payment under the circumstances would cause a reasonable person with knowledge of all the facts relevant to a particular case to question the integrity of agency programs or operations.    An employee who accepts travel from a non-Federal source in violation of 41 C.F.R. § 304-1.2 may be required to repay the amount of payment accepted from the non-Federal source and could be subject to additional penalties.

USCA4 Appeal: 23-2235    Doc: 13    Filed: 01/22/2024    Pg: 46 of 115
Case 1:20-cv-00731-LMB-JFA    Document 65-1    Filed 01/09/23    Page 4 of 6 PageID# 616

Memorandum to All of EOIR                                                    Page 3
Subject: Speaking Engagement Policy for EOIR Employees

an organization a majority of whose members are described in this section.[2]   As an adjudicatory body, EOIR should expect to be under constant scrutiny.   EOIR employees must avoid all improprieties and the appearance of impropriety to ensure complete public confidence in the integrity of our agency.   The acceptance of travel reimbursement for official duties from prohibited sources could undermine the public's confidence in the impartiality of EOIR's adjudicators.   Likewise, under no circumstances may an EOIR employee receive a supplementation of salary (i.e. honorarium) from a non-Federal source for a speaking activity that is done in their official capacity.[3]

## II.   Speaking in a Personal Capacity

When an EOIR employee participates in a speaking engagement in a personal capacity, they are not appearing at an event as part of their official duties or on behalf of the agency. Therefore, they may not imply that EOIR is endorsing or sanctioning the speaking engagement, as it is considered an outside speaking activity.  An EOIR employee may not use or permit the use of their official title or position to identify themselves in connection with the speaking activity unless it is included as one of several biographical details when such information is given to identify the individual in connection with the activity, provided that their title or position is given no more prominence than other significant biographical details.   When one's official title is used in this manner, as part of an overall biographical sketch, a disclaimer is not required.   Alternatively, in limited circumstances where an introduction does not include an overall biographical sketch, an IJ may be introduced using their title so long as they use an appropriate disclaimer at the beginning of their remarks in order to avoid the perception that they are appearing on behalf of the agency.   Additionally, they may not permit the sponsoring organization to use their official title in the promotion of the event in which they are invited to speak.

The Speaking Engagement Form is not required to be submitted for an EOIR employee who is invited to discuss, in their personal capacity, a topic that is unrelated to immigration law issues, their official EOIR duties or position, or any agency programs and policies. Additionally, the issuer of the invitation cannot be a prohibited source.   The form is required, however, for an EOIR employee who has been invited to discuss immigration related issues. Additionally, the employee must obtain supervisory approval to engage in the outside speaking activity before the form is submitted.   As a reminder, no EOIR employee may receive compensation for any outside speaking activity that relates to their official duties.

---

[2]  5 C.F.R. § 2635.203(d).

[3]  18 U.S.C. § 209.

If an EOIR employee is traveling to speak at an event in a personal capacity, the employee is not entitled to travel reimbursement by the agency.   However, when traveling in a personal capacity, an EOIR employee may accept reimbursements for travel expenses from the entity that is sponsoring the activity.[4]   On the other hand, employees offered travel reimbursement for mere attendance (as opposed to speaking on a panel) at a conference in a personal capacity must contact the Office of the General Counsel for a determination as to whether accepting the reimbursement of travel expenses is appropriate.   OGC will apply the gift rules in deciding whether such employee may accept payment of these expenses.   Factors that must be taken into consideration when applying the gift rules include the source and value of the reimbursement.[5]

## Conclusion

This policy does not necessarily address every situation that may arise related to speaking engagements.   It is intended to create a standard by which events may be evaluated.   If questions arise regarding the application of this policy or the proper determination of a speaking capacity, please contact the Ethics Office at EOIR.Ethics@usdoj.gov or (703) 305-0322.

---

[4] _Sanjour v. Environmental Protection Agency_, 56 F.3d 85 (D.C. Cir. 1995); 5 C.F.R. § 2635.807(a)(2)(iii)(D).
[5] 5 C.F.R. § 2635.201-205.

<u>Attachment A</u>

The Speaking Engagement Policy identifies the two capacities in which an EOIR employee may speak, when they are invited to participate in an event that involves immigration issues, relates to their official duties, or invited because of their official position at the agency. Because PTD will no longer be used, only Official and Personal Capacity are provided below with examples of appropriate events found within each category. Note that this is not an exclusive list, as some events, activities and forums may not be listed below.

<u>Official Capacity</u>

1. All senior EOIR officials, BIA Board Members, DCIJs and ACIJs shall <u>only</u> participate in speaking engagements in their official capacity.
2. For any event where at least one DOJ or EOIR official is participating officially, all EOIR participants must speak in their official capacity.
3. For any event where an inviter is a Federal government agency and the employee is asked to speak or present at a government event, the EOIR employee must speak in their official capacity.
4. National Conferences (e.g. AILA, FBA, etc.).
5. Regional Conferences.
6. Naturalization Ceremony, as guest speaker or to administer the oath.
7. Court Visit – when an outside group visits the Immigration Court and an IJ/EOIR official meets with the group at the court.
8. Any event where the topic of the discussion is the subject of pending litigation.
9. Pro Bono training – in association with EOIR's Office of Legal Access Programs.
10. EOIR Mock Hearing Program.
11. Recruiting for EOIR internship program.


<u>Personal Capacity</u>

1. Moot Court judge – not immigration related.
2. Commencement Speaker.
3. Career Day/Alumni Career Panel – to discuss full career path and experience.
4. Pro-bono training – not associated with EOIR's Office of Legal Access Programs.
5. Meeting with boy scouts or girl scouts.
6. Interview based on book written in personal capacity.
7. Teach university or law school immigration classes.

Attachment 2 to Second
Amended Complaint
(ECF No. 65-2), filed January 9,
2023

# ATTACHMENT 2

**OOD**

**Effective: January 2020**

# SUBMISSION AND PROCESSING OF REQUESTS FOR SPEAKING ENGAGEMENTS

| | |
|---|---|
| **PURPOSE:** | To announce the establishment of a new automated speaking engagement request portal and to restate EOIR's established policy on speaking engagements and the procedures employees must follow when requesting approval to speak at outside engagements |
| **OWNER:** | Office of the Director |
| **AUTHORITY:** | 18 U.S.C. § 209; 5 CFR § 2635.201-205, 2635.807(a)(2)(iii)(D);  8 CFR § 1003.0(b)(1); 41 CFR Chapter 304; |
| **CANCELLATION:** | None |

In conjunction with the launch of an updated speaking engagement team (SET) webpage and automated request form, the Office of the Director is reissuing the September 1, 2017 memorandum outlining the speaking engagement process.  The reissued memorandum does not substantively alter the original memorandum, though it does clarify some points that have occasionally caused confusion.[1]

## I.    Introduction

Our agency's stakeholders and other members of the public continue to be interested in hearing about, and understanding, what the agency does and specifically how immigration courts operate.  Our immigration judges, members of the Board of Immigration Appeals, and administrative law judges, along with senior EOIR officials and other staff, are frequently invited to speak or write on immigration law and policy at different events across the country. Depending on who is invited, who has issued the invitation, the forum, and the topic of the

---

[1] The reissued memorandum also does not alter, or purport to alter, the Memorandum of Understanding between EOIR and the National Association of Immigration Judges executed in May 2018.

discussion or presentation, a determination must be made as to which capacity is most appropriate for the employee's participation on that specific occasion.

On September 1, 2017, a memorandum was issued to outline the speaking engagement[2] process and provide clarity regarding the decision-making process. Since that time, the Office of Policy has worked to implement an online process to provide for more certainty and clarity surrounding the submission, tracking, and delineation of responsibility of each request. This memorandum does not change the approval process; rather, the changes are only to the mechanism by which approval is sought. To that end, the following sets forth details of the revised mechanism to carry out EOIR's established policy on speaking engagements and the procedures employees must follow when requesting approval to speak.

## II.   **Approval Process**

There are only two capacities, which are further described below in sections III and IV, in which an employee may participate in a speaking engagement: (1) official capacity or (2) personal capacity. It is the nature of the engagement, based on the totality of the circumstances that determines the appropriate capacity—the label given by either the inviter or the invitee is not dispositive. An employee who has been invited to participate in a speaking engagement related to immigration law or policy issues, the employee's official EOIR duties or position, or any agency programs and policies, or who has been invited because of the employee's official duties or position, has been invited in an official capacity regardless of how the invitation is labeled. All such requests must be approved by EOIR or the Department of Justice, and invitees should submit a request to participate via the new speaking engagement portal located on EOIR's intranet page. The request should be submitted no later than two weeks before the scheduled event. Submissions should include presentation slides and hand out materials if applicable and complete talking points at a minimum (*i.e.*, an outline, overview, or set of abbreviated talking points is an insufficient submission).

Requests to speak in a personal capacity are also subject to review through the SET process to determine whether they involve genuinely personal capacity events, whether there are any ethics concerns with the engagement, and whether the engagement will disrupt EOIR operations by requiring the employee to miss work.[3] Requests that are for genuinely personal capacity engagements that raise no ethics concerns and occur outside of the requester's normal EOIR work schedule will ordinarily be approved.[4]

All requests, regardless of capacity, must comply with applicable law and agency policies, including all ethics laws, the Hatch Act, any applicable ethics and professionalism guides or rules, Department regulations in title 28 of the Code of Federal Regulations, the Justice Manual, and any

---

[2] For purposes of this memorandum, "speaking engagement" includes written pieces intended for publication in any print or online media.

[3] Requests for annual leave to speak in a genuinely personal capacity at an event that does not raise any ethics concerns, like all requests for annual leave, remain subject to supervisory approval.

[4] Although most invitations to speaking engagements for senior executive managers at EOIR are necessarily invitations to speak in an official capacity, there is no blanket prohibition on senior executive managers speaking in a personal capacity if the engagement is a genuinely personal capacity event that does not implicate any ethics issues or disrupt EOIR operations.

Memorandum to All of EOIR                                                    Page 3
Speaking Engagement Policy for EOIR Employees

other applicable EOIR or Department policies. Further, all employees, especially all non-supervisory adjudicators, seeking approval of a speaking engagement request in either capacity are reminded of the importance of maintaining impartiality and avoiding the appearance of impropriety, favoritism, or preferential treatment.

    A. *Supervisor Review*

    The new speaking engagement request form is housed on an internal portal that automates the speaking request process and allows an employee to easily upload information related to their proposed speaking engagement. Once submitted, the portal automatically sends the form to the employee's first-line supervisor for review. Supervisors will receive notification from the SET portal to review the form and related materials so the supervisors may determine whether the request should move forward in the review process. If the request is incomplete or the supervisor does not approve of the requested engagement, the supervisor will deny the request via the portal and provide an explanation for the denial. If the denial is made based on an incomplete or vague submission, the employee may resubmit a request including the necessary information. If the request passes the supervisor's review, the supervisor will approve the request in the portal and it will be routed to the headquarters speaking engagement team (SET) for further review.

    B. *SET Review*

    After initial supervisory review and approval, requests must be reviewed by the SET, which consists of the Office of Policy, the Office of the General Counsel (OGC), and the Office of the Director. This process ensures compliance with both the law and agency policy and consistency in EOIR's communications. If the SET determines that an employee's request to speak is inappropriate, a recommendation for a denial with an explanation will be sent to the employee's supervisor via the portal. If the SET determines that the request to speak is appropriate, a recommendation for approval will be sent to the employee's supervisor.

    C. *Ethics Review*

    The OGC Ethics Program (Ethics) will receive and review any SET requests that have been recommended for approval. Ethics neither approves nor denies requests to speak, but offers guidance to ensure that speakers do not experience an ethical dilemma. If Ethics reviews a request and has guidance to provide to an employee, Ethics will submit its comments to the employee and supervisor via the speaking engagement portal.

    D. *Final Review*

    After the SET and Ethics review the request, the employee's supervisor will make the final decision concerning approval or denial of the request and inform the employee of the supervisor's decision. The supervisor will also advise the employee of any guidance that has been offered by Ethics. If circumstances surrounding the speaking event change, the requesting employee should convey such changes to the supervisor, who should consult with the SET via EOIR.Speakers@EOIR.USDOJ.GOV to determine whether the employee's participation is still advisable. Note that communication via email should be only for approved requests or troubleshooting – all requests and resubmissions must be submitted through the portal.

Memorandum to All of EOIR                                                    Page 4
Speaking Engagement Policy for EOIR Employees

### III.  <u>Speaking in Official Capacity</u>

When an EOIR employee is assigned to participate as a speaker or panel participant or otherwise present information on behalf of the agency at a conference or other event, the employee is doing so in an official capacity.  Any EOIR employee speaking at an event hosted by a Federal Department, Office, or Agency, or at an event featuring representatives from other Departments, Offices, Agencies or members of Congress, must speak in an official capacity.  This includes speaking at naturalization ceremonies even when not administering the naturalization oath.

If travel is required for an employee to speak in an official capacity, generally the employee may not accept reimbursement for travel and related expenses from any source other than the government.  However, 41 C.F.R. Chapter 304 authorizes the Department (or the employee on the Department's behalf) to accept payment of travel expenses from a non-Federal source, but only "when specifically authorized to do so" and "only for official travel to a meeting."[5]  Please note that EOIR has determined, as a matter of policy, that it will not accept any payment for the official travel of its employees by a non-Federal source that is considered a prohibited source for EOIR.  A prohibited source is considered a person or entity who seeks official action from the agency, does business with the agency, appears before the agency, or is an organization a majority of whose members are described in this section.[6]  As an adjudicatory body, EOIR should expect to be under constant scrutiny.  EOIR employees must avoid all improprieties and the appearance of impropriety to ensure complete public confidence in the integrity of our agency.  The acceptance of travel reimbursement for official duties from prohibited sources could undermine the public's confidence in the impartiality of EOIR's adjudicators.  Likewise, under no circumstances may an EOIR employee receive a supplementation of salary (e.g., an honorarium) from a non-Federal source for a speaking activity that is done in an official capacity.[7]

### IV.  <u>Speaking in a Personal Capacity</u>

When an EOIR employee participates in a speaking engagement in a personal capacity, the employee is not appearing at an event as part of the employee's official duties or on behalf of the agency.  Therefore, the employee may not imply that EOIR is endorsing or sanctioning the speaking engagement, as it is considered an outside speaking activity.  EOIR employees may not use or permit the use of an official title or position to identify themselves in connection with the speaking activity unless it is included as one of several biographical details when such information is given to identify the individual in connection with the activity, provided that their title or position is given no more prominence than other significant biographical details.  When one's official title is used in this manner, as part of an overall biographical sketch, a disclaimer is not required.  Alternatively, in limited circumstances where an introduction does not include an overall biographical sketch, an employee may be introduced using a title so long as the employee indicates at the beginning of the remarks that the employee is not speaking on behalf of the agency.

---

[5] *41 C.F.R. § 304-5.3 further provides that reimbursement for travel from outside sources must not be authorized if the approving official determines that acceptance of the payment under the circumstances would cause a reasonable person with knowledge of all the facts relevant to a particular case to question the integrity of agency programs or operations.  An employee who accepts travel from a non-Federal source in violation of 41 C.F.R. § 304-1.2 may be required to repay the amount of payment accepted from the non-Federal source and could be subject to additional penalties*

[6] *5 C.F.R. § 2635.203(d).*

[7] *18 U.S.C. § 209.*

Memorandum to All of EOIR                                                          Page 5
Speaking Engagement Policy for EOIR Employees

Additionally, the employee may not permit the sponsoring organization to use the employee's official title in the promotion of the event in which the employee is invited to speak.

If an EOIR employee is traveling to speak at an event in a personal capacity, the employee is not entitled to travel reimbursement by the agency. However, when traveling in a personal capacity, an EOIR employee may accept reimbursements for travel expenses from the entity that is sponsoring the activity.[8] On the other hand, employees offered travel reimbursement for mere attendance (as opposed to speaking on a panel) at a conference in a personal capacity must contact Ethics for a determination as to whether accepting the reimbursement of travel expenses is appropriate. Ethics will apply the gift rules in deciding whether such employee may accept payment of these expenses. Factors that must be taken into consideration when applying the gift rules include the source and value of the reimbursement.[9] In either circumstance, the agency highly encourages consulting their supervisor to ensure the employee's evaluation of the engagement is in line with the agency's.

Please remember that the issuer of the invitation cannot be a prohibited source, and no EOIR employee may receive compensation for any outside speaking activity that relates to their official duties.

## V.    Conclusion

This policy does not necessarily address every situation that may arise related to speaking engagements. It is intended to restate and clarify a standard by which events may be evaluated. If questions arise regarding the application of this policy or the proper determination of a speaking capacity, please contact the Speakers Inbox at EOIR.Speakers@EOIR.USDOJ.GOV.

---

[8] *Sanjour v. Environmental Protection Agency*, 56 F.3d 85 (D.C. Cir. 1995); 5 C.F.R. § 2635.807(a)(2)(iii)(D).
[9] 5 C.F.R. § 2635.201-205.

JA052

**Attachment A**

The Speaking Engagement Policy identifies the two capacities (Official and Personal) in which an EOIR employee may speak when the employee is invited to participate in an event that involves immigration issues, relates to the employee's official duties, or is invited because of the employee's official position at the agency.  Official and Personal Capacity designations are provided below with examples of appropriate events found within each category.  Note that this is not an exclusive list, as some events, activities and forums may not be listed below.

**Official Capacity**

1. For any event where at least one DOJ or EOIR official is participating officially, all EOIR participants must speak in their official capacity.
2. For any event where an inviter is a Federal government agency and the employee is asked to speak or present at a government event, the EOIR employee must speak in their official capacity.
3. Immigration Conferences or similar events where the subject is immigration (including litigation)
4. Meetings with Stakeholders
5. Naturalization Ceremony, as guest speaker or to administer the oath
6. Court Visits by Outside Groups
7. Pro Bono training related to immigration
8. EOIR Mock Hearing Program
9. Recruiting for EOIR internship program

**Personal Capacity**

1. Moot Court judge - not immigration related
2. Commencement Speaker
3. Career Day/Alumni Career Panel - to discuss full career path and experience
4. Meeting with Boy Scouts or Girl Scouts or similar organizations
5. Interview based on book written in personal capacity
6. Speaking at a book club or hobbyist meeting

Attachment 3 to Second
Amended Complaint
(ECF No. 65-3), filed January 9,
2023

# ATTACHMENT 3

Case 1:20-cv-00731-LMB-JFA   Document 65-3   Filed 01/09/23   Page 2 of 8 PageID# 627

**OOD**
**Effective: October 2021**



## SPEAKING ENGAGEMENTS

| | |
|---|---|
| **PURPOSE:** | To update the policy surrounding speaking engagements and the procedures employees must follow when requesting approval to speak at outside engagements. |
| **OWNER:** | Office of the Director |
| **AUTHORITY:** | 18 U.S.C. § 209; 5 CFR § 2635.201-205, 2635.807(a)(2)(iii)(D); 8 CFR § 1003.0(b)(l); 41 CFR Chapter 304. |
| **CANCELLATION:** | *Submission and Processing of Requests for Speaking Engagements*, January 2020 |

## I.    Introduction

Our agency's stakeholders and other members of the public continue to be interested in hearing about, and understanding, what the agency does and specifically how immigration courts operate. Our immigration judges, appellate immigration judges, and administrative law judges, along with senior EOIR officials and other staff, are frequently invited to speak or write on immigration law and policy at different events across the country. EOIR encourages qualified personnel at all levels to engage in these public speaking opportunities as a means of keeping the public informed of EOIR's mission, operations, and programs.

The agency has issued several memoranda related to speaking engagement approvals, most recently focusing on the process through the Speaking Engagement Team (SET) on the intranet portal. The SET consists of representatives from the Office of Policy, the Office of the General Counsel (OGC), and the Office of the Director, and assists with ensuring compliance with both the law and agency policy while also promoting consistency in all of EOIR's communications.

The following updates to the requirements related to personal and official capacity requests changes the process for seeking approval for official capacity requests and eliminates the requirement to seek approval for personal capacity speaking engagements on subjects unrelated to a person's official duties.

EOIR appreciates the diversity of our workforce and recognizes that employees engage in many activities outside of the workplace, often unrelated to their official duties. That said, speaking engagements directly related to the employee's official duties provide the public with the impression that the speech has the imprimatur of the agency, and therefore, require close coordination with the employee's supervisor, who may receive guidance from the SET. It is equally important, however, that employees enjoy the uninhibited ability to speak in a personal capacity about those parts of their lives that do not relate to their job.

## II.     Official Capacity

When an employee is invited to participate in an event because of their official position, is expected to discuss agency policies, programs, or a subject matter that directly relates to their official duties, or otherwise appear on behalf of the agency, the appearance and participation will be considered in an official capacity. Employees must request and receive their supervisor's approval prior to accepting an invitation to speak or participate in a panel in their official capacity. The request for approval must include event logistics and intended materials (i.e., presentations, talking points, handouts). Supervisors are encouraged to grant appropriate requests.

When an EOIR employee is assigned to participate as a speaker or panel participant or otherwise present information on behalf of the agency at a conference or other event, or requests to do so, the employee is doing so in an official capacity.  Further, any EOIR employee speaking at an event hosted by a Federal Department, Office, or Agency, or at an event featuring representatives from other Departments, Offices, Agencies or members of Congress, is presumed to be speaking in an official capacity.

Supervisors must consider the nature and purpose of the engagement, the host(s) and sponsor(s) of the event, and whether the event provides an appropriate forum for the dissemination of the information to be presented, before making a determination on the appropriate capacity of an individual employee's involvement. Supervisors may seek assistance from the SET in determining the appropriate capacity for a specific event.

## III.     Personal Capacity

An employee who seeks to speak in a personal capacity on a topic that is unrelated to official duties is not required to seek supervisory approval for participating in the engagement. However, if the engagement occurs during an official schedule of duty, a leave request submitted through the Time and Attendance process is required, and pursuant to OPM Policy supervisors may inquire how the employee intends to use the time before approving the leave request. Administrative leave is not authorized for a personal capacity speaking engagement.  Examples of personal capacity engagements can be found at Appendix A. If a supervisor approves an engagement, the supervisor would then obtain and provide guidance related to any ethical obligations that may impact the individual's decisions regarding participation.  Any employee who does not seek supervisory approval for speaking in a personal capacity is responsible for determining any ethical obligations associated with the speaking engagement, and is encouraged to contact the OGC Ethics Program. If an employee believes that there is potential that a speaking engagement may result in the perception by the public that the engagement relates to the employee's official duties or employment with EOIR, the employee is encouraged to discuss the engagement with their supervisor, who will assist in determining if approval is required.

Supervisors may also provide direction to the employee on the appropriateness of material to be shared and on the substance of information conveyed during the engagement to avoid the perception that the employee is speaking in an official capacity or with EOIR's imprimatur.

Employees and supervisors are encouraged to maintain an open dialogue regarding public speaking engagements. An employee who participates in an event that requires official capacity, or improperly presents the appearance of official capacity, without first obtaining supervisory approval may be subject to discipline.

When an EOIR employee participates in a speaking engagement in a personal capacity, the employee is not appearing at the event as part of the employee's official duties or on behalf of the agency. Therefore, the employee may not state or imply that EOIR endorses or sanctions the speaking engagement, as it is considered an outside speaking activity. When participating in an outside speaking activity in a personal capacity, EOIR employees may not use an official title or position or permit the use of an official title or position to identify themselves in connection with such information is included as one of several biographical details and is given to identify the individual in connection with the activity, provided that the title or position is given no more prominence than other significant biographical details. When an employee's official title and/or position is used as part of an overall biographical sketch of the employee, a disclaimer is not required. When an introduction does not include an overall biographical sketch, an employee may be introduced using an official title or position so long as the employee indicates at the beginning of the remarks that the employee is not speaking on behalf of the agency.[1] Further, as discussed above, employees must be in an annual leave status for any personal capacity event occurring during their schedule of duty.

EOIR employees speaking in a personal capacity are responsible for ensuring that the hosting organization is aware that the employee is appearing in a personal capacity and does not improperly convey appearance of official capacity (*e.g.*, promotional materials including the employee speaker's name and official title outside of the guidelines herein). Whether or not the employee opted to seek supervisory approval for participating in a speaking engagement in their personal capacity, if the circumstances surrounding the speaking event change, the requesting employee should convey such changes to the supervisor to consider the advisability of the employee's continued participation. The supervisor may consult with the SET for additional guidance, if needed.[2]

## IV.    Supervisor's Decision

Supervisors must submit for guidance from the SET all speaking engagement requests that relate to the employee's official duties—regardless of the employee's proposed capacity. It is important to note that the OGC Ethics Program (Ethics) will receive and review all speaking engagement requests that relate to the employee's official duties, regardless of capacity, that a supervisor has recommended for approval. Note that, while Ethics does not approve or deny requests to speak, it offers guidance to avoid speakers' ethical dilemmas, including the prohibition

---

[1] An example of a proper disclaimer is "The views and opinions I am expressing today are my personal views and opinions and are not necessarily those of EOIR."

[2] Supervisors seeking additional guidance on an approved request may submit an email directly to the SET team at EOIR.Speakers@EOIR.USDOJ.GOV. The SET email address should only be used for approved requests or for troubleshooting issues with the online portal. All new requests or resubmissions must be submitted through the SET portal.

against the receipt of compensation for any speaking engagements that are in an official capacity or are related to one's official duties. If, following review, Ethics has guidance to provide to an employee, Ethics will provide its comments to the employee and supervisor. When the supervisor is submitting a speaking engagement request through the portal for informational purposes only, such as a personal capacity engagement or a subsequent official capacity engagement where blanket approval has been granted, (i.e., the supervisor is not seeking SET guidance), no further action is required after submitting the request through the portal.

Supervisors seeking guidance on speaking capacity are encouraged to submit such requests at least ten days before the speaking engagement. If a supervisor is evaluating a request for personal capacity and seeks guidance to determine whether the employee should participate instead in official capacity, the supervisor must include in the request for guidance the employee's talking points and any handouts or presentation materials associated with the speaking engagement. When seeking such guidance, the supervisor must also include specific questions or notes in the Comments section of the speaking engagement Request Form.

After the supervisor completes the final review of an employee's request, including consideration of any guidance received from the SET, the supervisor will make the final decision concerning approval or denial of the request and inform the employee of the supervisor's decision. The supervisor may also advise the employee of any guidance offered by the SET, and will provide any guidance offered by Ethics.

## V.    Travel

If travel is required for an employee to speak in an official capacity, generally the employee may not accept reimbursement for travel and related expenses from any source other than the government. However, 41 C.F.R. Chapter 304 authorizes the Department (or the employee on the Department's behalf) to accept payment of travel expenses from a non-Federal source, but only "when specifically authorized to do so" and "only for official travel to a meeting." Please note that EOIR has determined, as a matter of policy, that it will not accept any payment for the official travel of its employees by a non-Federal source that is considered a prohibited source for EOIR.[3] A prohibited source is a person or entity who seeks official action from the agency, does business with the agency, appears before the agency, or is an organization a majority of whose members are described in this section.[4] EOIR employees must avoid all improprieties and the appearance of impropriety to ensure complete public confidence in the integrity of our agency. The acceptance of travel reimbursement for official duties from prohibited sources could undermine the public's confidence in the impartiality of EOIR's adjudicators. Likewise, under no circumstances may an EOIR employee receive a supplementation of salary (e.g., an honorarium) from a non-Federal source for a speaking activity that is done in an official capacity.[5]

---

[3] 41 C.F.R § 304-5.3 further provides that reimbursement for travel from outside sources must not be authorized if the approving official determines that acceptance of the payment under the circumstances would cause a reasonable person with knowledge of all the facts relevant to a particular case to question the integrity of agency programs or operations. An employee who accepts travel from a non-Federal source in violation of 41 C.F.R. § 304-1.2 may be required to repay the amount of payment accepted from the non-Federal source and could be subject to additional penalties.

[4] 5 C.F.R. § 2635.203(d).

[5] 18 U.S.C. § 209.

If an EOIR employee travels to speak at an event in a personal capacity, the employee is not entitled to travel reimbursement by the agency. When traveling in a personal capacity, an EOIR employee may accept reimbursements for travel expenses from the entity that is sponsoring the activity.[6] Employees offered travel reimbursement for mere attendance (without a speaking commitment, such as on a panel) at a conference in a personal capacity must contact Ethics for a determination as to whether accepting the reimbursement of travel expenses is appropriate. Ethics will apply the gift rules in deciding whether the employee may accept payment of these expenses. Factors that must be taken into consideration when applying the gift rules include the source and value of the reimbursement.[7] In all circumstances involving reimbursement for travel from a non-government entity, EOIR highly encourages employees to consult their supervisor to ensure the employee's evaluation of the travel reimbursement does not create any ethical conflicts or other issues based on the employee's official duties.

## VI.    Exception for Teaching

An employee who is interested in teaching an immigration law course, or any course on a subject matter or topic that is related to their official duties, is required to obtain prior approval from their supervisor. Additionally, it is recommended, but not required, that supervisors submit speaking engagements in the form of teaching requests for those courses described above and others to the SET - primarily for informational purposes - but also to confirm if the employee may receive compensation. Of course, supervisors may seek additional guidance as needed or desired.

When engaging in teaching, speaking, or writing in a personal capacity, an employee may not use nonpublic information, or use an official title except as part of other biographical information. An employee may not use their official time or that of another employee for the engagement, including preparation of materials.

## VII.    Exclusions and Blanket Approvals for Recurring Speaking Engagements

Although speaking in an official capacity, EOIR employees who engage with the public or other agencies as part of their assigned duties or on a recurring or repetitive basis may obtain blanket approval. The supervisor will determine whether a blanket approval is appropriate for the engagement and any subsequent engagements after considering information provided by the employee, including clear descriptions of the purpose, format, audience, participants, and topics covered.   When such a blanket approval is granted, employees need only notify their supervisor that they will be attending any subsequent meetings.  Employees must take care to stay within the bounds of the approval and to seek additional approvals as necessary.

## VIII.   Conclusion

This policy may not address every situation that may arise related to speaking engagements. It is intended to restate and clarify the standard for evaluating requests for speaking engagements. If questions arise regarding the application of this policy or the proper determination of a speaking capacity, please contact the Speaking Engagement Team at EOIR.Speakers@EOIR.USDOJ.GOV.

---

[6] *Saniour v. Environmental Protection Agency*, 56 F.3d 85 (D.C. Cir. 1995); 5 C.F.R. § 2635.807(a)(2)(iii)(D).
[7] 5 C.F.R. § 2635.201-205.

All employees speaking to a public group, regardless of the employee's capacity for the specific engagement, must comply with applicable law and agency policies, including all ethics laws, the Hatch Act, any applicable ethics and professionalism guides or rules, Department regulations in title 28 of the Code of Federal Regulations, the Justice Manual, privacy and information disclosure laws, and any other applicable EOIR or Department policies. Further, all employees, especially all non-supervisory adjudicators, seeking approval of a speaking engagement request in either capacity are reminded of the importance of maintaining impartiality and avoiding the appearance of impropriety, favoritism, or preferential treatment.

Please remember that the issuer of the invitation cannot be a prohibited source, and no EOIR employee may receive compensation for any outside speaking activity that relates to their official duties. Supervisors and employees who have questions regarding prohibited sources are encouraged to seek guidance from the SET.

October 12, 2021

DAVID NEAL
Digitally signed by DAVID NEAL
Date: 2021.10.12 18:25:55 -04'00'

David L. Neal, Director
Executive Office for Immigration Review

**Attachment A**

Official and Personal Capacity designations are provided below with examples of appropriate events found within each category. Note that this is not an exclusive list, as some events, activities and forums may not be listed below.

**Official Capacity**

For any event where at least one DOJ or EOIR official is participating officially, all EOIR participants must speak in their official capacity.

For any event where the host/sponsor is a Federal Government agency or the employee is asked to speak or present at a Government event, the EOIR employee is presumed to speak in their official capacity.

Immigration conferences or similar events where the subject is immigration (including litigation).

Meetings with Stakeholders.

Naturalization ceremony, as guest speaker or to administer the oath.

Court visits that include engagement with outside groups or individuals.

Pro bono training related to immigration.

EOIR Model Hearing Program.

Recruiting.

**Personal Capacity**

Moot court judge - not immigration related.

Commencement speaker when topic is unrelated to immigration or official duties.

Career day/Alumni career panel - to discuss full career path and experience.

Interview based on book written in appropriate personal capacity.

Speaking at community, religious, youth, or small social groups (e.g., book club) and meetings, not directly related to immigration law or advocacy.

Memorandum Opinion
(ECF No. 77), filed September
21, 2023

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NATIONAL ASSOCIATION OF          )
   IMMIGRATION JUDGES, affiliated with the   )
   International Federation of Professional and   )
   Technical Engineers,              )
                                )     1:20-cv-731 (LMB/JFA)
       Plaintiff,                )
                                )
   v.                      )
                                )
DAVID L. NEAL, in his official capacity as   )
   Director of the Executive Office for   )
   Immigration Review,              )
                                )
       Defendant.               )

MEMORANDUM OPINION

Plaintiff, the National Association of Immigration Judges ("plaintiff" or "NAIJ"), a voluntary association of immigration judges, [Dkt. No. 65] at ¶ 7,[1] challenges the 2021 "Speaking Engagements" policy ("2021 policy") of the Executive Office for Immigration Review ("EOIR") on the grounds that it constitutes a prior restraint on the speech of immigration judges in violation of the First Amendment and that it is void for vagueness under the First and Fifth Amendments because it effectively prohibits immigration judges from speaking in their personal capacities about immigration law or policy and EOIR.  [Dkt. No. 65] at ¶¶ 1, 63–64; [Dkt. No. 65-3].  Defendant, David L. Neal ("defendant" or "EOIR") has filed a Motion to Dismiss plaintiff's Second Amended Complaint for Declaratory and Injunctive Relief ("SAC"), arguing that plaintiff lacks Article III standing, that its claims are jurisdictionally barred by the Civil Service Reform Act of 1978 ("CSRA"),[2] and that it has failed to state a claim upon which

_____

[1] Until April 15, 2022, NAIJ was a labor union representing immigration judges.

[2] Pub. L. No. 95–454, 92 Stat. 1111 (codified as amended throughout 5 U.S.C.).

relief can be granted. For the reasons that follow, the Court finds that, although plaintiff has sufficiently alleged Article III standing, the CSRA strips the Court of jurisdiction over plaintiff's claims. As such, the Court will not reach the merits of the parties' other arguments, and will grant defendant's Motion to Dismiss.

## I. BACKGROUND

### A. **Factual Background**

#### 1. History of EOIR's Speaking Engagement Policies

Before 2017, immigration judges' speaking engagements and publications were subject to supervisory approval, but approval was "routinely" granted, and judges were frequently able to speak in their personal capacities about immigration and EOIR at conferences, schools, and in law review articles. [Dkt. No. 65] at ¶ 17–18. Judges were permitted to use their official titles to identify themselves to their audience, as long as they also included a disclaimer that the views represented were their own. Id. at ¶ 18. To receive approval to speak or write publicly, a judge would submit a request to a supervising Assistant Chief Immigration Judge ("supervisor"). If a request were approved by the supervisor, it would be forwarded to a department official to provide ethical guidance. Id. The Ethics and Professionalism Guide for Immigration Judges ("Ethics Guide"), enacted in 2011 and signed by both the EOIR and NAIJ, when it served as a union for immigration judges, approved this process and memorialized the Ethics Guide. [Dkt. No. 65] at ¶ 18; Ethics Guide, 8–9, 17.[3]

---

[3] Ethics and Professionalism Guide for Immigration Judges, Executive Office for Immigration Review, (Jan. 26, 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf [https://perma.cc/M6LA-JUFZ]. The Ethics Guide is incorporated in the SAC, defendant has linked to it in the Motion to Dismiss, and plaintiff does not contest its authenticity. As such, the Court can properly consider it. In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (stating standard for 12(b)(1) motion); Lokhova v.

Beginning in 2017, EOIR's approach to how immigration judges could speak about immigration or EOIR in their private capacities began to change. On September 1, 2017, EOIR promulgated a memorandum titled "Speaking Engagement Policy for EOIR Employees" ("2017 policy"), which required judges who were invited to speak at an event[4] "about immigration-related topics" to receive not only supervisory approval for the engagement, but also to seek review of the request by the Office of General Counsel ("OGC") and the Office of Communications and Legislative Affairs ("OCLA") through the "headquarters speaking engagement team." ("SET"). [Dkt. No. 65-1] at 3, 6. The 2017 policy did not outline criteria for approval of these speaking engagement requests and lacked a timeline for decisions, although it encouraged requests to be submitted to the SET within seven days of the event at which the judge wanted to speak. Id. at 3. The 2017 policy stated that the goal of the SET review was to "allow[] OCLA to ensure that EOIR's messaging is consistent across official engagements." Id. In 2018, NAIJ engaged in collective bargaining over the 2017 policy, resulting in the 2018 Memorandum of Understanding between EOIR and the NAIJ. [Dkt. No. 65] at ¶ 24. This Memorandum imposed deadlines on the approval process that supervisors and the SET aimed to meet, and committed EOIR to providing NAIJ with a list of factors that EOIR would consider when approving speaking engagement requests. [Dkt. No. 3].

In January 2020, EOIR issued a new memorandum titled "Submission and Processing of Requests for Speaking Engagements" ("2020 policy"). [Dkt. No. 65] at ¶ 25; [Dkt. No. 65-2]. Although the 2020 policy only purported to reissue the 2017 policy and "clarify some points that

---

Halper, 441 F. Supp. 3d 238, 252 (E.D. Va. 2020) (quoting Sec'y of State for Defense v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)) (stating standard for 12(b)(6) motion).

[4] The 2017 policy only applied to speaking engagements, rather than written publications. [Dkt. No. 65-1].

have occasionally caused confusion," [Dkt. No. 65-2] at 2, plaintiff alleges that the 2020 policy

was "significantly more restrictive than its predecessor," [Dkt. No. 65] at ¶ 25. The 2020 policy

prohibited immigration judges from speaking or writing[5] about immigration or EOIR in their

personal capacities by labeling any speech or writing about "immigration law or policy issues,

the employee's official EOIR duties or position, or any agency programs and policies" as

"official" speech. [Dkt. No. 65-2] at 3; [Dkt. No. 65] at ¶ 29. The 2020 policy also required

SET review of requests to speak in a personal capacity about any topic so that EOIR could

"determine whether [the requests] involve genuinely personal capacity events, whether there are

any ethics concerns with the engagement, and whether the engagement will disrupt EOIR

operations by requiring the employees to miss work." [Dkt. No. 65-2] at 3.

 The 2020 policy specifically outlined the multiple layers of review for all requests by

immigration judges and other EOIR employees to participate in a speaking engagement or to

publish a piece of writing.[6] Id. It required judges to submit a request including any

"presentation slides and hand out materials if applicable and complete talking points at a

minimum" through EOIR's portal. Id. at 3. In the first step, the judge's supervisor would

determine if the request should move forward in the approval process. Id. at 4. If the supervisor

did not reject the request, the SET would review the request and make a recommendation to the

supervisor. Id. The Office of General Counsel's Ethics Program ("Ethics Program") would also

review the request for any ethical concerns, but would not make a recommendation as to whether

---

[5] The 2020 policy applied to all "written pieces intended for publication," rather than just
speaking engagements. [Dkt. No. 65-2] at 3 n.2; [Dkt. No. 65] at ¶ 26.

[6] Plaintiff alleges that this multi-step review process was "instituted" by the 2021 policy;
however, the policy itself, attached to the SAC, states that it "does not change the approval
process" but, rather, only changes "the mechanism by which approval is sought," i.e., through a
new online portal. [Dkt. No. 65-2] at 3.

the supervisor should approve or deny the request. Id. Finally, the supervisor would consider

the recommendation provided by the SET and the guidance provided by Ethics, and make a final

determination. Id. Plaintiff alleges that, if the engagement involved prepared materials, the

supervisor could condition approval on the judge making changes. [Dkt. No. 65] at ¶ 26.

Like the 2017 policy, the 2020 policy did not contain specific criteria for supervisors or

the SET to consider when reviewing and approving or denying requests, other than indicating

that "[a]ll requests, regardless of capacity, must comply with applicable law and agency

policies," and that "all employees, especially all non-supervisory adjudicators," such as

plaintiff's members, "seeking approval of a speaking engagement request in either capacity are

reminded of the importance of maintaining impartiality and avoiding the appearance of

impropriety, favoritism, or preferential treatment." Id. at 3–4; [Dkt. No. 65] at ¶ 27. The 2020

policy also did not include a timeline by which the approval process would be completed, other

than specifying that requests should be submitted no later than two weeks before an engagement.

[Dkt. No. 65-2] at 3.

    2. 2021 Speaking Engagement Policy

The EOIR policy at issue in this litigation became operational in October 2021 ("2021

policy"). [Dkt. No. 65-3] at 2. It effectively continues to prohibit immigration judges from

speaking or writing in their personal capacities about immigration or EOIR, although it does not

do so as explicitly as the 2020 policy. Under the 2021 policy, EOIR employees speak in their

official capacity "[w]hen an employee is invited to participate in an event because of their

official position, is expected to discuss agency policies, programs, or a subject matter that

directly relates to their official duties, or otherwise appear on behalf of the agency."[7] Id. at 3.

---

[7] Largely consistent with the 2017 and 2020 policies, the 2021 policy also defines official
capacity speech as "[w]hen an EOIR employee is assigned to participate as a speaker or panel

"Attachment A" to the 2021 policy gives examples of official capacity engagements, including

"[i]mmigration conferences or similar events where the subject is immigration (including

litigation)," "[m]eetings with [s]takeholders," "[p]ro bono training related to immigration," and

the "EOIR Model Hearing Program." Id. at 8.  Attachment A's examples of personal capacity

engagements confirm that the 2021 policy continues the 2020 policy's prohibition on personal

capacity speech about immigration, as it explicitly excludes speaking about immigration from

many of the following examples of personal capacity speech: "[m]oot court judge - not

immigration related," "[c]ommencement speaker when topic is unrelated to immigration or

official duties," "[c]areer day/[a]lumni career panel - to discuss full career path and experience,"

"[i]nterview based on book written in appropriate personal capacity," "[s]peaking at community,

religious, youth, or small social groups (e.g., book club) and meetings, not directly related to

immigration law or advocacy." Id. at 8.

    Under the 2021 policy, requests to speak or write in an official capacity, which includes

any speech about immigration or EOIR, must undergo a multi-step review process, which is

largely similar to the approval process outlined in the 2020 policy. Id. at 4–5.  It requires

supervisors to submit requests for review by the SET and by the Ethics Program, and permits

supervisors to make the final decision as to whether a judge must speak or write in his or her

official or personal capacity and whether to approve official capacity requests.[8]  Id.  The 2021

---

participant or otherwise present information on behalf of the agency at a conference or other
event, or requests to do so," and states that "any EOIR employee speaking at an event hosted by
a Federal Department, Office, or Agency, or at an event featuring representatives from other
Departments, Offices, Agencies or members of Congress" will be presumed to be speaking in an
official capacity." [Dkt. No. 65-3] at 3.

[8] The 2021 policy does not require the SET to review requests by judges to teach classes on
immigration, although it does recommend that supervisors submit these requests to the SET for
guidance. [Dkt. No. 65-3] at 6.

policy does not list extensive criteria for supervisors to use in determining whether a judge's speech is in the judge's official or personal capacity. Other than the broad definition of official capacity speech and the examples given in Attachment A, the 2021 policy only specifies that a supervisor "must consider the nature and purpose of the engagement, the host(s) and sponsor(s) of the event, and whether the event provides an appropriate forum for the dissemination of the information to be presented" when determining the proper capacity of a judge's speech for an engagement. [Dkt. No. 65-3] at 3. Supervisors may also seek guidance from the SET as to how to classify an engagement. Plaintiff alleges that "supervisors treat [the SET's] input as determinative." [Dkt. No. 65] at 13 n.4.

Like the 2017 and 2020 policies, the 2021 policy does not provide supervisors with criteria to consider when approving or denying a request by a judge to speak or write in his or her official capacity. It merely states that "[s]upervisors are encouraged to grant appropriate requests." [Dkt. No. 65-3] at 3. The 2021 policy continues to lack a timeline for the approval process, but supervisors are encouraged to submit requests relating to a judge's official duties at least ten days before the event at which the judge wants to speak or the date by which a writing is due. [Dkt. No. 65-3] at 5.

Under the 2021 policy, judges generally are not required to seek approval for any personal capacity speaking engagements or writing, a change from the 2020 policy which required approval for any personal capacity event. [Dkt. No. 65-3] at 3; [Dkt. No. 65-2] at 3. But plaintiff alleges that the 2021 policy keeps supervisors, the SET, and Ethics involved in reviewing and approving personal capacity requests in one "significant carveout." [Dkt. No. 65] at ¶ 30. If an event takes place during working hours, a leave request must be submitted to the judge's supervisor, and the supervisor may "inquire how the employee intends to use the time

before approving the leave request." [Dkt. No. 65-3] at 3. If the supervisor "approves an engagement," the supervisor would then solicit ethics guidance and pass this along to the employee. Id. The SAC alleges that the 2021 policy permits EOIR to exert control over personal capacity speech even when formal approval is not required. For example, even if a judge did not initially seek approval to speak at an event because the judge was appearing in a personal capacity outside of working hours, the 2021 policy specifies that, "if the circumstances surrounding the speaking event change, the requesting employee should convey such changes to the supervisor to consider the advisability of the employee's continued participation." Id. at 4. Additionally, the 2021 policy encourages judges to consult with their supervisors if they believe "that there is a potential that a speaking engagement may result in the perception by the public that the engagement relates to the employee's official duties or employment with EOIR." Id. at 3. To enforce compliance with all of the described procedures, the 2021 policy states that a judge "who participates in an event that requires official capacity, or improperly presents the appearance of official capacity, without first obtaining supervisory approval may be subject to discipline." Id. at 4.

3. Individual Judges' Experiences with the 2021 Policy

The SAC contains a number of allegations as to how the 2021 policy has stymied the ability of judges to speak about immigration in their personal capacities, claiming that "many judges who wish to share their private views on substantive questions of immigration law or policy no longer do so." [Dkt. No. 65] at ¶ 47. For example, before 2017, NAIJ President Judge Mimi Tsankov frequently participated in her personal capacity on conference panels, speaking about immigration-related issues such as mental competency and juvenile hearings, court practice and procedure, and "crimmigration" issues. Id. She also published articles in her personal capacity on topics related to immigration law. Id. The SAC alleges that, although

Judge Tsankov would like to continue to speak in her personal capacity on panels or publish writing about immigration law, she has not sought approval to do so "because she understands the [2021] [p]olicy to prohibit her from speaking about these issues in her private capacity," and because speaking in her official capacity "would require her to recite the agency's talking points." Id. at ¶ 48. Despite her reluctance to seek approval to speak at events or publish writing about immigration, Judge Tsankov has requested approval to teach a course on immigration law at Fordham Law School in her personal capacity. Id. at ¶ 53. Plaintiff alleges that, although the 2021 policy provides that a judge only needs to receive supervisory approval to teach an immigration law course, "in practice, requests to teach are routed to the SET, and judges who have sought approval often receive no decision." Id. In Judge Tsankov's case, although she submitted her request on November 3, 2022 to teach a course in the Spring 2023 semester, the request remained pending at the time the SAC was filed on January 9, 2023. Id.

NAIJ Vice President Judge Samuel Cole has similarly experienced delays in the approval process, and the SAC alleges that he has been encouraged by EOIR to make changes to his written work about immigration. On September 2, 2022, Judge Cole emailed his supervisor requesting to publish an article about immigration court bond hearings. Id. at ¶ 49. Although he wanted to publish the article in his personal capacity, he requested authorization in either his personal or official capacity because he did not believe a personal capacity request would be approved for an article on this topic. Id. Judge Cole's article was determined to be official capacity speech, and, because of this, a member of EOIR's Office of Policy "made several edits to the tone and substance of the piece," which the SAC alleges "demonstrate the control that the agency exercises over immigration-related speech that the agency deems 'official capacity.'" Id. at ¶¶ 50–51. The article "seeks to give practitioners practical advice on how to approach

immigration court bond hearings," and the SAC alleges that certain comments made by a reviewing official indicated her view that "certain observations made in the piece were not appropriate because they were not the official view of the agency." Id. at ¶ 51. For example, in response to one observation made by Judge Cole in the article, the reviewing official asked whether it constituted a "'sanctioned' EOIR practice tip," because Judge Cole was writing in his official capacity. Id. In response to another observation, which was described as the "author's opinion," the reviewing official asked again if it was an "EOIR tip," and, if it was, it "should not be expressed as [the] author's opinion." Id. If it was not, an "evaluation must be done as to whether [it was] appropriate in [his] official capacity." Id. Even after making revisions to his article in response to these comments by the SET, Judge Cole's request had not been approved by January 9, 2023. Id.

A judge who wished to remain unnamed similarly experienced a delay in receiving approval to publish an article under the 2021 policy. She intended to publish an article titled "Five Perspectives on Immigration Law and Policy," and, although she would have preferred to publish the article in her personal capacity, she submitted the article for approval without specifying the capacity for which she sought approval "to maximize the chance approval would be granted." Id. at ¶ 52. She submitted this request to her supervisor on September 6, 2022, and the supervisor forwarded this request to the SET the next day. Id. Even though the supervisor followed up with the SET six separate times, as of January 9, 2023, the request had not been granted. Id.

Delays caused by the approval process have presented issues for two other judges as well. Judge Frank Loprest requested to teach an immigration law course for Spring 2023 at St. John's University School of Law. Id. at ¶ 53. Despite making this request on October 20, 2022, the

request had neither been approved nor denied as of January 9, 2023. Id. On October 3, 2022,

Judge Michael Straus sought approval to speak about immigration court practice at a November

17, 2022 meeting of the Connecticut chapter of the American Immigration Lawyers Association

("AILA"). Id. at ¶ 54. He requested to speak in his official capacity because "he believed that

this is what the [2021 policy] required him to do," even though he would have preferred to speak

in his personal capacity. Id. On November 1, 2022, his supervisor asked him to send talking

points that the SET could consider when making its decision, advising him that the SET would

not approve any speech about "EOIR and court 'initiatives, updates, and policies, because those

are topics that only the [Assistant Chief Immigration Judge] and [Court Administrator] can

generally speak about to outside groups.'" Id. (alteration in original). He agreed to confine his

remarks to just his own docket in the court. Id. Eventually, his request was approved; however,

he received the approval on November 17, 2022, the day of the meeting, despite having

submitted his request almost two months before. Id. Because the event organizers had not

received a timely confirmation that he could participate, they had already made plans to proceed

without his participation. Id.

### B. Procedural History

On July 1, 2020, the NAIJ filed its initial complaint [Dkt. No. 1] and a Motion for a

Preliminary Injunction, [Dkt. No. 9], seeking to enjoin the enforcement of the 2017 and 2020

policies, both of which were still in effect. On August 6, 2020, Judge Liam O'Grady[9] denied the

Motion for a Preliminary Injunction finding that the Court did not have jurisdiction over

plaintiff's claims because NAIJ was, at the time, the "exclusive collective bargaining

---

[9] The undersigned judge was randomly reassigned this civil action after Judge O'Grady's
retirement.

representative for non-managerial immigration judges" and the Federal Service Labor-Management Relations Statute ("FSL-MRS") precluded jurisdiction by the district court over NAIJ's claims.[10]  [Dkt. No. 31] at 1, 6, 14–15.

The NAIJ appealed the dismissal to the United States Court of Appeals for the Fourth Circuit, which initially affirmed the dismissal on April 4, 2022; however, on April 15, 2022, the Federal Labor Relations Authority decertified plaintiff as a labor union.  Based on that changed circumstance, the Fourth Circuit vacated Judge O'Grady's August 6 order, and remanded this action.[11]  [Dkt. No. 43].

On remand, the plaintiff, now appearing as a voluntary organization, filed an Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint") on August 18, 2022, [Dkt. No. 47].  On October 7, 2022, defendant filed a Motion to Dismiss plaintiff's Amended Complaint, [Dkt. No. 49], which the Court granted on December 2, 2022, because the Amended Complaint had failed to allege that any of NAIJ's members had standing to challenge the 2021 policy, [Dkt. No. 62].  The Court granted plaintiff leave to file a second amended complaint, and, on January 9, 2023, the plaintiff filed the Second Amended Complaint ("SAC"), [Dkt. No. 65], which is at issue in the defendant's Motion to Dismiss, [Dkt. No. 68].

---

[10] The FSL-MRS provides administrative review of actions involving "negotiability" and "unfair labor practice" disputes and requires parties to bring their claims in front of the Federal Labor Relations Authority ("FLRA").  [Dkt. No. 31] at 6–7 (citing Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 752 (D.C. Cir. 2019)).

[11] Defendant's memorandum supporting its Motion to Dismiss indicated that NAIJ was seeking recertification as a union.  If recertified, this Court's jurisdiction over this action would again be stripped by the FSL-MRS; however, plaintiff stated in its opposition that it withdrew its petition for recertification on February 3, 2023.  [Dkt. No. 72] at 3 n.1.

## II. DISCUSSION

EOIR moves to dismiss the SAC under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), arguing that (1) the SAC has failed to allege that plaintiff has Article III standing to bring its First and Fifth Amendment claims; (2) the Civil Service Reform Act ("CSRA") strips the Court of jurisdiction to hear plaintiff's claims; and (3) if the Court has jurisdiction, the SAC should be dismissed for failure to state a claim. For the reasons discussed below, the Court finds that, although the SAC sufficiently alleges that plaintiff has standing, the CSRA divests this Court of jurisdiction to hear plaintiff's claims. As such, the SAC will be dismissed under Rule 12(b)(1).

### A. **Standard of Review**

Under Rule 12(b)(1), "a civil action must be dismissed whenever the court lacks subject matter jurisdiction." Al Shimari v. CACI Premier Tech., Inc., 320 F. Supp. 3d 781, 782 (E.D. Va. 2018). "[B]ecause 'Article III gives federal courts jurisdiction only over cases and controversies,' and standing is 'an integral component of the case or controversy requirement[,]'" motions to dismiss for lack of Article III standing are brought under Rule 12(b)(1). CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 52 (4th Cir. 2011) (quoting Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)). "When a Rule 12(b)(1) challenge is raised, the burden of proving subject matter jurisdiction is on the plaintiff." Ortiz v. Mayorkas, No. 20-7028, 2022 WL 595147, at *2 (4th Cir. Feb. 28, 2022) (citing Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). In evaluating a motion to dismiss based on Rule 12(b)(1), the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (internal quotation marks omitted); see also White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). Without jurisdiction, a court cannot reach any decision on the

13

merits of a plaintiff's claim. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998)

("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to

declare the law, and when it ceases to exist, the only function remaining to the court is that of

announcing the fact and dismissing the cause." (quoting Ex parte McCardle, 74 U.S. (7 Wall.)

506, 514 (1868))). Because the Court does not have jurisdiction over the claims in the SAC, it

will not consider defendant's arguments as to why the SAC should be dismissed pursuant to Rule

12(b)(6).

### B. Analysis

#### 1. Standing

NAIJ brings this civil action "on behalf of its members," [Dkt. No. 65] at ¶ 7, which

means it must establish that it has "associational standing." To do so, it must show that "(1) its

members would otherwise have standing to sue as individuals; (2) the interests at stake are

germane to the group's purpose; and (3) neither the claim made nor the relief requested requires

the participation of individual members in the suit." White Tail Park, 413 F.3d at 458 (quoting

Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 320 (4th Cir. 2002)). To establish

standing, an individual "must show (i) that he suffered an injury in fact that is concrete,

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant;

and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v.

Ramirez, 141 S. Ct. 2190, 2203 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555,

560–561 (1992)).

Standing requirements are "'somewhat relaxed in First Amendment cases,' given that

even the risk of punishment could 'chill[]' speech." Edgar v. Haines, 2 F.4th 298, 310 (4th Cir.

2021), cert. denied, 142 S. Ct. 2737 (2022) (quoting Cooksey v. Futrell, 721 F.3d 226, 235 (4th

Cir. 2013)) (emphasis and alteration in original). A plaintiff "need not show she ceased"

speaking "'altogether' to demonstrate an injury in fact." Benham v. City of Charlotte, N.C., 635

F.3d 129, 135 (4th Cir. 2011) (quoting Smith v. Frye, 488 F.3d 263, 272 (4th Cir. 2007)).

Instead, "a plaintiff must allege that he or she has 'experienced a non-speculative and objectively

reasonable chilling effect,' on speech." Menders v. Loudoun Cnty. Sch. Bd., 65 F.4th 157, 165

(4th Cir. 2023) (quoting Cooksey, 721 F.3d at 236). This chilling effect can be established in

one of two ways. First, a plaintiff "may show that [he or she] intend[s] to engage in conduct at

least arguably protected by the First Amendment but also proscribed by the policy [he or she]

wish[es] to challenge, and that there is a 'credible threat' that the policy will be enforced against

[him or her] when [he or she] do[es] so." Id. (quoting Abbott v. Pastides, 900 F.3d 160, 176 (4th

Cir. 2018)). Second, a plaintiff may allege that he or she intends to comply with the policy, but

in doing so, will suffer "self-censorship." Id. Even under this second path, to establish standing,

the Fourth Circuit has emphasized that "a credible threat of enforcement is critical" because,

without one, a plaintiff cannot show "an objectively good reason for refraining from speaking

and 'self-censoring.'" Abbott, 900 F.3d at 176 (citations omitted).

　　　　Here, the SAC alleges that its members have complied with the 2021 policy's prohibition

on personal capacity speech about immigration and EOIR, and, as a result, have been injured.

For example, the SAC asserts that multiple judges, including Judge Cole, would prefer to speak

or write in their personal capacity about immigration, but instead have requested to speak or

write in their official capacity because they feel compelled to do so. [Dkt. No. 65] at ¶ 49.

Moreover, it alleges that Judge Tsankov has stopped requesting to speak at events or publish

written work about immigration altogether because she believes she will not be permitted to

speak in her personal capacity and does not want to be required to recite EOIR's talking points.

Id. at ¶ 48. Additionally, Judge Straus' choice to comply with the 2021 policy and wait for

EOIR to approve his speech at the Connecticut chapter of the AILA program actually prevented him from speaking because of delays in the approval process. Id. at ¶ 54. These examples show that the SAC has alleged that certain judges have self-censored their speech in an effort to comply with the 2021 policy, and, in some cases, have been denied the ability to speak. See Edgar, 2 F.4th at 310 ("[S]ome plaintiffs alleged that they have decided not to write about certain topics because of the prepublication review policies. Such self-censorship is enough 'for an injury-in-fact to lie.'").

The SAC has also sufficiently alleged that this self-censorship stemmed from an objectively reasonable chilling effect. In assessing whether a chilling effect is objectively reasonable, the Fourth Circuit considers whether a policy "would be 'likely to deter a person of ordinary firmness from the exercise of First Amendment rights,'" and has found that a prepublication review policy similar in important respects to the 2021 policy has met this standard. Edgar, 2 F.4th at 310 (quoting Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011)). Plaintiffs in Edgar v. Haines claimed that a prepublication review policy "allowed agency officials to 'redact material unwarrantedly' . . . and caused them to write some pieces 'differently than [they] would have otherwise written them,'" and that "these infirmities, together with the delays created by the defendants' prepublication review regimes," had "'dissuaded [them] from writing some pieces' they 'would have otherwise written,'" and had "made it more difficult to engage in 'quickly evolving public debates.'" Id. at 310 (alterations in original). The Fourth Circuit found that all of these allegations taken together established an objectively reasonable chilling effect. Id.; see also Menders, 65 F.4th at 165 (finding an objectively reasonable chilling effect was imposed on students who desired to speak about certain issues but refrained from doing so out of fear that they would be investigated under a bias reporting policy).

16

The SAC has similarly alleged that immigration judges' speech has been chilled because they feel compelled to seek approval to speak or write about immigration or the EOIR in their official capacity when they would prefer to do so in their personal capacity, which, at least in Judge Tsankov's situation, has prevented her from speaking or writing about immigration or the EOIR at all. Furthermore, the SAC alleges, similar to the prepublication review scheme at issue in Edgar, that the delays caused by the 2021 policy's lack of definite deadlines have entirely prevented judges from speaking or publishing written works.

Despite defendant's arguments to the contrary, an objectively reasonable chilling effect can be established without a showing of actual discipline. In a recent Fourth Circuit opinion, the court considered whether parents representing their children's interests had standing to challenge a school's policy that permitted "students to anonymously report incidents of perceived bias." Menders, 65 F.4th at 160, 164–66. The parents had alleged that their children wanted to speak in a manner that could be perceived as biased under the school's policy, which could trigger an anonymous report and investigation, and that "any such report, investigation or public disclosure could harm their [children's] standing in the school community and ruin their college or career prospects." Id. at 165. Although the parents' complaint did not allege that any child had actually been disciplined as a result of the policy, the Fourth Circuit concluded that the potential negative impact of a report under the school's policy created an objectively reasonable chilling effect. Id. In so holding, the court explicitly reversed the district court's finding that the parents lacked standing because they "failed to allege that there have been any disciplinary incidents launched as a result of the reporting form or even bias incidents recommended for investigation." Id. at 164–66. Similarly, the SAC alleges that "EOIR has warned judges that failure to comply with its speaking engagement policy may result in disciplinary action, including reprimand, suspension,

and even removal from the federal service." [Dkt. No. 65] at ¶ 20. This warning establishes that there is potential liability for any judge who fails to follow the 2021 policy. The threatened discipline, which could include termination, present in this case is far more severe than the investigation or public disclosure of certain speech that the Fourth Circuit found sufficient to establish an objectively reasonable chilling effect in Menders. As such, the SAC has adequately alleged that the 2021 policy has an objectively reasonable chilling effect on plaintiff's members.

The SAC has also satisfied the causation requirement for standing by alleging that the 2021 policy caused this self-censorship. For example, it alleges that Judge Tsankov has been deterred "from seeking approval to discuss substantive questions of immigration law in her private capacity" by the 2021 policy. [Dkt. No. 65] at ¶ 48. The SET's determination that Judge Cole could only publish his forthcoming article in his official capacity, and the subsequent edits it required him to make to his article, resulted from the 2021 policy. Id. at ¶ 49. These allegations that the 2021 policy caused the alleged chilling effects are sufficient to establish causation for purposes of the standing inquiry. See Edgar, 2 F.4th at 311 ("The chilling of the plaintiffs' speech was plainly alleged to have been caused by the particular prepublication review regimes at issue here. As the plaintiffs alleged, they would publish more but for those regimes." (emphasis in original) (citing Cooksey, 721 F.3d at 238)).

Furthermore, the relief requested by plaintiff—a declaratory judgment that the 2021 policy violates the First and Fifth Amendments and an order enjoining defendant from continuing to enforce the 2021 policy—would redress plaintiff's alleged injury—the chilling of certain judges' speech. See id. (finding "more than 'a non-speculative likelihood that [plaintiffs'] injury would be redressed by a favorable judicial decision" when "[a] favorable

decision on the plaintiffs' behalf would deem the defendants' regimes unconstitutional and enjoin the defendants from enforcing them." (citing Cooksey, 721 F.3d at 238)).

Accordingly, the SAC's allegations support the conclusion that plaintiff's members have standing to bring this First Amendment challenge. Defendant does not contest the two other required showings for associational standing—namely that "the interests at stake are germane to the group's purpose" and that the action does not "require[] the participation of individual members in the suit," White Tail Park, 413 F.3d at 458 (quoting Friends for Ferrell Parkway, 282 F.3d at 320), and the Court finds that plaintiff's challenge to the EOIR's speaking policy is sufficiently germane to the purpose of NAIJ as a voluntary association of non-supervisory immigration judges and that plaintiff's facial challenge will not require the participation of individual members in this action. For these reasons, the SAC has alleged plaintiff's associational standing as to its First Amendment claim that the SAC constitutes a prior restraint on speech.

Defendant also argues that the SAC fails to allege standing as to the plaintiff's First and Fifth Amendment claim that the 2021 policy is void for vagueness because it does not allege that any individual judge was treated arbitrarily by the 2021 policy. Responding to a similar challenge to a plaintiff's First and Fifth Amendment void for vagueness claim, the district court in Edgar recognized that "a provision may be impermissibly vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement,'" and found that the plaintiffs had plausibly alleged an injury in the form of a chilling effect by alleging that "their works have been arbitrarily redacted and excised, in part because of discrimination against the viewpoints they contain." Edgar v. Coats, 454 F. Supp. 3d 502, 528 (D. Md. 2020), aff'd sub nom. Edgar, 2 F.4th 298 (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)). The Fourth Circuit affirmed,

finding that the plaintiffs had sufficiently alleged that the "vagueness and breath of the
defendants' prepublication review regimes" created a chilling effect.  Edgar, 2 F.4th at 310.
Although the SAC does not specifically allege that any judge's work has been redacted because
the EOIR wanted to discriminate against certain viewpoints, it has alleged that redactions and
delays imposed by the 2021 policy have created a chilling effect on the speech of judges and
have deprived some judges of speaking at all because of the delay in approving speaking
requests.  Additionally, it has alleged that the 2021 policy could permit arbitrary enforcement as
supervisors and the SET have sole discretion over whether to label speech as official or personal
capacity, and limited guidance exists within the 2021 policy to cabin this discretion.  At this
stage, these allegations are sufficient to state an injury in fact as to plaintiff's Fifth Amendment
void for vagueness claim.  Because the SAC has adequately alleged that the 2021 policy directly
causes the alleged injuries and that a change of this policy would redress the injuries, and given
that defendant did not contest the other requirements for associational standing, the Court finds
that plaintiff has standing to raise a void for vagueness claim.

### 2.  Civil Service Reform Act

Defendant next contends that the CSRA strips this Court's jurisdiction over plaintiff's
claims.  Congress passed the CSRA to "replace the haphazard arrangements for administrative
and judicial review of personnel action," and, in doing so, created "an elaborate 'new framework
for evaluating adverse personnel actions against [federal employees].'"  United States v. Fausto,
484 U.S. 439, 443–44 (1988) (alteration in original) (quoting Lindahl v. OPM, 470 U.S. 768, 773
(1985)).  This framework regulates virtually every aspect of federal employment and "prescribes
in great detail the protections and remedies applicable to such action[s], including the availability
of administrative and judicial review."  Id. at 443.  When considering actions taken against

federal employees covered by this elaborate framework, courts almost always find that Congress intended to preclude district court jurisdiction over their claims.

The CSRA provides carefully crafted remedial administrative review schemes for three types of personnel actions taken against federal employees, two of which are relevant here.[12] First, Chapter 23 lays out "merit systems principles" by which agencies must abide. See 5 U.S.C. § 2301(b). That chapter also classifies certain violations of those principles as "prohibited personnel practices," defined by the CSRA as "any one of fourteen acts that supervisory employees may not take" against covered federal employees. Rydie v. Biden, No. 21-2359, 2022 WL 1153249, at *5 (4th Cir. Apr. 19, 2022). For example, it prohibits a supervisor from taking any "personnel action"—including "disciplinary or corrective action" or "any other significant change in duties, responsibilities, or working conditions"—against an employee if taking the action "violates any law." § 2302(a)(2)(A), (b)(12).[13] A federal employee who has experienced a "prohibited personnel practice" must file the allegation with the Office of Special Counsel ("OSC" or the "Special Counsel"). § 1214(a)(1)(A). The Special Counsel is then required to "investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." Id. If the Special Counsel determines that there are reasonable grounds to believe that a personnel action was taken or is to be taken as a result of a prohibited personnel practice, the Special Counsel must investigate the allegation and report its determination together with any findings or recommendations to the MSPB, the employing

---

[12] The third, found in Chapter 43 of the CSRA, "provides that before an employee can be removed or reduced in grade for unacceptable job performance certain procedural protections must be afforded." Fausto, 484 U.S. at 446; see 5 U.S.C. § 4303.

[13] Unless otherwise indicated, all sections cited refer to title 5 of the United States Code.

agency, and the Office of Personnel Management. § 1214(b)(2)(B).[14]  If the employing agency

does not take corrective action within a reasonable period of time, "the Special Counsel may

petition the [MSPB]," and the MSPB can order corrective action. § 1214(b)(2)(C).  Whenever

the Special Counsel petitions the MSPB for corrective action, both the agency involved and the

federal employee who is subject to the prohibited personnel practice have an opportunity to

provide written comments to the MSPB. § 1214(b)(3).  Judicial review of the MSPB's final

order is available in the United States Court of Appeals for the Federal Circuit. § 1214(c);

§ 7703(b)(1)(A).

    If the Special Counsel determines that there are not reasonable grounds to believe that a

personnel action was taken or is to be taken as a result of a prohibited personnel practice, it may

terminate the investigation.  When the Special Counsel terminates an investigation, it must notify

the employee of: 1) the "relevant facts ascertained by the Special Counsel, including the facts

that support, and the facts that do not support, the allegations;" and 2) the reasons for the

termination of the investigation. § 1214(a)(2)(A).

    This comprehensive statutory scheme gives the Special Counsel the mandate to bring all

reasonable, nonfrivolous claims of prohibited personnel practices to the employing agency and

the MSPB; and if the MSPB makes a finding as to the agency's need to take corrective action,

that finding is subject to Article III review.[15]  Should the Special Counsel violate this non-

---

[14] The Special Counsel also has the statutory authority to "report any such determination,
findings, and recommendations to the President," including recommendations for corrective
action. § 1214(b)(2)(B).

[15] This mandate is subject to two exceptions, not relevant here.  First, if the substantive law
provides employees the right to appeal directly to the MSPB, employees need not first bring their
claim of a prohibited personnel practice to the OSC. § 1214(a)(3).  Second, the statute provides
that an employee who seeks corrective action for retaliation, as described in § 2302(b)(8) or
§ 2302(b)(9)(A)(i), (B), (C), or (D) may themselves appeal to the MSPB after first going to the
OSC.

discretionary statutory duty to investigate an employee's allegations, a federal district court has

subject matter jurisdiction to issue a writ of mandamus directing the Special Counsel to

investigate the claim.[16]

Federal employees can challenge more serious personnel actions, that is "adverse

actions," through the second statutory scheme outlined in Chapter 75 of the CSRA. See Rydie,

2022 WL 1153249, at *3. Among the types of adverse actions subject to this scheme are "a

suspension for 14 days or less," § 7502, "removal," "a suspension for more than 14 days," or "a

reduction in pay," § 7512(1)–(5). When challenging an adverse action, a federal employee is

afforded a number of procedural rights, including notice of the action, a right to respond,

representation by counsel, and a written decision as to the action. § 7513(b). Employees against

whom an adverse action is taken do not need to go through the Special Counsel, but can directly

appeal the agency's written decision to the MSPB, § 7503(c), 7513(d), and can then appeal an

unsatisfactory MSPB decision to the Federal Circuit, § 7703(b)(1)(A). Federal employees who

challenge these more serious adverse actions therefore have a more expeditious journey to an

Article III court after the administrative process.

Although federal district courts typically have jurisdiction "of all civil actions arising

under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, Congress may

"impliedly' preclude jurisdiction by creating a statutory scheme of administrative adjudication

---

[16] See, e.g., Weber v. United States, 209 F.3d 756 (D.C. Cir. 2000); Carson v. U.S. Off. of
Special Couns., No. 04-0315-PLF, 2006 WL 785292, at *3 (D.D.C. March 27, 2006) (finding
that district courts have jurisdiction to review whether OSC conducted an investigation); Hunt v.
U.S. Dep't of Agric., 740 F. Supp. 2d 41, 51 (D.D.C. 2010) ("This Court only has jurisdiction to
review whether OSC conducted an investigation, it cannot pass on the merits of OSC's decision
to terminate an investigation." (citation omitted)); Krasfur v. Davenport, 736 F.3d 1032 (6th Cir.
2013) ("A court may not review the Special Counsel's decisions unless the Counsel has declined
to investigate a complaint at all." (internal quotation marks omitted)).

and delayed judicial review in a particular court." Bennett v. U.S. Sec. & Exch. Comm'n, 844

F.3d 174, 178 (4th Cir. 2016) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207

(1994)).  To determine whether Congress intended to divest district courts of jurisdiction, courts

generally apply the two-part test enumerated in Thunder Basin Coal Co., 510 U.S. 200.  Bennett,

844 F.3d at 178, 181.  "First, [courts] ask whether Congress's intent to preclude district-court

jurisdiction is 'fairly discernible in the statutory scheme.'"  Id. at 181 (quoting Thunder Basin,

510 U.S. at 207).  "Second, [courts] ask whether [a] plaintiff['s] 'claims are of the type Congress

intended to be reviewed within this statutory structure.'"  Id. at 181 (quoting Thunder Basin, 510

U.S. at 212).  At this second step, courts evaluate three factors: "(1) whether the statutory scheme

'foreclose[s] all meaningful judicial review.' . . . (2) the extent to which the plaintiff's claims are

'wholly collateral' to the statute's review provisions, and (3) whether 'agency expertise could be

brought to bear on the . . . questions presented.'"  Id. (alteration in original) (quoting Thunder

Basin, 510 U.S. at 212–13, 215).

　　　At step one, the United States Supreme Court has concluded that it is fairly discernable

from the CSRA's scheme that Congress intended to preclude district-court jurisdiction over

certain covered actions brought by covered federal employees. Elgin v. Dep't of Treasury, 567

U.S. 1, 11–12 (2012); Rydie, 2022 WL 1153249, at *4.  Acknowledging "the painstaking detail

with which the CSRA sets out the method for covered employees to obtain review of adverse

employment actions," the Supreme Court held that "it is fairly discernible that Congress intended

to deny such employees an additional avenue of review in district court." Elgin, 567 U.S. 11–12;

Rydie, 2022 WL 1153249, at *4.

　　　At step two, to present claims of the type intended to be reviewed through the statutory

scheme, a plaintiff must both be a covered employee and bring a covered action.  Neither party

disputes that immigration judges are "covered employees" under the CSRA.[17]  Plaintiff primarily

argues that the SAC does not challenge a covered employment action under the CSRA, and, as

such, the CSRA process would not provide meaningful judicial review of plaintiff's claims,

which are wholly collateral to the CSRA process.  Plaintiff also argues that, even if an

immigration judge could bring a challenge to a prohibited personnel practice through the

CSRA's administrative scheme, there is no meaningful judicial review because he or she would

not be guaranteed review by an Article III court under the CSRA's scheme.  Additionally,

plaintiff contends that, because its claims are "purely constitutional" and do not challenge a

covered action, the MSPB's expertise in adjudicating workplace issues in the executive branch

would not come to bear on plaintiff's claims.  By contrast, defendant argues that plaintiff's

challenge does fall under the CSRA because its First and Fifth Amendment claims "arise directly

out of [judges'] employment with EOIR and their alleged dissatisfaction with a condition of that

employment."  [Dkt. No. 69] at 17.  Moreover, defendant contends that the Fourth Circuit has

rejected the idea that the CSRA's process does not provide meaningful judicial review when an

employee challenges a lesser prohibited personnel practice.

> a.  Meaningful Judicial Review

"A statutory scheme provides meaningful judicial review, even if it requires litigants to

begin in an administrative forum, so long as an appeal to an Article III court is available 'in due

course.'"  Rydie, 2022 WL 1153249, at *5 (quoting Bennett, 844 F.3d at 186).  If it "pose[s] a

risk of some additional and irreparable harm beyond the burdens associated with the dispute

---

[17] The CSRA defines a "covered position" as including "any position in the competitive service," § 2302(a)(2)(B), § 7511(a)(1)(A), which includes "all civil service positions in the executive branch," § 2102(a)(1), and excludes limited categories of positions, which are not relevant here. See Rydie, 2022 WL 1153249, at *5–*6 & n.8.

resolution process," or requires the plaintiff "to 'bet the farm . . . by taking [a] violative action' before 'testing the validity of [a] law" to obtain relief, the statutory scheme fails to provide meaningful judicial review. Id. (alterations in original) (quoting Tilton v. Sec. & Exch. Comm'n, 824 F.3d 276, 286 (2d Cir. 2016), then quoting Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 490 (2010)). Whether an administrative scheme provides meaningful judicial review is the most important factor at step two of the Thunder Basin analysis. Bennett, 844 F.3d at 183 n.7.

For the CSRA's scheme to provide meaningful judicial review, the plaintiff must challenge an action covered under the statute. The parties first dispute whether plaintiff's facial challenge to the 2021 policy, which has been made before any disciplinary actions have been taken or proposed against any of plaintiff's members, can constitute a CSRA covered action. Second, even if the plaintiff's members could bring these claims through the CSRA, the parties dispute whether the CSRA process provides for meaningful judicial review in an Article III court.

i.  Covered Action Under the CSRA

Plaintiff argues that it would not receive meaningful judicial review under the CSRA because the CSRA's scheme does not govern an employee speech policy such as the 2021 policy. Plaintiff emphasizes that, rather than "challenging [an] individual personnel decision[,] . . . it is challenging a policy that imposes a prior restraint on the speech of all immigration judges."[18] [Dkt. No. 72] at 30 (emphasis in original). By contrast, defendant contends that

---

[18] Plaintiff appears to argue that its status as an organization, rather than as an individual, means it could not bring a challenge under the CSRA. There is no support for this argument. Cf. Feds for Med. Freedom v. Biden, 63 F.4th 366, 369 (5th Cir. 2023) (en banc) (considering a CSRA challenge including organizational plaintiffs without concluding that the status of the organizational plaintiffs affected the CSRA analysis). To accept plaintiff's argument would permit any group of federal employees aggrieved in the same way to form a voluntary

26

plaintiff's First Amendment claims "arise directly out of [judges'] employment with EOIR and their alleged dissatisfaction with a condition of that employment." [Dkt. No. 69] at 17. As such, defendant argues that plaintiff's members could bring this challenge under the CSRA's administrative scheme as either a challenge to a significant change in the judges' working conditions, or as a hypothetical challenge to the discipline that could result if an individual judge did not comply with the 2021 policy. The Court agrees that the 2021 policy constitutes a significant change in working conditions in that it effectively eliminates all personal capacity speech involving immigration- or EOIR-related topics, and that plaintiff's members can challenge it as a prohibited personnel practice under the CSRA. The Court rejects defendant's argument that plaintiff's members could challenge either a prohibited personnel practice or an adverse action under the CSRA based on the hypothetical discipline judges may face.[19]

The CSRA prohibits a "supervisory employee," defined as "[a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action," § 2302(b), from "tak[ing] or fail[ing] to take any . . . personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit

---

association to bring an action in the district court in the first instance, an unacceptable loophole in the CSRA's structure when the same individual members in the voluntary association would otherwise have to bring their challenges through the CSRA.

[19] Although the Fourth Circuit has held that the CSRA provides the exclusive remedy to challenge prospective, more serious adverse actions if the actions have been "proposed," Rydie, 2022 WL 1153249, at *6, because the SAC has only alleged that judges have been "warned" that failing to comply with the policy could lead to disciplinary actions and that discipline "may" result from violating the policy, it has not alleged a "proposed" adverse action that the plaintiff can properly challenge under the CSRA. [Dkt. No. 65] at ¶ 20. Furthermore, in contrast with the plaintiffs in Rydie, whose complaint had alleged that they intended to not comply with the policy at issue, Rydie, 572 F. Supp. 3d 153 (D. Md. 2021), vacated and remanded, 2022 WL 1153249, [Dkt. No. 1] at ¶¶ 18, 22, plaintiff here has alleged that its members intend to comply with the 2021 policy, meaning that no discipline could be proposed. Moreover, plaintiff is correct, and defendant cites no contrary authority, that the provisions governing less severe personnel actions do not permit employees to challenge purely prospective or hypothetical disciplinary action.

system principles" as stated in the CSRA, which includes constitutional violations.
§ 2302(b)(12); Rydie, 2022 WL 1153249, at *5 ("Violations of an employee's constitutional
rights fall within this subsection." (citing Weaver v. U.S. Info. Agency, 87 F.3d 1429, 1432
(D.C. Cir. 1996)).  Included in the list of personnel actions is a "significant change in duties,
responsibilities, or working conditions."  § 2302(a)(2)(A)(xii).  As defendant correctly argues,
the actions the 2021 policy requires supervisors to take in reviewing immigration judges'
requests to speak or write about immigration matters represents a "significant change in duties,
responsibilities, or working conditions," and, because the SAC has alleged that the policy
compels supervisors to act in a way that violates the First and Fifth Amendments, it has alleged a
CSRA-covered action.  § 2302(b)(12).

  The parties primarily dispute whether the 2021 policy's restrictions on speech change the
"working conditions" of immigration judges, or whether these restrictions solely affect the
"private, off-the-job speech of employees."  [Dkt. No. 72] at 32 (emphasis in original).  Although
the CSRA does not define "working conditions," courts have interpreted the term to encompass
broadly the circumstances that affect an employee's job.  For example, the Supreme Court has
interpreted the term "working conditions" in "the labor-management provisions of the CSRA,"
Turner v. U.S. Agency for Glob. Media, 502 F. Supp. 3d 333, 367 (D.D.C. 2020), to mean "the
'circumstances' or 'state of affairs' attendant to one's performance of a job."  Fort Stewart Sch.
v. Fed. Labor Relations Auth., 495 U.S. 641, 645 (1990) (citation omitted); see also Dep't of
Def. Dependents Sch. v. Fed. Labor Relations Auth., 863 F.2d 988, 990 (D.C. Cir. 1988),
judgment vacated on reh'g on other grounds, 911 F.2d 743 (D.C. Cir. 1990) (interpreting the
same provision to mean the "the day-to-day circumstances under which an employee performs
his or her job.").  In interpreting the specific CSRA provision at issue here, the Federal Circuit

has found that "'working conditions' most naturally connote[] the physical conditions under

which an employee labors," but has also acknowledged that the ambiguity in the meaning of

"conditions" could make it "possible to give it a broader interpretation to mean the conditions

that the employee must satisfy to qualify for the job." Hesse v. Dep't of State, 217 F.3d 1372,

1378 (Fed. Cir. 2000); see also Mahoney v. Donovan, 721 F.3d 633, 636 (D.C. Cir. 2013)

(interpreting this provision to include actions that "affect the ability of administrative law judges

to do their jobs efficiently and effectively," and that "interfere with . . . [the] decisional

independence" of administrative law judges when adjudicating matters); Turner, 502 F. Supp. 3d

at 367 ("[C]ourts have determined that the term "working conditions" generally refers to the

daily, concrete parameters of a job, for example, hours, discrete assignments, and the provision

of necessary equipment and resources.").

Although the SAC alleges that the 2021 policy primarily burdens the private speech of

judges, the policy broadly affects how judges interact with their supervisors and the EOIR,

governs what types of speaking or writing they may do within their official capacities, and

enforces these restrictions through traditional workplace disciplinary measures. For example,

Judge Straus' exchange with his supervisor discussing the types of statements he may make in an

official capacity speech about immigration court practice represents a traditional exchange

between supervisor and employee as to how an employee should represent an agency at an

external event. Moreover, the SAC's challenge to the requirement that immigration judges

receive approval to attend speaking engagements during working hours certainly constitutes a

challenge to a working condition, as the regulation of how employees may take time off during

working hours meets even the narrowest understanding of a working condition. Although the

restrictions in the 2021 policy may not directly bear on immigration judges' key responsibilities

of adjudicating matters that come before them, the CSRA's "working conditions" provision has

no primary purpose test. Instead, consistent with other courts' interpretation, it encompasses the

circumstances that relate to one's performance of a job. The 2021 policy governs just that.

The enumerated personnel actions found in § 2302(a)(2)(A) before "change in . . .

working conditions" confirm that "working conditions" encompasses a significant policy

governing employee's speech such as the 2021 policy. For example, § 2302(a)(2)(A) includes

the following categories of personnel action: "disciplinary or corrective action," "a performance

evaluation," and "a decision concerning pay, benefits, or awards, or concerning education or

training. . . ." Most relevant here, it also includes "the implementation or enforcement of any

nondisclosure policy, form, or agreement." § 2302(a)(2)(A)(x)–(xi). Listing enforcement of a

nondisclosure policy as a personnel practice suggests that Congress intended to include a policy

regulating the speech of employees in the types of "working conditions" that federal employees

can challenge through the CSRA process. See Yates v. United States, 574 U.S. 528, 545 (2015)

("[W]here general words follow specific words in a statutory enumeration, the general words are

[usually] construed to embrace only objects similar in nature to those objects enumerated by the

preceding specific words." (alteration in original) (quoting Washington State Dept. of Social and

Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2003))).

Plaintiff urges the Court to follow three out-of-circuit decisions that held certain First

Amendment challenges fell outside of the CSRA's scheme. Weaver, 87 F.3d at 1429; Turner v.

U.S. Agency for Glob. Media, 502 F. Supp. 3d 333 (D.D.C. 2020); Firenze v. N.L.R.B., No. 12-

10880-PBS, 2013 WL 639151 (D. Mass. Jan. 10, 2013), report and recommendation adopted,

Firenze v. N.L.R.B., No. 12-cv-10880-PBS, 2013 WL 639148 (D. Mass. Feb. 19, 2013). In

Weaver, the United States Court of Appeals for the D.C. Circuit considered whether an

employee at Voice of America ("VOA") could bring a challenge in district court to a prepublication review policy that required all employees "to submit all speaking, writing, and teaching material on matters of 'official concern' to their employers for review prior to publication," as well as a challenge to an admonishment that she received under this policy. Weaver, 87 F.3d at 1431–32. Although the D.C. Circuit found that the admonishment was a CSRA-covered prohibited personnel practice, it found that the plaintiff did not need to bring her constitutional challenge through the CSRA as "the district court would have" otherwise had "jurisdiction over such a suit, framed as a simple pre-enforcement attack on a regulation restricting employee speech." Id. at 1432–34 (citing United States v. Nat'l Treasury Employees Union, 513 U.S. 454 (1995); Sanjour v. EPA, 56 F.3d 85 (D.C. Cir. 1995) (en banc)). Neither decision cited by the D.C. Circuit considered whether the CSRA barred consideration of the laws and regulations at issue, and, accordingly, do not support the plaintiff's proposition that a pre-enforcement constitutional challenge to an employee speech policy falls outside of the CSRA absent any enforcement (or proposed enforcement) against employees. See [Dkt. No. 31] at 13–14.

Moreover, Weaver did not consider the Thunder Basin factors to determine whether the CSRA precluded jurisdiction, as the Supreme Court in Elgin has since clarified that courts must, even when plaintiffs bring a constitutional challenge. See id.; Elgin, 567 U.S. at 15. As Judge O'Grady has already held, and as the Fourth Circuit has affirmed,[20] the Supreme Court in Elgin "expressly declined to draw 'a jurisdictional rule' based on 'amorphous distinctions' such as whether a plaintiff is bringing a facial or as-applied challenge. . . . The law is clear that, where a

---

[20] The Fourth Circuit initially affirmed Judge O'Grady's decision in full. It was only vacated after the NAIJ was decertified as a union and, accordingly, no longer met the requirements to bring a claim through the FSL-MRS's administrative scheme.

complex statutory scheme is exclusive, that 'exclusivity does not turn on the constitutional

nature' of a plaintiff's claim." [Dkt. No. 31] at 9 (quoting Elgin, 567 U.S. at 15).

Plaintiff has cited to only two opinions that, it contends, support Weaver's conclusion

that "challenges to employee speech policies do not qualify" as CSRA-covered actions, [Dkt.

No. 72] at 30; however, neither decision addresses the same type of broad employee speech

policy as plaintiff challenges here. In Turner, the plaintiffs brought First Amendment challenges

to changes in policy at a government-run media agency, which they alleged permitted Executive

Branch appointees to interfere with journalistic content. Turner, 502 F. Supp. 3d at 348–51, 369.

In concluding that one plaintiff had experienced no covered action, and that the district court had

jurisdiction to consider plaintiff's claim, the court emphasized that the media agency was a "sui

generis environment," and that, in this environment which is "unique among government

agencies, . . . dramatic shifts in policy and practice that implicate the very constitutional rights on

which U.S.-funded international broadcasting is predicated are outside the bounds of a 'working

condition.'" Id. at 367. In Firenze, after the plaintiff sought to publicize that his employer had

sought to use arbitration to adjudicate six grievances that plaintiff had filed in the course of his

employment, his employer sent him an email prohibiting him from doing so, which plaintiff

contended was enforcing a rule from his employer preventing employees from publicizing their

grievances at work. Firenze, 2013 WL 639151, at *2. Plaintiff challenged this email and rule as

a prior restraint in violation of the First Amendment, and, because the court found that this

communication and rule did not constitute a prohibited personnel practice under the CSRA, it

concluded that it had jurisdiction to hear plaintiff's claim. Id. at *6, *8. Neither of the situations

challenged by the plaintiffs in both Turner and Firenze—a broad First Amendment challenge to a

media agency, which the court acknowledged as a "sui generis" environment, and an individual

communication enforcing a rule by an employer prohibiting employees from speaking internally about workplace grievances—are sufficiently similar to a speech policy affecting how all immigration judges can speak about immigration or EOIR to suggest that the 2021 policy does not constitute a CSRA-covered action. And, as stated, Weaver's determination that a prepublication review policy did not constitute a CSRA-covered action is of waning significance after the Supreme Court's decision in Elgin.[21] For all the reasons explained above, notwithstanding plaintiff's reference to these three non-binding decisions, its challenge to the 2021 policy constitutes a challenge to a significant change in working conditions.

### ii. Whether There is Meaningful Review by an Article III Court

Plaintiff contends that CSRA review is inappropriate because it may not have a guaranteed avenue to an Article III court. This is because a federal employee challenging a prohibited personnel practice under the CSRA must first bring the claim to the Office of Special Counsel, which, after mandatory investigation, may decline to petition the MSPB for corrective action, making the decision potentially unreviewable by the Federal Circuit. Yet few courts have encountered the circumstance in which a plaintiff brings a nonfrivolous constitutional claim that is not acted on by the Special Counsel, and thus potentially barring Article III review after the administrative process. See, e.g., Fleming v. Spencer, 718 Fed. App'x. 185, 188 n.2 (4th Cir. 2018) (citing Webster v. Doe, 486 U.S. 592, 603 (1988)) (per curiam); Bridges v. Colvin, 136 F. Supp. 3d 620, 637–48 (E.D. Pa. 2015), aff'd sub nom. Bridges v. Comm'r Soc. Sec., 672 F.

---

[21] In Elgin, the Supreme Court observed that the "MSPB routinely adjudicates some constitutional claims, such as claims that an agency took adverse employment action in violation of an employee's First or Fourth Amendment rights, and that these claims must be brought within the CSRA." 567 U.S. at 12 (emphasis added). It went on to reject petitioner's argument seeking to carve out an exception to the CSRA exclusively for facial or as-applied constitutional challenges. Id.

App'x 162 (3d Cir. 2016).  Contra Krasfur, 736 F.3d at 1038 (requiring a constitutional

challenge to a prohibited personnel practice be exhausted under the CSRA despite the risk of the

Special Counsel refusing to petition the MSPB).

The Thunder Basin analysis specifies that "where Congress simply channels judicial

review of a constitutional claim to a particular court," such as the Federal Circuit, courts should

merely ask whether Congress's intent to divest district courts of jurisdiction is "fairly discernable

in the statutory scheme," Elgin, 567 U.S. at 9 (quoting Thunder Basin, 510 U.S. at 207);

however, the lack of guaranteed access to an Article III court when a plaintiff brings a

constitutional claim implicates "the 'serious constitutional question' that would arise if a federal

statute were construed to deny any judicial forum for a colorable constitutional claim."  Webster

v. Doe, 486 U.S. 592, 603 (1988) (quoting Bowen v. Michigan Academy of Family Physicians,

476 U.S. 667, 681 n.12 (1986)).  To avoid this serious constitutional question, the Supreme

Court has held that "where Congress intends to preclude" any Article III "judicial review of

constitutional claims[,] its intent to do so must be clear."  Webster v. Doe, 486 U.S. at 603 (citing

Johnson v. Robison, 415 U.S. 361, 373–74 (1974)).  Whether Webster's heightened standard

should apply to a colorable constitutional claim that is not guaranteed Article III review under

the CSRA's scheme for prohibited personnel practices is a question that has divided federal

courts.  See Bridges, 136 F. Supp. 3d at 637–48 (collecting cases).

The Supreme Court's decision in Elgin provides guidance but not an answer to this

question because the plaintiffs in Elgin had suffered an adverse action,[22] meaning they were

---

[22] Plaintiffs were federal employees who were terminated for their failure to comply with the
Military Selective Service Act, which requires male citizens and permanent residents between
the ages of 18 and 26 to register for the selective service.  Elgin, 567 U.S. at 6–8.  Plaintiffs
challenged the federal statute that authorized their terminations as an unconstitutional bill of
attainder, and as unconstitutional discrimination on the basis of sex.  Id.  The court found the

34

guaranteed the ability to bring their constitutional challenges to an Article III court.[23]  Petitioners

in Elgin had urged the court to apply Webster's heightened, clear-statement standard to the

CSRA to determine whether Congress had intended to divest the district court of jurisdiction

over their constitutional claims. Elgin, 567 U.S. at 9.  In deciding to apply the Thunder Basin

factors instead, the court emphasized that Webster's heightened standard only applies to "a

statute that purports to 'deny any judicial forum for a colorable constitutional claim,'" but did not

apply "where Congress simply channels judicial review of a constitutional claim to a particular

court." Id. (quoting Webster, 486 U.S. at 603).  Because the petitioners in Elgin had a structural

guarantee that they would be able to bring their constitutional claims to the Federal Circuit, the

Court applied Thunder Basin to determine the preclusive effect of the CSRA.  Essential to the

court's determination was that the petitioners could bring their claims to the Federal Circuit, and

that the Federal Circuit would eventually be able to adjudicate the constitutional issues

underlying plaintiffs' lawsuit. Id. at 10 ("[T]he CSRA does not foreclose all judicial review of

petitioners' constitutional claims, but merely directs that judicial review shall occur in the

---

CSRA precluded district court jurisdiction over plaintiffs' claims because when "constitutional
claims are the vehicle by which [a plaintiff] seek[s] to reverse" an adverse action, a plaintiff's
claims must proceed exclusively through the CSRA's scheme. Id. at 22.

[23] As described, the CSRA provides two different avenues of review that depend on the type of
action taken against a federal employee. More serious adverse actions, such as proposed
termination, can be brought to the MSPB, and the employee can then appeal the MSPB's
decision to the Federal Circuit. § 7703(b)(1)(A).  Accordingly, federal employees who challenge
an adverse action will be guaranteed Article III judicial review should they seek it. By contrast,
less serious prohibited personnel practices must first be brought to the OSC, who then "may
petition" the MSPB for review.  § 1214(b)(2)(C).  The OSC's discretionary authority means that
federal employees who challenge a less serious prohibited personnel practice may not receive
Article III judicial review.  But the availability of judicial review under the CSRA can still be
meaningful despite the inability of a plaintiff to assert a pre-enforcement challenge initially in
federal court.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 757 (D.C. Cir.
2019) ("[I]t is the comprehensiveness of the statutory scheme involved, not the adequacy of
specific remedies thereunder, that counsels judicial abstention." (quoting Am. Fed'n of Gov't
Emps. v. Sec. of Air Force, 716 F.3d 633, 638 (D.C. Cir. 2013)).

Federal Circuit."). Accordingly, although Elgin did not confront the issue presented here, which involves a prohibited personnel practice rather than an adverse action, it emphasized the importance of the eventual review of plaintiff's constitutional claims by the Federal Circuit.

The Fourth Circuit has directly considered whether Webster's heightened standard applies to constitutional challenges to prohibited personnel practices. In the 1984 decision Pinar v. Dole, 747 F.2d 899 (4th Cir. 1984), the Fourth Circuit held that a plaintiff challenging a letter of reprimand and a two day suspension as violative of his First Amendment rights must go through the CSRA's administrative scheme to challenge a prohibited personnel practice, even if he would not have a guaranteed recourse to an Article III court. Id. at 910–11. The court emphasized that, to hold otherwise would "fly in the face of" Congressional intent to guarantee more serious, adverse actions, recourse to an Article III court, and guarantee less serious, personnel actions, only administrative review. Id. at 911.

Defendant argues that Pinar conclusively establishes that, even with a lack of guaranteed Article III review, the CSRA provides meaningful judicial review for prohibited personnel practices; however, more recent Fourth Circuit opinions have cast doubt on the continued relevance of Pinar's holding. In 1991, the Fourth Circuit considered again whether a federal employee must bring his First Amendment claim through the CSRA process, but "decline[d] to address the continuing vitality of Pinar" to the case, instead, finding that the plaintiff lacked Article III standing to bring his claims. Bryant v. Cheney, 924 F.2d 525, 528 (4th Cir. 1991). The Fourth Circuit had the occasion in Bryant to address whether Pinar remained good law because of a remand from the Supreme Court. In a prior opinion in Bryant, the Fourth Circuit had found that the district court lacked jurisdiction over the claim, stating "Pinar holds that recourse to CSRA procedures is [plaintiff's] exclusive remedy in challenging punitive personnel

actions on the basis that they were undertaken in retaliation for his exercise of his [F]irst

[A]mendment rights." Bryant v. Weinberger, 838 F.2d 465 (4th Cir. 1988) (unpublished table

decision), cert. granted, judgment vacated sub nom. Bryant v. Carlucci, 488 U.S. 806 (1988).

The Supreme Court vacated and remanded the initial opinion "for further consideration in light

of Webster v. Doe, 486 U.S. 592 . . . (1988)," Bryant, 488 U.S. 806 (1988), the opinion which

stated definitively that "where Congress intends to preclude judicial review of constitutional

claims its intent to do so must be clear," Webster, 486 U.S. at 603.

More recently, albeit in an unpublished opinion, the Fourth Circuit held that Webster's

clear statement test should apply to determine whether the CSRA provides meaningful judicial

review of a prohibited personnel practice. In Fleming v. Spencer, 718 Fed. App'x. 185 (4th Cir.

2018), the court upheld a district court's decision to dismiss an action for lack of jurisdiction

when the plaintiff challenged prohibited personnel practices as violative of his First Amendment

rights. Id. at 187–89. This time, the Fourth Circuit cast the jurisdictional deficiencies as a

failure to exhaust administrative remedies, rather than assuming that the CSRA completely

stripped district court jurisdiction to hear any constitutional claims that federal employees had

brought through the CSRA process. See id. at 188 ("The CSRA plainly precludes extrastatutory

judicial review of constitutional claims that are asserted before an employee has exhausted his

remedies available under the statute."). When contemplating the CSRA's exhaustion

requirement, the court observed that "[a] different question would be presented here if [plaintiff]

had brought his constitutional claim to the OSC and been denied an opportunity to pursue that

claim in the Federal Circuit. In such a case, this court would need to address whether 'Congress

intend[ed] [for the CSRA] to preclude judicial review of constitutional claims.'" Fleming, 718

Fed. App'x. at 188 n.2 (later alterations in original) (citing Webster, 486 U.S. at 603). This

approach is consistent with that of other courts that have similarly found that the CSRA does not

preclude all access to Article III courts when a plaintiff raises a colorable constitutional claim,

but require a plaintiff to exhaust administrative remedies by first bringing her claim to the OSC.

See, e.g., Weaver, 87 F.3d at 1433; Irizarry v. United States, 427 F.3d 76, 77 (1st Cir. 2005).

Here—without question—plaintiff raises a reasonable, nonfrivolous First Amendment

challenge to the 2021 policy, the type of constitutional claim that the Special Counsel would be

required to investigate and report its determination and recommendation to the MSPB, the

employing agency, and the Office of Personnel Management. § 1214(b)(2)(B). Should the

agency fail to take corrective action within a reasonable period of time, the Special Counsel

could then petition the MSPB seeking corrective action of the nonfrivolous claim.

§ 1214(b)(2)(C). But plaintiff has taken no such action before the Special Counsel as required

by the CSRA. Nor has plaintiff actually been denied an opportunity to bring its constitutional

claims to the Federal Circuit after proceeding through the statute's adjudicative structure.

Accordingly, plaintiff has not exhausted its administrative remedies, and, under more recent

Fourth Circuit precedent that suggests a plaintiff must exhaust administrative remedies through

the CSRA process before bringing constitutional challenges to prohibited personnel practices in

district court, the CSRA process does not on this record deny plaintiff meaningful judicial

review. Moreover, Fleming suggests that, should plaintiff proceed through the CSRA process

and not receive Article III review of its constitutional claims, it would be able to return to district

court. For example, plaintiff would be well within its right to return to this Court seeking a

petition for a writ of mandamus if the Special Counsel failed to investigate its nonfrivolous

constitutional claims, at which time this Court could order the Special Counsel to abide by its

statutory mandate and conduct such an investigation, starting the congressionally-designed CSRA process once more. See supra at 23 n.16.

Plaintiff's common rejoinder centers on the hypothetical scenario in which the Special Counsel fails to pursue its constitutional claims with the agency and the MSPB. But this postulated argument—which does not reflect the facts of this case—cannot overshadow the balance that Congress has struck in "establish[ing] a comprehensive system for reviewing personnel action taken against federal employees." Fausto, 484 U.S. at 455; Elgin, 567 U.S. at 5. By design, the Special Counsel weeds out only frivolous complaints, see § 1214(b)(2)(B); and frivolous arguments—even those constitutional in nature—have no special entitlement to reach a federal court. Moreover, the Special Counsel also weeds out grievances that agencies stand ready to redress without litigation. See § 1214(b)(2)(C). Beyond that, various safeguards attending the Special Counsel procedure diminish the risk of blocking meritorious constitutional challenges. The Special Counsel has every incentive to help wronged federal employees. In creating the Office of Special Counsel, Congress empowered the independent officeholder to expose agency misbehavior and to "protect employees . . . from prohibited personnel practices." § 1212(a). The Special Counsel receives his appointment from the President, may be removed only for cause, chooses his staff without interference from other executive agencies, and has independent authority to launch investigations, to participate in MSPB proceedings, and to file amicus briefs. §§ 1211(b), 1212(b)-(d), (h).

Allowing plaintiff to pivot straight to federal district court would undermine a central element of the CSRA's architecture: the harsher the action, the greater the employee's entitlement to judicial review. See Kloeckner v. Solis, 568 U.S. 41, 44 (2012) (" [The CSRA] provides graduated procedural protections depending on an action's severity."). Under Elgin,

employees facing more severe adverse actions must go through the MSPB before bringing their constitutional challenges in federal court. Under plaintiff's theory, however, employees facing less severe decisions (prohibited personnel practices) would enjoy immediate judicial review without resort to the administrative process. Put another way, an immigration judge would have more extensive and immediate remedies for a reprimand than for a dismissal, more for a temporary reassignment than for a permanent demotion, and more for a denial of leave to attend a speaking engagement than for a two-week suspension.[24]

The CSRA serves another purpose which goes unaddressed by plaintiff: ensuring that federal workplaces across the country follow a uniform body of law developed by the Federal Circuit. Elgin, 567 U.S. at 6, 14 ("The CSRA's objective of creating an integrated scheme of review would be seriously undermined if . . . a covered employee could challenge a covered employee action first in a district court, and then again in one of the courts of appeals, simply by alleging that the statutory authorization for such action is unconstitutional."). Here, plaintiff attempts to challenge a prohibited personnel practice in a regional circuit, which might have a divergent interpretation of the underlying constitutional claims than the court of Congress's choosing—the Federal Circuit.[25]

Plaintiff's interpretation of the CSRA and this Court's jurisdiction attempts to bypass the comprehensive system established by Congress for addressing the personnel complaints of federal employees. Because meaningful judicial review of nonfrivolous constitutional claims is

---

[24] Moreover, if a federal district court adjudicated a constitutional claim before the Special Counsel had an opportunity to investigate the claim, it would deny the agency the opportunity to correct its own mistakes. Direct review in federal court would also eliminate the opportunities to have issues first focused, or potentially resolved, by the Special Counsel.

[25] See Krasfur, 736 F.3d at 1040 (Sutton, C.J.) (discussing the risk of forum shopping if prohibited personnel actions could be routed to the regional circuits instead of through the Special Counsel and ultimately the Federal Circuit).

ultimately available through the statutory scheme, plaintiff's constitutional claims cannot escape the exhaustion requirement of the CSRA.

### iii.   Whether There is Otherwise No Meaningful Review

Plaintiff otherwise argues that it would not receive meaningful judicial review under the CSRA because an immigration judge may be forced to provoke a disciplinary action to receive any judicial review and review through this process could delay relief for so long as to cause "additional and irremediable harm beyond the burdens associated with the dispute resolution process." Bennett, 844 F.3d at 186 n.13 (4th Cir. 2016) (quoting Tilton v. Sec. & Exch. Comm'n, 824 F.3d 276, 286 (2d Cir. 2016)).

A statutory scheme including administrative and judicial review does not provide meaningful judicial review when it requires a plaintiff "to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law," Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 490 (2010) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007)); see also Rydie, 2022 WL 1153249, at *5; however, merely bringing a pre-enforcement challenge to a policy does not force employees to "bet the farm." For example, the Fourth Circuit in Rydie found that the plaintiffs did not need to be disciplined before challenging the policy because they could challenge the policy as a proposed covered action. Rydie, 2022 WL 1153249, at *5. Similarly here, immigration judges can bring a CSRA challenge to the 2021 policy as a change in working conditions, and therefore do not need to experience any disciplinary actions before bringing a CSRA challenge. See Payne v. Biden, 602 F. Supp. 3d 147, 160 (D.D.C. 2022), aff'd, No. 22-5154, 2023 WL 2576742 (D.C. Cir. Mar. 21, 2023) ("[Plaintiff's] ability to challenge a change in his working conditions via the OSC allows him to raise his constitutional claims before termination is even proposed.").

Plaintiff also argues that requiring it to pursue its claims through the CSRA would unduly delay resolution of the prior restraint on speech allegedly created by the 2021 policy. "A scheme that 'pose[s] a risk of some additional and irreparable harm beyond the burdens associated with the dispute resolution process' is not meaningful" review. Rydie, 2022 WL 1153249, at *5 (alterations in original) (quoting Tilton, 824 F.3d at 286). The Fourth Circuit has held that when employees challenge covered actions under the CSRA, the administrative process generally does not impose any additional burdens beyond those associated with traditional litigation. Id.

Plaintiff argues that a challenge to a prior restraint on speech requires a faster resolution than the CSRA can provide as it represents "the most serious and the least tolerable infringement on First Amendment rights," Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976), and, in other situations, courts have held that plaintiffs bringing First Amendment challenges need not exhaust administrative remedies because this delay may result in irreparable injury. See Able v. United States, 88 F.3d 1280, 1289 (2d Cir. 1996); Ramirez v. U.S. Customs & Border Prot., 709 F. Supp. 2d 74, 84 (D.D.C. 2010); see also Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 376 F.3d 239, 244 (4th Cir. 2004) (Wilkinson, J., concurring); however, the time plaintiff has spent litigating this civil action rather than pursuing remedies through the administrative scheme belies its contention that pursuing its claims through the CSRA would create irreparable harm. That no individual immigration judge has chosen to proceed through the administrative scheme after almost three years of litigation suggests that the irreparable harm faced by judges is not so great that the CSRA's process would fail to provide meaningful judicial review. Moreover, in Rydie, the Fourth Circuit found that the CSRA's procedure created no burdens outside those of traditional litigation even when the Rydie plaintiffs filed suit only three weeks before they needed to receive the first dose of a COVID-19 vaccine or risk being fired. See Rydie, 2022 WL

1153249, at *5; Rydie v. Biden, 572 F. Supp. 3d 153 (D. Md. 2021), vacated and remanded,

2022 WL 1153249 (4th Cir. Apr. 19, 2022), [Dkt. No. 1] at ¶ 2.  If the three-week deadline

present in Rydie did not mandate review by a district court in the first instance, plaintiff's

challenge to a speech policy enacted in 2021 does not here.

### b.  Wholly Collateral

Thunder Basin's second factor at step two asks whether claims are "wholly collateral" to

the CSRA's review process.  "[C]laims are not wholly collateral when they are 'the vehicle by

which [petitioners] seek to'" challenge a CSRA-covered action.  Bennett, 844 F.3d at 186

(quoting Elgin, 567 U.S. at 22).  "In other words, a claim isn't wholly collateral to the CSRA if

the Board 'regularly adjudicate[s]' similar challenges."  Rydie, 2022 WL 1153249, at *7

(alteration in original) (quoting Elgin, 567 U.S. at 22).  As the Fourth Circuit has acknowledged,

because this factor also focuses on whether a plaintiff challenges a covered action, it does not

have much "independent significance."  Bennett, 844 F.3d at 187.  Here again, plaintiff argues

that it does not challenge a CSRA-covered action, but instead, brings a "'general challenge' to an

employee speech policy," [Dkt. No. 72] at 35; however, as discussed, plaintiff challenges a

significant change in the working conditions of immigration judges, and, as such, its claims are

not wholly collateral to the CSRA scheme. See Elgin, 567 U.S. at 22 (finding a claim not wholly

collateral when it was "precisely the type of personnel action regularly adjudicated by the Board

and the Federal Circuit within the CSRA scheme.").

### c.  Agency Expertise

The third step-two Thunder Basin factor requires courts to determine "whether 'agency

expertise could be brought to bear on the . . . questions presented.'"  Bennett, 844 F.3d at 181

(quoting Thunder Basin, 510 U.S. at 212, 215).  Plaintiff contends that its constitutional claims

are beyond both the OSC and the MSPB's agency expertise because they have "never had

occasion to evaluate the constitutionality of a broad prior restraint like the [2021] Policy." [Dkt. No. 72] at 36 (emphasis in original). In <u>Elgin</u>, the Supreme Court held that, even if an Article III court may be necessary to ultimately adjudicate the constitutional issues in an employee's claim, the MSPB is competent to adjudicate the "threshold questions that may accompany a constitutional claim" such as "preliminary questions unique to the employment context." <u>Elgin</u>, 567 U.S. at 22. As agency expertise can be brought to bear on a challenge to a prohibited personnel practice, the OSC and the MSPB have agency expertise relevant to adjudicate plaintiff's claims.[26]

### III. CONCLUSION

In sum, evaluating the <u>Thunder Basin</u> factors, it is fairly discernable that Congress intended the CSRA scheme to preclude district court jurisdiction over plaintiff's challenge to the 2021 policy. Were plaintiff's members to pursue their reasonable, nonfrivolous constitutional claims through the CSRA's administrative process and fail to secure review in the Federal Circuit, it is possible that plaintiff would then be entitled to district court review; however, at this stage, this Court is satisfied that it lacks jurisdiction over plaintiff's claims.

For the reasons stated above, defendant's Motion to Dismiss [Dkt. No. 68] will be GRANTED by an Order to be issued with this Memorandum Opinion.

Entered this 21st day of September, 2023.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

[26] For example, the OSC and the MSPB, having broad jurisdiction over federal employees, may actually have more experience with the restriction, if any, imposed on administrative law judges throughout the federal sector, which could be relevant when assessing the merits of plaintiff's First and Fifth Amendment challenges. Although counsel provided examples of only two other agencies—the Social Security Administration and the Patent and Trademark Office—that had speech policies for its administrative judges, the OSC or the MSPB may know of more.

Order
(ECF No. 78), filed September
21, 2023

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NATIONAL ASSOCIATION OF                )
   IMMIGRATION JUDGES, affiliated with the  )
   International Federation of Professional and )
   Technical Engineers,                 )
                       )       1:20-cv-731 (LMB/JFA)
        Plaintiff,              )
                       )
     v.                     )
                       )
DAVID L. NEAL, in his official capacity as )
   Director of the Executive Office for  )
   Immigration Review,                   )
                       )
        Defendant.              )

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendant's Motion

to Dismiss [Dkt. No. 68] is GRANTED, and it is hereby

ORDERED that judgment be and is entered in favor of defendant.

The Clerk is directed to enter judgment in defendant's favor pursuant to Federal Rule of

Civil Procedure 58, forward copies of this Order and Memorandum Opinion to counsel of record,

and close this civil action.

Entered this $\underline{21}$ day of September, 2023.

Alexandria, Virginia

                                /s/
                                Leonie M. Brinkema
                                United States District Judge

Notice of Appeal
(ECF No. 80), filed November
19, 2023

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers, | |
| *Plaintiff*, | Civil Action No. 20 Civ. 731 (LMB/JFA) |
| v. | |
| DAVID L. NEAL, in his official capacity as Director of the Executive Office for Immigration Review, | |
| *Defendant*. | |

**NOTICE OF APPEAL**

**NOTICE IS HEREBY GIVEN** that Plaintiff the National Association of Immigration

Judges hereby appeals to the United States Court of Appeals for the Fourth Circuit from this

Court's Memorandum Opinion and Order, entered on September 21, 2023, granting Defendant's

Motion to Dismiss. *See* ECF Nos. 77, 78.

November 19, 2023                           Respectfully submitted,

/s/ *Victor M. Glasberg*                    /s/ *Ramya Krishnan*
Victor M. Glasberg (VA 16184)               Ramya Krishnan, *Pro Hac Vice*
Nickera S. Rodriguez (VA 95952)             Alexia Ramirez, *Pro Hac Vice*
Victor M. Glasberg & Associates             Alex Abdo, *Pro Hac Vice*
121 S. Columbus Street                      Knight First Amendment Institute
Alexandria, VA 22314                          at Columbia University
T: (703) 684-1100                           475 Riverside Drive, Suite 302
F: (703) 684-1104                           New York, NY 10115
vmg@robinhoodesq.com                        T: (646) 745-8500
nrs@robinhoodesq.com                        F: (646) 661-3361
                                            ramya.krishnan@knightcolumbia.org

                                            Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2023, I electronically filed the

foregoing Plaintiff's Notice of Appeal with the clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing.

/s/ *Victor M. Glasberg*
Victor M. Glasberg (VA 16184)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
T: (703) 684-1100
F: (703) 684-1104
vmg@robinhoodesq.com